IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: CHOCOLATE | : | MDL DOCKET NO. 1935 |
| CONFECTIONARY ANTITRUST | : | (Civil Action No. 1:08-MDL-1935) |
| LITIGATION | : | |
| _____ | : | (Judge Christopher C. Conner) |
| | : | |
| THIS DOCUMENT APPLIES TO: | : | |
| | : | |
| ALL DIRECT PURCHASER | : | |
| CLASS ACTION CASES | : | |

## DIRECT PURCHASER PLAINTIFFS'
## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Brookshire Brothers, Ltd., Card & Party Mart II Ltd., Stephen L. LaFrance Pharmacy, Inc. d/b/a SAJ Distributors, Jones Vend and OCS Distributing, Inc., PITCO Foods, The Lorain Novelty Co., Inc., Diane Chiger and Marc and Jill Lavin, individually and on behalf of all those similarly situated, bring this action for damages and injunctive relief under the antitrust laws of the United States against the defendants.

## NATURE OF THE ACTION

1.    This case arises from a conspiracy among the largest chocolate manufacturers to fix, raise, maintain, and stabilize the price at which Chocolate Candy (as defined below) would be sold, in violation of U.S. antitrust law. Specifically, beginning in December 2002, after a long period of stable pricing for Chocolate Candy, defendants enacted a series of parallel price increases for Chocolate Candy despite declining demand and largely stable raw material costs for which defendants were substantially insulated from any price spikes through futures contracts and/or forward purchasing.

2.    Defendants' conduct in the U.S. is consistent with the information contained in affidavits from the Canadian Competition Bureau, detailing how defendants met secretly at coffee shops, restaurants, and trade conventions, and communicated via telephone and email to fix prices for chocolate confectionery products.  The Canadian affidavits also reveal that the conspiracy involved senior employees in *both* the United States and Canada.  Furthermore, the U.S. market for Chocolate Candy exhibits several economic features commonly found in markets where price fixing has occurred, including: a small number of sellers with a dominant share of the market, highly diffuse buyers in comparison to the concentrated sellers, high barriers to entry, and ample opportunities to

communicate with one another through trade associations and other business relationships.

3.      Plaintiffs bring this antitrust class action on behalf of all persons and entities who directly purchased Chocolate Candy in the United States or for delivery into the United States from December 9, 2002 to at least December 20, 2007 (the "Class Period").  As a result of defendants' unlawful conduct, plaintiffs and the other members of the Class paid artificially inflated prices for Chocolate Candy.  Such prices exceeded the amount they would have paid if the prices had been determined in a competitive market.

4.      "Chocolate Candy," as used herein, refers to chocolate bars and other chocolate confectionery products (*e.g.*, 3 Musketeers, Hershey's Kisses, Dove Chocolates, M&Ms, etc.) packaged to be sold at retail.

## JURISDICTION AND VENUE

5.      Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, from defendants for their violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

7.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the defendants reside in this district.

8.     This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business in the United States, including in this district; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Chocolate Candy in the United States, including in this district; (c) had substantial contacts with the United States, including this district; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business in the United States, including in this district.

## PLAINTIFFS

9.     Plaintiff Brookshire Brothers, Ltd. is a partnership organized under the laws of the State of Texas with its principal place of business at 1201 Ellen Trout Drive, Lufkin, Texas.  Brookshire Brothers, Ltd. directly purchased Chocolate Candy in the United States from one or more defendants during the Class Period.

10.    Plaintiff Card & Party Mart II Ltd. is an Illinois corporation with its principal place of business at 4216 W. Belmont Ave., Chicago, Illinois.  Card & Party Mart II Ltd. directly purchased Chocolate Candy in the United States from one or more defendants during the Class Period.

11.    Plaintiff Stephen L. LaFrance Pharmacy, Inc. (d/b/a SAJ Distributors) is an Arkansas corporation with its principal place of business at 3017 North Midland Drive, Pine Bluff, Arkansas.   Stephen L. LaFrance Pharmacy, Inc. conducts its retail and wholesale pharmacy and sundries business as SAJ Distributors. Stephen L. LaFrance Pharmacy, Inc. directly purchased Chocolate Candy in the United States from one or more defendants during the Class Period.

12.    Plaintiff Jones Vend and OCS Distributing, Inc. is a Missouri corporation with its principal place of business at 5409 Bulwer Avenue, St. Louis, Missouri. Jones Vend and OCS Distributing, Inc. directly purchased Chocolate Candy in the United States from one or more defendants during the Class Period.

13.    Plaintiff PITCO Foods is a food wholesaler headquartered at 567 Cinnabar Street, San Jose, California.  PITCO Foods directly purchased Chocolate Candy in the United States from one or more defendants during the Class Period.

14.    Plaintiff The Lorain Novelty Co., Inc. is an Ohio corporation with its principal place of business at 1735 Broadway, Lorain, Ohio. The Lorain Novelty

15.     Plaintiffs Brookshire Brothers, Ltd., Card & Party Mart II Ltd., Stephen L. LaFrance Pharmacy, Inc. d/b/a SAJ Distributors, Jones Vend and OCS Distributing, Inc., PITCO Foods, and The Lorain Novelty Co., Inc. (collectively, "the Wholesale Direct Purchaser Plaintiffs") purchased Chocolate Candy directly from defendants for re-sale during the Class Period.   The Wholesale Direct Purchaser Plaintiffs are members of the Wholesale Direct Purchaser Component of the Class (defined below at ¶ 37).

16.     Plaintiff Diane Chiger is a resident of Jackson, New Jersey.   Ms. Chiger directly purchased Chocolate Candy in the United States from one or more defendants during the Class Period.

17.     Plaintiffs Marc and Jill Lavin are residents of West Hills, California. Mr. and Mrs. Lavin directly purchased Chocolate Candy in the United States from one or more defendants during the Class Period.

18.     Plaintiffs Diane Chiger and Marc and Jill Lavin (collectively, "the Consumer Direct Purchaser Plaintiffs") purchased Chocolate Candy directly from defendants for personal consumption and/or as gifts during the Class Period.   The Consumer Direct Purchaser Plaintiffs are members of the Consumer Direct Purchaser Component of the Class (defined below at ¶ 37).

## DEFENDANTS

19.     Defendant The Hershey Company is a Delaware corporation with its principal place of business at 100 Crystal A Drive, Hershey, Pennsylvania.  The Hershey Company dominates the market for chocolate in the United States, with more than 40% of the market.  It manufactures several popular Chocolate Candy products, including, *inter alia*, Hershey's Kisses, Reese's Peanut Butter Cups, Hershey's Milk Chocolate Bar, Hershey's Dark Chocolate Bar, Mr. Goodbar, and 5th Avenue.  During the Class Period, The Hershey Company manufactured, sold, and/or distributed Chocolate Candy throughout the United States.

20.     Defendant Hershey Canada, Inc. ("Hershey Canada") is a Canadian corporation with its principal place of business at Airport Corporate Centre, 5750 Explorer Drive, Mississauga, Ontario.   Hershey Canada is a wholly-owned subsidiary of The Hershey Company that manufactures, distributes, and sells confectionery, snack, refreshment, and grocery products in Canada.   Hershey Canada's operations are overseen by Hershey North America, the division of The Hershey Company responsible for sales and marketing in the U.S. and Canada. During the Class Period, Hershey Canada sold and/or distributed Chocolate Candy in the United States and/or had Chocolate Candy available for purchase by members of the Class (defined below at ¶ 37).

21.    Defendants The Hershey Company and Hershey Canada are collectively referred to herein as "Hershey."

22.    Defendant Mars, Inc. is a privately held Delaware corporation with its principal place of business at 6885 Elm Street, McLean, Virginia.  Mars, Inc. is the second largest manufacturer of Chocolate Candy in the United States, holding approximately 26% of the market.  Mars, Inc.'s major Chocolate Candy products include, *inter alia*, Snickers, 3 Musketeers, Milky Way, Twix, M&Ms, Dove Chocolates, and Mars Bars.  During the Class Period, Mars, Inc. manufactured, sold, and/or distributed Chocolate Candy throughout the United States.

23.    Defendant Mars Snackfood U.S. LLC is headquartered at 800 High Street, Hackettstown, New Jersey.  It is a business unit of Mars, Inc. During the Class Period, Mars Snackfood U.S. LLC manufactured, sold, and/or distributed Chocolate Candy throughout the United States.

24.    Defendant Mars Canada, Inc. ("Mars Canada") is a Canadian corporation with its principal place of business at 37 Holland Drive, Bolton, Ontario.  Mars Canada is a subsidiary of and the Canadian division of Mars, Inc. Prior to May 8, 2007, Mars Canada was known as Effem, Inc., a name derived from the initials of Mars' founder Frank Mars.  Mars, Inc. organizes its food and snack operations through its Mars North America division.   During the Class

Period, Mars Canada sold and/or distributed Chocolate Candy in the United States and/or had Chocolate Candy available for purchase by members of the Class.

25.   Mars, Inc., Mars Snackfood U.S. LLC and Mars Canada are collectively referred to herein as "Mars."

26.   Defendant Nestlé S.A. is a Swiss entity with its principal place of business at Avenue Nestlé 55, CH-1800 Vevey, Switzerland.   Nestlé S.A. is the world's largest food and beverage company.   Nestlé S.A. is the manufacturer of several well-known Chocolate Candy products, including Baby Ruth, Butterfinger, Nestlé Crunch Bar, and 100 Grand.   Nestlé S.A. organizes its business by geographic zone.   Its "Zone Americas" includes the U.S. and Canada.   During the Class Period, Nestlé S.A. manufactured, sold, and/or distributed Chocolate Candy in the United States.

27.   Defendant Nestlé U.S.A., Inc. ("Nestlé U.S.A.") is a Connecticut corporation with its principal place of business at 800 North Brand Boulevard, Glendale, California.   Nestlé U.S.A. is a wholly-owned subsidiary of Nestlé S.A. During the Class Period, Nestlé U.S.A. manufactured, sold, and/or distributed Chocolate Candy throughout the United States.

28.   Defendant Nestlé Canada, Inc. ("Nestlé Canada") is a Canadian corporation with its principal place of business at 25 Sheppard Avenue West, Floors 18-22, North York, Ontario.   Nestlé Canada is a wholly-owned subsidiary

of Nestlé S.A.  During the Class Period, Nestlé Canada sold and/or distributed Chocolate Candy in the United States and/or had Chocolate Candy available for purchase by members of the Class.

29.     Defendants Nestlé S.A., Nestlé U.S.A., and Nestlé Canada are collectively referred to herein as "Nestlé."

30.     Defendant Cadbury Holdings Ltd. (formerly known as Cadbury Schweppes plc) is a major international food and beverage company incorporated under the laws of the United Kingdom of Great Britain, with its headquarters located at 25 Berkeley Square, London WIJ 6HB, United Kingdom.  As stated in Cadbury's Amended Rule 7.1 Corporate Disclosure filed on June 13, 2008, Cadbury Schweppes plc changed from a public to a private company and changed its name to Cadbury Holdings Ltd.  During the Class Period, Cadbury licensed several popular Chocolate Candy products to Hershey for sale in the United States, including York Peppermint Pattie, Mounds and Almond Joy.  During the Class Period, Cadbury organized its businesses by geographic region and included the U.S. and Canada in its Americas region.  During the Class Period, Cadbury Holdings Ltd. (formerly known as Cadbury Schweppes plc) directly and/or through its predecessors, affiliated companies, subsidiaries and licensee manufactured, sold, and/or distributed Chocolate Candy in the United States.

31.    Defendant Cadbury plc is a British entity with its principal place of business at 25 Berkeley Square, London, W1J 6HB, United Kingdom.  According to Cadbury's Amended Rule 7.1 Corporate Disclosure filed on June 13, 2008, Cadbury plc, a publicly traded corporation, is the parent company of Cadbury Holdings Ltd.  During the Class Period, Cadbury plc directly and/or through its predecessors, affiliated companies, subsidiaries and licensee manufactured, sold, and/or distributed Chocolate Candy in the United States.

32.    Cadbury Adams Canada, Inc. ("Cadbury Adams Canada") is a Canadian corporation with its principal place of business at 5000 Yonge Street, Suite 2100, Toronto, Ontario.  Cadbury Adams Canada is a subsidiary of defendant Cadbury plc.   During the Class Period, Cadbury Adams Canada sold and/or distributed Chocolate Candy in the United States and/or had Chocolate Candy available for purchase by members of the Class.

33.    Defendants Cadbury Holdings Ltd., Cadbury plc, and Cadbury Adams Canada are referred to collectively herein as "Cadbury."

## AGENTS AND CO-CONSPIRATORS

34.    The acts alleged against the defendants in this Complaint were authorized, ordered, and/or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' businesses and affairs.

35.     Various other persons, corporations, and/or firms not named as defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

36.     Each defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by plaintiffs.

## CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring this action on behalf of a Class of direct purchasers of Chocolate Candy (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).   The Class is composed of two components of direct purchasers:

The  Wholesale Direct Purchaser Component

All persons and entities who directly purchased Chocolate Candy, for re-sale, from any defendant or any predecessor, controlled subsidiary affiliates or division of any defendant, in the United States or for delivery into the United States at any time from December 9, 2002 to at least December 20, 2007.   Excluded from the Wholesale Direct Purchaser Component of the Class are governmental entities, Defendants, or any present or former parent, subsidiary or affiliate thereof.   Also excluded from the Wholesale Direct Purchaser Component of the Class are Meijer, Inc., Meijer Distribution, Inc., Publix Supermarkets, Inc., CVS Pharmacy, Inc., Rite Aid Corporation, Rite Aid Hdqtrs

Corp., Longs Drug Stores California, Inc., The Kroger Co., Safeway, Inc., Walgreen Co., Hy-Vee, Inc., Giant Eagle, Inc., Affiliated Foods, Inc., Food Lion, LLC, Hannaford Bros. Co., and Kash N' Karry Food Stores, Inc.

<u>The Consumer Direct Purchaser Component</u>

All persons or entities who directly purchased Chocolate Candy, for personal consumption and/or as gifts, from any defendant or any predecessor, controlled subsidiary affiliates or division of any defendant, in the United States or for delivery into the United States at any time from December 9, 2002 to at least December 20, 2007. Excluded from the Consumer Direct Purchaser Component of the Class are governmental entities, Defendants, or any present or former parent, subsidiary or affiliate thereof.

38.   The Wholesale Direct Purchaser Component and the Consumer Direct Purchaser Component are collectively referred to as the "Class."

39.   Plaintiffs do not know the exact size of the Class or each component thereof because such information is in the exclusive control of the defendants. Due to the nature of the trade and commerce involved, plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States as to render joinder of all Class members impracticable.

40.   Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class have all sustained damage in that they purchased Chocolate Candy at artificially inflated, non-competitive prices

established by the actions of defendants in connection with the restraint of trade alleged herein.

41.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

42.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  The questions of law and fact include, but are not limited to:

> a.     whether defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, and stabilize prices of Chocolate Candy sold in the United States and/or for delivery into the United States;
>
> b.     the identity of the participants in the conspiracy;
>
> c.     the duration of the conspiracy and the acts carried out by defendants and their co-conspirators in furtherance of the conspiracy;
>
> d.     whether the conspiracy violated the Sherman Act;

e.   whether the conduct of defendants and their co-conspirators caused injury to the businesses and property of the plaintiffs and the other members of the Class;

f.   the effect of the conspiracy on the prices of Chocolate Candy sold in the United States and/or for delivery into the United States during the Class Period;

g.   whether the defendants and their co-conspirators fraudulently concealed the conspiracy's existence from plaintiffs and the other members of the Class; and

h.   the appropriate measure of damages.

44.   A class action is superior to the alternative methods, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.  Class treatment will permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate the antitrust claim asserted in this Complaint.

## TRADE AND COMMERCE

45.     Throughout the Class Period, defendants manufactured, sold, and shipped substantial quantities of Chocolate Candy in a continuous and uninterrupted flow of interstate commerce throughout the United States, including in this District. Defendants' Canadian subsidiaries also manufactured, sold, and shipped substantial quantities of Chocolate Candy in a continuous and uninterrupted flow of foreign import commerce into the United States and/or had Chocolate Candy available for purchase by members of the Class.

46.     The unlawful activities of defendants that are the subject of this Complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

## FACTUAL ALLEGATIONS

**A.      The Market For Chocolate Candy Is Susceptible To Price-Fixing**

47.     Each defendant, either itself, through its subsidiaries, or through licensing agreements with other defendants described in more detail below, produces and sells chocolate candy bars, bagged chocolate products and seasonal novelty chocolates that are interchangeable and in competition with chocolate candy bars, bagged chocolate products and seasonal novelty chocolates offered by other defendants.  All Chocolate Candy serves the same purpose for consumers as

packaged chocolate snacks, which are sold in standardized sizes.  In this regard, Chocolate Candy consists of commodity-like products.

48.    Chocolate Candy constitutes a distinct product market recognized by defendants, the trade associations that serve their industry, and governmental agencies that have examined the industry.  According to statistics reported by the United States Department of Agriculture, in 2006, wholesale sales of chocolate candy in the U.S. totaled approximately $10.2 billion.

49.    The United States is a net importer of confectionery products, including Chocolate Candy products, and the value of imported confectioneries has grown steadily as manufacturers close factories in the United States.  According to U.S. Customs, in 2003, confectionery imports into the United States totaled 639,000 tons, valued at $1.8 billion.  40% of confectionery imports into the United States are chocolate confectionery products.

50.    In connection with defendants' planned imports of Chocolate Candy from Canada into the United States, the defendants from time to time have sought "tariff classifications" from the United States Customs and Border Protection agency ("CBP").   For example, Hershey has sought and obtained tariff classifications from the CBP in connection with planned imports into the United States of Mr. Goodbar chocolate bars and York Peppermint Patties from Canada,

Hershey's Kisses from Canada, and Hershey's Krackel candy bars from Canada, among other forms of Chocolate Candy.

51.    In 1997, Canada exported approximately $413 million (Canadian) in chocolate confectionery products, representing 69% of Canadian confectionery exports for that year.  95% of these Canadian confectioneries were imported into the United States.

52.    During the Class Period, defendants controlled the majority of the Chocolate Candy market in the United States and Canada.  In 2006, for example, The Hershey Company had a United States market share of approximately 43%, Mars, Inc. had nearly 26%, and Nestlé U.S.A. had about 8%.   In Canada, defendants control approximately 64% of the Chocolate Candy market.

53.    Defendants manufacture Chocolate Candy in Canada which is sold directly to purchasers in the United States.  *See, e.g.*, the picture inserted below, which represents a 3 Musketeers Mint chocolate bar from a shipment received by plaintiff Jones Vend and OCS Distributing, Inc. which contains a "Made in Canada" stamp on the wrapper.



54.    Other cross-border commerce occurs as a result of the licensing agreements between or among defendants.

55.    The "buyer" side of the market is highly diffuse, consisting of all manner of wholesale distributors, chain grocery stores, mass merchandisers, chain drug stores, vending companies, wholesale clubs, convenience stores, dollar stores, concessionaires, department stores and other outlets.  Because of the sheer number and diversity of buyers, in comparison to the highly concentrated "seller" side, buyers are not able to influence prices in any meaningful way.

56.    Additionally, there are high barriers to entry to the Chocolate Candy market in the form of technical know-how, brand recognition and advertising, and access to distribution channels.  Because of their high collective market share in the United States and Canada, defendants are able to exercise market power in the United States and Canada, including the ability to raise prices.

57.    Industry commentators have noted these high barriers to entry.  The 2007 MATRADE New York report mentioned above stated: "[t]he US Chocolate market is a mature market.  Private label companies and upstarts face high barriers to entry from the leading manufacturers.  The Hershey Company and Mars, Inc. dominate the US chocolate confectionery industry, with Nestlé the only foreign manufacturer who has made inroads with the US market."  Defendant Cadbury sells its York, Almond Joy and Mounds Chocolate Candy products in the United

States through a longstanding licensing agreement with Defendant Hershey, which provides that senior management representatives of Cadbury are to meet with Hershey each quarter to discuss the marketing, promotion and sale.

58.    The concentrated market share held by defendants, the commodity-like nature of Chocolate Candy, lack of buyer power, and high barriers to entry all make the Chocolate Candy market susceptible to anticompetitive conduct and make the conspiracy alleged herein plausible.

**B.    Defendants Engaged In A Conspiracy To Increase Prices For Chocolate Candy In The United States And Canada**

59.    From the mid-1990s until December 2002, prices for Chocolate Candy were relatively stable in the United States.  Beginning in late 2002, despite stagnant or declining demand and stable or declining raw material costs for which defendants were insulated through futures contracts and/or forward purchasing, defendants departed from historical practice and enacted a series of parallel price increases for Chocolate Candy.

60.    On or about December 9, 2002, Mars instituted price increases of approximately 10.7% on its regular sized chocolate bars ("Singles"), and approximately 22% on its Multi-Pack Six Packs for several of its chocolate bars (Milky Way, Snickers, 3 Musketeers, Snickers Almond, Twix Caramel Cookie), purportedly driven by the rising cost of raw materials, labor and transportation.

61.     On or about December 11, 2002, Hershey announced a price increase of approximately 10.7% for its regular sized chocolate bars ("Standard Bars") effective January 1, 2003, approximately 13.6% for its King Size bars, approximately 7.6% for its 6-Packs of bars, and approximately 15.4% for its 10-Packs of bars.

62.     On or about December 13, 2002, Nestlé instituted a price increase of approximately 10.3% on its regular sized chocolate bars ("Singles"), approximately 14.5% on its king size bars ("Kings") and approximately 16.8% on its multi-count packs ("10-pack"), purportedly driven by increases in raw material, packaging, labor and transportation costs.

63.     Both PROFESSIONAL CANDY BUYER and CANDY BUSINESS reported on January 1, 2003 that Nestlé U.S.A., Hershey Foods Corp. and Masterfoods USA raised "wholesale candy prices as much as 10.8 percent."

64.     PROFESSIONAL CANDY BUYER and CANDY BUSINESS also noted that "the increases mark the first time the companies have raised prices since 1995."

65.     On or about November 19, 2004, Mars announced a price increase on its baglines ("Peg Packs," "Small Bags," "Medium Bags," "Large Bags," "X-Large Bags," and "Travel Cups") ranging from 2.9% to 15.6%, effective on November 19, 2004. On or about on December 17, 2004, Mars also instituted price increases

of approximately 5.5% on its regular bars ("Singles"), approximately 8.5% on its Multi-Pack Six Packs, and approximately 4.7% on its King Size Packs.

66.    On or about December 15, 2004 Hershey instituted a price increase of approximately 5.5% on its Standard Bars, approximately 4.7% on its King Size bars, approximately 8.5% on its 6-Packs, approximately 5.5% on its Variety Packs, and increases ranging from approximately 2.5% to 7.6% on its Chocolate Packaged Candy, Large Chocolate Peg bags, Kisses Peg Bags, and Travel Cups.

67.    On or about December 22, 2004, Nestlé instituted  a price increase of approximately 5.7% on its regular chocolate bars ("Singles"), approximately 4.8% on its King size bars ("King Bars"), approximately 7.7% on its 6-Packs of chocolate bars, approximately 7.5% on Chocolate Peg Bags and Chocolate Miniatures and additional price increases on other chocolate candy products.

68.    A third round of coordinated price increases was instituted by defendants in March and April of 2007.

69.    On or about March 23, 2007, Mars instituted price increases of approximately 5.3% on its regular chocolate bars ("Singles"), its Multi Packs, its 6-Packs and its Variety Packs, approximately 4.5% for its King-size bars, and approximately 15% for its Dove Packages, citing raw material cost increases and increasing advertising and labor costs.

70.   On or about April 4, 2007, Hershey announced price increases effective April 7, 2007 of approximately 5.2 % for Standard Bars, Standard Size Variety Packs, and 6 Packs, and  approximately 4.5% for King Size Bars and King Size Variety Packs, citing raw material and other cost increases.

71.   On or about April 5, 2007, Nestlé instituted price increases of approximately 5.4%, on its regular chocolate bars ("Singles"), approximately 4.6% on its king size bars ("Kings"), approximately 4.6% on its 6 packs ("6 Pack Trays"), as well as additional price increases on other Chocolate Candy products.

72.   Defendants' parallel price increases in the United States occurred contemporaneously with a series of secret meetings at coffee shops, restaurants, and trade conventions, and communications via telephone and email that began in Canada in February 2002 to fix the prices for Chocolate Candy in Canada.  Those meetings and communications would have involved prices for Chocolate Candy in the United States because, as discussed in more detail below, the Canadian and U.S. operations of the defendants are tightly interwoven.

73.   Moreover, because Defendants had large customers that purchased Chocolate Candy in both the United States and Canada, the threat of arbitrage was present.  This threat required that the price of Chocolate Candy was set in relation to one another in both the United States and Canada.

74.     Consistent with the above, chocolate price indices in Canada were closely correlated with price indices in the United States throughout the Class Period, with price hikes in Canada often following price hikes in the United States by just a few months, and in almost identical amounts.

**C.     Defendants' Price Increases Cannot Be Justified By Increased Demand Or Raw Materials Costs**

75.     Defendants' price increases cannot be justified by principles of supply and demand because demand for Chocolate Candy remained stable or declined during the Class Period as public tastes shifted toward healthier and more upscale products.  Villanova University marketing professor William Madway recently described the Chocolate Candy market as "a mature, bordering on declining, industry."  Indeed, decreasing demand led to the closure of several Hershey manufacturing plants throughout the United States and Canada during the Class Period.  In 2007 alone, Hershey announced plans to reduce its workforce by 11.5%.

76.     Nor can defendants' price increases be justified based on rising raw material costs.  Defendants all have similar basic cost structures.  They use the same basic raw materials such as cocoa beans, milk and sugar, which are traded on commodity exchanges.

77.     The price of cocoa beans, the most significant raw material used to produce Chocolate Candy, either decreased or remained stable from 2003 through

2006. Although there were sporadic increases in the price of cocoa, they were short-lived and substantially offset by futures contracts and/or forward purchasing by defendants. In fact, data compiled by the International Cocoa Organization shows that although there was a spike in the price of cocoa in late 2002, prices were otherwise stable between 2002 and 2006.

78. Sugar is another key ingredient in the manufacture of Chocolate Candy. Sugar prices were stable during the Class Period, with the exception of a brief spike in late 2005 following the 2005 hurricane season. Sugar prices fell in 2006 and 2007 as sugar crops recovered. Likewise, the price of milk fluctuated within a relatively narrow range over the Class Period, and the price was moving down as often as it was moving up.

79. Beginning at least as early as the mid-1990s, Hershey insulated itself from price fluctuations for its major raw materials, including cocoa, sugar and dairy products, as well as from energy costs, by entering into futures contracts and/or forward purchasing for periods of up to two years. Like Hershey, Cadbury enters into forward purchasing agreements and long term contracts to minimize the impact of price fluctuations for its costs. Nestlé has taken similar steps to ensure that it is not a hostage of volatile raw material prices. As a large multinational company, Mars, like its competitors, would engage in strategic purchasing practices to protect itself from volatile prices for its key costs.

80.     Despite their claims of increasing costs and despite their raising prices in the face of stagnant or reduced demand, defendants were able to achieve healthy profits.  For example, in July 2003, Hershey reported that its second quarter net profits rose to $71.5 million compared with $63.1 million for the same period in 2002.  Hershey attributed the increase in profits, in part, to the implementation of the price increase announced in December 2002.  Hershey also credited *decreasing* raw material costs with improving profit margins.  In 2004, Hershey posted a record-breaking net income of $574,637,000.  Hershey explained that its record profitability in 2004 was the result of strong sales growth fueled by new products, more efficient trade spending, and solid cost control.  The company also attributed its extraordinary profits to marketplace momentum, as well as record sales, earnings, and returns despite significant pressures.  In reality, Hershey's soaring profits were partially the result of artificially inflated prices for their Chocolate Candy.

81.     Likewise, as a result of the conspiracy, despite stagnant demand, during the Class Period defendants were able to increase or at least maintain profit margins as a result of their collusively imposed price increases.  For example, Hershey's profit margins from 2001 through 2006 increased, with Hershey posting profit margins of 35.5%, 37.8%, 39.0%, 39.5%, 38.7% and 37.8%, respectively.

**D.**     **Defendants' U.S. And Canadian Operations Are Tightly Interwoven**

82.     Defendants operate their United States and Canadian confectionery businesses on an integrated basis.  For example, Hershey and Mars both employ "North American" divisions or groups to oversee their North American operations. Nestlé and Cadbury organize their businesses by geographic region and recognize the "Americas," which includes the United States and Canada, as a single geographic region.

83.     Furthermore, in October 2006, Hershey's U.S. Commercial Group became the newly established North American Commercial Group (now called "Hershey North America").  The new group was created to "recognize the combination of marketing, customer marketing and sales in the U.S. and Canada." Hershey North America is responsible for sales and marketing operations in both the United States and Canada.  The head of Hershey North America is based in Pennsylvania.

84.     Hershey also aggregates its operations in the United States, Canada, Mexico, and Brazil for segment reporting purposes.  According to Hershey's yearly SEC Form 10-K filings, Hershey "base[s] this aggregation on similar economic characteristics, and similar products and services, production processes, types or classes of customers, distribution methods, and the similar nature of the regulatory environment in each location."

85.     Likewise, defendant Mars organizes its North American food and snack operations through its Mars North America division.  The Mars website has referred to its Canadian operations as a "division" or "unit" of the Virginia-based parent.  Today, Mars participates in the Canadian market through its wholly-owned subsidiary, Mars Canada.

86.     Defendant Nestlé S.A. organizes its business by geographic zone. The United States and Canada are both part of Nestlé S.A.'s "Zone Americas." The Head of Zone Americas is a top corporate official who reports directly to Nestlé S.A.'s Swiss-based Chief Executive Officer.  Indeed, current Nestlé CEO Paul Bulcke was the Executive Vice President responsible for Zone Americas from July 2004 until his appointment as CEO in October 2007.  Paul Polman, formerly Nestlé S.A. Chief Financial Officer, succeeded Mr. Bulcke as Executive Vice President for Zone Americas in October 2007.  According to Nestlé S.A.'s 2007 consolidated financial statements, Zone Americas was Nestlé's largest geographic zone in terms of sales.

87.     Like Nestlé S.A., Cadbury also organizes its business by geographic region and includes the United States and Canada in its Americas region.  The Americas region is led by the President of Americas Confectionery.  According to Cadbury's website, the President of Americas Confectionery is a member of the Chief Executive's Committee who reports to the Board of Directors and "is

accountable for the day-to-day management of the operations and the implementation of strategy." Jim Chambers, the current President of Americas Confectionery, is based in New Jersey. The Americas region, and the United States and Canada in particular, are critical to Cadbury's business. The Americas region accounts for 27% of all revenue at Cadbury. 54% of all sales in the Americas region are made in the United States and Canada.

88.     Thus, it is likely that senior Canadian management with sales, marketing, and pricing responsibility, who reported to defendants' U.S.-based North American operations management or who worked with them as part of an "Americas" region or zone, met and/or communicated with their U.S.-based counterparts and superiors on a periodic basis to discuss sales and marketing strategies, and plans and budgets, including pricing strategies. Accordingly, it is likely that decisions relating to defendants' pricing in Canada were part of defendants' overall North American budgeting and strategic planning process and necessarily affected pricing in the United States.

**E.     Defendants Cooperated Through Licensing Agreements**

89.     During the Class Period, there was a high degree of cooperation among defendants regarding their Chocolate Candy as evidenced by various product licensing agreements. For example, Cadbury has a licensing agreement

with Hershey for the manufacture and sale of Cadbury York, Almond Joy and Mounds brand products in the United States.

90.   Additionally, Hershey has a licensing agreement with Nestlé S.A., which licenses Hershey to manufacture and distribute Chocolate Candy in the United States under the brand names Kit Kat and Rolo.   Hershey and Nestlé also have an agreement whereby Hershey manufactures O-Henry bars in Canada, and Nestlé manufactures them in the United States.

91.   The cooperation among defendants in the form of licensing agreements gave companies that were supposedly in competition with each other multiple opportunities to discuss pricing.   Indeed, the Hershey/Cadbury licensing agreement specifically provides for senior management representatives of Hershey to meet with Cadbury at least once every calendar quarter to review and consult on the marketing, promotion and sale of the licensed products in the United States, including by providing Cadbury with the annual marketing plan for the licensed products.   All parties involved in the licensing agreements stood to profit from the business arrangements, creating a financial incentive to participate in the conspiracy to fix the prices of Chocolate Candy.

## F.   Defendants Cooperated Through Trade Associations

92.   Defendants had the opportunity to collaborate through their memberships in trade associations and industry organizations.   The trade

associations servicing the chocolate and confectionery industry include, but are not limited to: (1) the American Association of Candy Technologists ("AACT"); (2) the National Confectioners Association ("NCA"); (3) the Chocolate Manufacturers Association ("CMA") (which merged with NCA in early 2008 and is now known as the Chocolate Council of the NCA); (4) the Confectionery Manufacturers Association of Canada ("CMAC"); (5) the Food and Consumer Products of Canada ("FCPC"); (6) the Pennsylvania Manufacturing Confectioners Association ("PMCA"); (7) the International Confectionery Association ("ICA"); and (8) the World Cocoa Foundation ("WCF").   These trade associations hold annual meetings, events, and conferences, at which members have the opportunity to discuss the Chocolate Candy industry.

93.     During the Class Period, defendants have been actively involved and have held leadership positions in these trade associations.  For example, the NCA's members include: The Hershey Company, Mars Snackfood U.S., and Nestlé Confections and Snacks Division.   Executives from Masterfoods USA (a division of Mars, Inc.) and The Hershey Company serve on NCA's Executive Board. Executives from Masterfoods USA and Nestlé Confections and Snacks Division serve on NCA's Board of Trustees.  The CMA's members included: The Hershey Company, Mars Snackfood U.S., and Nestlé Confections and Snacks Division. The Hershey Company and divisions of Cadbury and Nestlé are members of

PMCA.  Bob Huzinec of Hershey is the President and Randy Hofberger of Nestlé is a Councilor-at-Large for AACT.

94.     The CMAC lists Cadbury Canada, Hershey Canada, Mars Canada, and Nestlé Canada as active members.  Notably, the CMAC, at whose annual meeting conspiratorial activities took place (*see* ¶ 101 below), and NCA, are members of ICA.  On its website, ICA lists one of its roles in the industry as to provide "an international and *non-competitive* forum for the global confectionery industry and its associates to meet, identify and agree on matters of common interest and action." (emphasis added)

95.     There were also opportunities for conspiratorial activities to take place at dinners hosted by the FCPC.  (*See* ¶ 104 below.)  The FCPC's members include Cadbury Canada, Hershey Canada, Mars Canada, and Nestlé Canada.

96.     A host of organizations and companies are members of the WCF, including the CMAC, the CMA, and the NCA.  The Hershey Company, Mars, Inc., and Nestlé are also members.

97.     Through events and meetings hosted by these trade associations, such as the NCA's annual State of the Industry Conference and the AACT's National Technical Seminar, defendants were able to gather in the same venue and had the opportunity to discuss their plans as they related to the price of Chocolate Candy.  These meetings and conferences included panel discussions on commodities

supply and demand, market analysis, and industry regulation.  Defendants' ability to congregate in these settings also provided ample opportunity to discuss, formulate, and implement the conspiracy during private meetings or away from public gatherings.

## G.   Defendants' Pricing Practices Are Under Investigation By Competition Authorities

98.   On November 28, 2007, the Associated Press reported that Canadian authorities had launched an investigation into an alleged price-fixing scheme among Hershey Canada, Nestlé Canada, Mars Canada, and Cadbury Canada.   The Canadian Competition Bureau's investigation began in July 2007 with the assistance of a cooperating company involved in the conspiracy.  The Canadian Competition Bureau submitted two sets of affidavits on November 19, 2007 and November 28, 2007 in support of its request to obtain search warrants.

99.   The affidavits revealed that senior Canadian executives at Mars, Hershey, and Nestlé met secretly at coffee shops, restaurants, and trade conventions, and communicated via telephone and email to fix prices.  The actual affidavits provide a very detailed set of events and facts which evidence numerous improper communications among the defendants.

100.   According to the affidavits, the conspiracy began in February 2002 when ITWAL, a Canadian candy distributor, coordinated with manufacturers to stop retailers from cutting prices for chocolate bars.  Canadian officials discovered

a set of letters dated February 21, 2002 from Glenn Stevens, President of ITWAL, which were addressed to each of Bob Leonidas (Nestlé Canada), Rick Meyers (Hershey Canada), Don Robinson (Mars Canada), and Arthur Soler (Cadbury Adams Canada). The letters are substantively the same and the following statement was taken from the letter to Nestlé Canada: "At the 'end of the day,' it is only the suppliers' control and discipline of trade spending that can restore functionality of the marketplace. The problem is very serious and completely out of control on the part of the suppliers. I am being forced to reexamine how we operate in the market and I am not sure it would be in the best interests of Nestlé. I urge you to meet and take action before this chocolate bar 'bubble bursts.'" The unprecedented parallel price increases in the United States began in the same year, in December 2002.

101.   At a Chocolate Manufacturers Association of Canada annual meeting held June 2-5, 2005, Bob Leonidas, President and CEO of Nestlé Canada, sought out a witness from the cooperating company and they had a short meeting. Leonidas said words to the effect of "I want you to hear it from the top – I take my pricing seriously" or "We are going to take a price increase and I want you to hear it from the top." Leonidas handed the witness an envelope. The witness agreed that Leonidas would have left the meeting with the idea that the cooperating company would follow a price increase led by Nestlé Canada.

102.   Another example of collusive conduct cited in the affidavits involved a lunch meeting between a witness from the cooperating company and President of Nestlé Confectionery, Sandra Martinez de Arevalo at Auberge du Pommier on July 4, 2007 in Toronto.  Martinez suggested that the cooperating company lead a price increase in 2007, as Nestlé wanted to take a price increase in the third quarter.  The witness replied that he was not prepared to take a price increase in 2007, but indicated that the cooperating company might take one in 2008.  The witness said he would follow on chocolate but not lead.  Martinez said she would call him back in two weeks.  The witness stated that Martinez would have understood that "they were on the same page."

103.   It is evident from both the Canadian Competition Bureau's affidavits and the corporate structures of defendants that defendants' conspiracy involved senior employees in both the United States and Canada.  For example, on January 3, 2007, Humberto Alfonso, Senior Vice President and Chief Financial Officer of The Hershey Company in the United States (formerly Executive Vice President Finance, Chief Financial Officer of Cadbury Schweppes) sent an email to both Eric Lent of Hershey and to an employee of the cooperating company.  Eric Lent, formerly Vice-President of Refreshment, Snacks and Confectionery of the U.S. Commercial Group was named Vice-President and General Manager of Hershey Canada in October 2006.  Eric Lent had pricing authority in the United States

during a portion of the Class Period.  Mr. Alfonso's email included the following statement: "As we discussed, Hershey has recently appointed Eric Lent as Vice President and General Manager for the Canada business.  In keeping with the good advice from 'The Godfather,' keep close to your competition, I am including contact info below in an effort to introduce you both.  All kidding aside, I know Eric is looking forward to meeting you."  Subsequent email communications between Lent and the employee for the cooperating company set up a phone call between the two for 3:30 on January 4, 2007.  As reflected above, these improper contacts were facilitated by a senior official within Hershey's United States operations.

104.   Yet another witness from the cooperating company stated that he first met Lent at a dinner hosted by the Food and Consumer Products of Canada trade association at Niagara-on-the-Lake on September 27, 2007.  As he was getting ready to sit down at a dinner table, the witness was approached by Hershey's Lent. Lent congratulated the witness on his new position and then said: "Hey, by the way, Nestlé is taking a price increase."  Lent continued with either "So we should take advantage" or "we should increase our prices too."  The witness replied either "We should not be having this conversation" or "I am not comfortable having this conversation."  Lent continued: "Don't worry we can talk about it.  Bob and I talk

all the time [Lent pointed to Bob Leonidas].  It's public knowledge that Nestlé is taking its prices up."

105.   As discussed above, the U.S. and Canadian markets for Chocolate Candy are tightly interwoven – including the same defendant manufacturers who operate their U.S. and Canadian confectionery businesses on an integrated basis and substantial cross-border commerce concerning chocolate confectionery products (*see* ¶¶ 49-54; 82-88).

## VIOLATIONS ALLEGED

106.   On or about December 9, 2002, the exact date being unknown to plaintiffs, defendants entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).  Upon information and belief, these activities included the following:

a.      discussing and agreeing upon price increases for Chocolate Candy sold in the United States;

b.      agreeing to fix, increase, stabilize, and/or maintain prices of Chocolate Candy sold in the United States;

c.      issuing price announcements and price quotations in accordance with the agreements reached;

d.      selling Chocolate Candy at the agreed upon prices; and

e.      selling Chocolate Candy to various customers throughout the United States at artificially inflated prices.

107.   The conspiracy alleged herein has had the following effects, among others:

a.      price competition in the sale of Chocolate Candy by defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

b.      prices charged to plaintiffs and the Class for Chocolate Candy have been raised, fixed, maintained, and stabilized at artificially high and non-competitive levels; and

c.      plaintiffs and the Class have been deprived of the benefits of free and open competition in the purchase of Chocolate Candy.

108.   As a direct and proximate result of the unlawful conduct of defendants, plaintiffs and the Class have been injured in their businesses and property in that they paid more for Chocolate Candy than they otherwise would have paid in the absence of the unlawful conduct of defendants.

## FRAUDULENT CONCEALMENT

109.   Throughout the Class Period, defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

110.   Plaintiffs and the members of the Class did not discover, nor could have discovered through reasonable diligence, the existence of the conspiracy alleged herein until at least November 28, 2007, when it was first publicly reported that manufacturers of Chocolate Candy were under investigation by antitrust authorities in Canada, if not until December 20, 2007, when it was disclosed that the U.S. Department of Justice had opened an investigation as well.

111.   Plaintiffs and the members of the Class could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

112.   Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning Chocolate Candy, which they affirmatively concealed, at least in the following respects:

> a.   their discussions and agreement about increasing prices of Chocolate Candy;
>
> b.   by not discussing publicly, or otherwise revealing, the nature and substance of the acts and communications in furtherance of their illegal scheme; and

c.    by giving false and pretextual reasons for increases in the prices of Chocolate Candy sold by them during the Class Period, such as attributing such increases to increased prices for, *inter alia,* raw material component costs, when the latter did not justify the level of increased prices for Chocolate Candy, a conclusion that is supported by third-party economic analysis.

113.   When Hershey announced price increases on its Chocolate Candy in December 2002, December 2004, and April 2007, it concealed the anticompetitive basis for its prices by contending they were due to changes in input costs.  Hershey has claimed:

> We change prices and weights of our products when necessary to accommodate changes in manufacturing costs, the competitive environment and profit objectives, while at the same time maintaining consumer value. Price increases and weight changes help to offset increases in our input costs, including raw and packaging materials, fuel, utilities, transportation, and employee benefits.

114.   In a June 2003 interview with *The Manufacturing Confectioner*, Hershey's President and CEO Richard Lenny explained away price increases by Hershey and its competitors by claiming:

> We were simply responding to a major competitor initiating a price increase.  When a competitor's prices go

up, and other competitors follow, we know that …
retailers tend to move the entire category.

What I don't want to see happen is higher pricing starting
to erode demand.  So, we need to be smart and continue
to invest in our brands, whether it be value-added line
extensions, innovative packaging or sufficient resources
available at retail to help merchandise our items and
programs.   We also need to continue to invest in
advertising to support our brands.

We are the leader in the category.  If the category's going
to do well, the leaders have to support it.  It's not just
taking the price increase to recoup money and improve
profitability.  We do have margins that we want to invest
in the business.  We know it is our job to grow the
category.

115.   Cadbury      disseminated      numerous      misleading      market-based

explanations which served to conceal defendants' anticompetitive conduct.  For

instance, after Cadbury posted strong growth in the first half of 2007, Cadbury plc

CEO Todd Stitzer stated:

First half revenue growth was strong driven by
investment in brands, innovation and market-place
execution.  We expect continued good revenue growth in
the second half, while margins will be impacted by the
combination of growth investments and higher input
costs.

116.   Defendants consistently attributed their price increases to ordinary

market forces and considerations.   In truth, at all relevant times, the prices of

Chocolate Candy were artificially inflated and maintained as a direct result of the

defendants' anti-competitive scheme, the operation of which was a substantial, but undisclosed factor in the pricing of Chocolate Candy during the Class Period.

117.   Because of such fraudulent concealment, and the fact that a price-fixing conspiracy such as this one is inherently self-concealing, plaintiffs and members of the Class could not have discovered the existence of this conspiracy any earlier than its public disclosure.

118.   As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that plaintiffs and members of the Class have as a result of the anticompetitive conduct alleged in this Complaint.

## COUNT I

## VIOLATIONS OF § 1 OF THE SHERMAN ACT

119.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

120.   Defendants and their co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

121.   The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among defendants and their co-conspirators in furtherance of which defendants raised, fixed, stabilized and

maintained prices for Chocolate Candy. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws.

122. Defendants' contract, combination, agreement or conspiracy occurred in or affected interstate and international commerce. Defendants' unlawful conduct was through mutual understanding or agreement between or among defendants and their co-conspirators. These other co-conspirators either have acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

123. Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

> a. prices charged by defendants and their co-conspirators to plaintiffs and the members of the Class for Chocolate Candy were fixed, raised, stabilized, and maintained at artificially high and non-competitive levels in the United States;
>
> b. plaintiffs and the other members of the Class had to pay more for Chocolate Candy than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;
>
> c. price competition in the sale of Chocolate Candy was restrained, suppressed and eliminated in the United States; and

      d.     as a direct and proximate result of the illegal combination, contract or conspiracy, plaintiffs and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief as follows:

A.     A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23(b)(3) on behalf of the Class defined herein, and an Order directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each member of the Class;

B.     A declaration that the unlawful combination and conspiracy alleged herein is an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.     An injunction enjoining, preliminarily and permanently, defendants from continuing the unlawful combination and conspiracy alleged herein;

D.     An award to plaintiffs and each member of the Class damages, as provided by law, and joint and several judgments in favor of plaintiffs and each member of the Class against defendants, and each of them, in an amount to be trebled in accordance with the antitrust laws;

E.   An award to plaintiffs and the Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law; and

F.   An award for such other and further relief as the nature of this case may require or as this Court deems just, equitable, and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: August 13, 2008

> _/s/ Walter W. Cohen_
> Walter W. Cohen
> Kevin J. Kehner
> **OBERMAYER REBMANN**
> **MAXWELL & HIPPEL LLP**
> 200 Locust Street, Suite 400
> Harrisburg, PA 17101
> Tel: (727) 234-9730
> Fax: (727) 234-9734
>
> _Local Counsel for the Direct_
> _Purchaser Class Plaintiffs_

H. Laddie Montague, Jr.
Ruthanne Gordon
Candice J. Enders
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Michael D. Hausfeld
Hilary K. Ratway
**COHEN MILSTEIN HAUSFELD &
TOLL, P.L.L.C.**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C.  20005-3934
Tel:  (202) 408-4600
Fax: (202) 408-4699

Robert G. Eisler
Seth Gassman
**COHEN, MILSTEIN, HAUSFELD**
**& TOLL, P.L.L.C.**
150 East 52nd Street, Thirtieth Floor
New York, NY 10022
Tel:  (212) 838-7797
Fax: (212) 838-7745

Michael Lehmann
**COHEN, MILSTEIN, HAUSFELD**
**& TOLL, P.L.L.C.**
One Embarcadero Center, Suite 2440
San Francisco, CA 94111
Tel: (415) 229-2080
Fax: (415) 986-3643

*Co-Lead Counsel for the Direct*
*Purchaser Class Plaintiffs*


Daniel Hume
Beverly Tse
**KIRBY MCINERNEY LLP**
830 Third Avenue
New York, NY 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

Bernard Persky
Hollis L. Salzman
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

Gregory P. Hansel
Randall B. Weill
**PRETI, FLAHERTY, BELIVEAU
& PACHIOS, LLP**
One City Center, P.O. Box 9546
Portland, ME 04112
Tel: (207) 791-3000
Fax: (207) 791-3111

Joseph F. Roda
Dianne M. Nast
**RODA NAST, P.C.**
801 Estelle Drive
Lancaster, PA 17601
Tel: (717) 892-3000
Fax: (717) 892-1200

*Executive Committee for the Direct
Purchaser Class Plaintiffs*

*Additional Attorneys for the Direct
Purchaser Class Plaintiffs listed
under Exhibit A*

Malta440152