# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: CHOCOLATE CONFECTIONARY ANTITRUST LITIGATION | : : : : : : : : : | MDL DOCKET NO. 1935 (Civil Action No. 1:08-MDL-1935) |
| THIS DOCUMENT APPLIES TO: | | (Judge Christopher C. Conner) |
| CIVIL ACTION NO. 1:12-CV-01604 | | ELECTRONICALLY FILED |

## ANSWER OF THE HERSHEY COMPANY
## AND HERSHEY CANADA INC. TO COMPLAINT OF
## <u>ASSOCIATED WHOLESALE GROCERS, INC.</u>

Defendants The Hershey Company and Hershey Canada, Inc. (collectively "Hershey Defendants") respond to the Associated Wholesale Grocers, Inc. Original Complaint ("AWG Complaint") by generally denying the existence of a contract, combination, and/or conspiracy to fix, raise, maintain, and stabilize prices of chocolate candy sold in the United States and/or for delivery into the United States and the involvement of the Hershey Defendants in the same, denying the allegations contained in the AWG Complaint to the extent not specifically admitted hereafter, and respond to the AWG Complaint as follows:

## INTRODUCTION

1.     This action arises out of a conspiracy among the leading manufacturers of chocolate candy products to fix, raise, maintain or stabilize prices of those products in the United States.  As more fully described herein, after sales of their products declined, Defendants entered into a conspiracy not to compete in the sale of chocolate candy products.  As a direct and proximate result of this unlawful agreement, Defendants and their co-conspirators overcharged Plaintiff for chocolate candy products.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 1.

2.     As alleged more fully below, Defendants and their co-conspirators fixed, raised, maintained or stabilized prices for chocolate candy products (as defined in this Complaint) directly sold in Kansas and throughout the United States beginning by at least January 1, 2002 and continuing until at least 2008 (the "Relevant Period").

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 2.

3.     Throughout the Relevant Period and continuing through today, Plaintiff purchased chocolate candy products directly from Defendants in Kansas.

**Answer:**

Hershey Defendants admit the allegations contained in Paragraph 3 as they relate to The Hershey Company. Hershey Defendants deny the allegations contained in Paragraph 3 as they relate to Hershey Canada. Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 3 as they relate to the other defendants and therefore deny them.

4.     As a result of Defendants' unlawful conduct, Plaintiff has been directly injured in its businesses and property, including paying supracompetitive prices for chocolate candy products purchased from Defendants. Plaintiff therefore seeks damages and injunctive relief.

**Answer:**

Denied. Hershey Defendants deny the allegations contained in Paragraph 4.

## JURISDICTION AND VENUE

5.     This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. §1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), for permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and for full consideration, treble damages, and permanent injunctive relief pursuant to the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.

**Answer:**


Paragraph 5 contains no allegations and thus no response is required.


6.    This Court has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337.  This Court further has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. § 1332, as this action is between citizens of different States, with citizens or subjects of a foreign state as additional parties, and has an amount in controversy in excess of $75,000.

**Answer:**


Admitted in part and denied in part.  Hershey Defendants admit that this

court has subject matter jurisdiction over the claims brought against the Hershey

Company but deny that subject matter jurisdiction exists with respect to the claims

brought against Hershey Canada.


7.    Venue is proper in this Court pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) (c) & (d), because:

(a)    a substantial part of the events giving rise to these claims occurred in this District, including the sales to Plaintiff of chocolate candy products at artificially high prices;

(b)    each Defendant is subject to personal jurisdiction in this District;

4

(c)     Defendants transact business in this District, or in the case of the foreign Defendants, they transact business directly and/or through the activities of domestic subsidiaries and affiliates that each foreign Defendant dominates and controls within this District; and

(d)     Defendants Cadbury Holdings Ltd., Cadbury plc, Cadbury Adams Canada, Inc., and Hershey Canada, Inc., are legal aliens and may be sued in any District.

**Answer:**

Admitted in part and denied in part.  Hershey Defendants admit that this multidistrict litigation was transferred to the Middle District of Pennsylvania pursuant to an April 7, 2008 Order of the Judicial Panel on Multidistrict Litigation and that this is a proper venue.  Hershey Defendants admit that The Hershey Company transacts business in the United States, including in the Middle District of Pennsylvania, and that Hershey Canada has engaged in transactions with its parent corporation, The Hershey Company.  Hershey Defendants deny the remaining allegations contained in Paragraph 7.

8.     Defendants are subject to the personal jurisdiction of this Court because:

(a)     they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     certain Defendants are registered with the Kansas Secretary of State to do business in the State of Kansas;

(c)     they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in this District, and Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling chocolate candy throughout the United States, including in this District;

(d)     they are amenable to service of process because each Defendant belonged to the conspiracy alleged in this Complaint and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling chocolate candy products to Plaintiff and others in this District at artificially inflated prices;

(e)     they are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and/or the Kansas Long Arm Statute, K.S.A. 60-308 because each Defendant, either personally or through their co-conspirators in furtherance of the conspiracy, has sufficient minimum contacts with Kansas, including that each Defendant: transacted (and continues to transact) business in this state, committed tortious acts within Kansas; entered into contracts with a Kansas resident that were to be performed in whole or in part in Kansas; and caused injury in Kansas arising out of acts or omissions outside of Kansas while Defendants were engaged in solicitation or service activities within Kansas.  In addition, Defendants have submitted to the jurisdiction of the Court because of their continuous and systematic contacts with Kansas; and

(f)     they and one or more of their co-conspirators contracted to supply services or goods, including chocolate candy products, or have agents who contracted to supply materials or goods, including chocolate candy products, in this District; money flowed from Plaintiff in Kansas to pay Defendants and their co-conspirators for chocolate candy products; Defendants and one or more of their co-conspirators transact business in the District or have agents who transact business on their behalf in the District in furtherance of the conspiracy;

(g)     Defendants and their coconspirators committed unlawful acts or caused one or more unlawful acts to be done, or consequences to occur, in the District; and Defendants and their co- conspirators engaged in unlawful conduct described below outside of the District causing injury to Plaintiff in the District.

**Answer:**

Admitted in part and denied in part.  Hershey Defendants admit that The Hershey Company transacts business in the United States, including in Kansas, and that The Hershey Company has manufactured, sold, shipped, and/or delivered chocolate candy products in the United States, including in Kansas.  Hershey Defendants further admit that Hershey Canada has engaged in transactions with its parent corporation, The Hershey Company.   Hershey Defendants deny the remaining allegations contained in Paragraph 8.

**PARTIES**

**PLAINTIFF**

9.     Plaintiff Associated Wholesale Grocers, Inc. (herein, "AWG" or "Plaintiff") is a Kansas corporation with its headquarters and principal place of business in Wyandotte County, Kansas, at 5000 Kansas Avenue, Kansas City, Kansas 66106.  Founded in 1924, AWG provides over 2,000 grocery stores and other retail outlets with a complete assortment of grocery, fresh meat, fresh produce, specialty foods and general merchandise items.   From its Kansas corporate headquarters, AWG purchased chocolate candy products that were manufactured and sold by Defendants, their subsidiaries, divisions, units or

affiliates.  As a result, AWG has been injured by reason of the antitrust violations alleged herein.

**Answer:**

Hershey Defendants deny that they committed antitrust violations.  Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 9 and therefore deny them.

## DEFENDANTS

10.     References in this Complaint to acts, statements or transactions of business by any corporation or entity mean that the corporation or entity engaged in the act, deed or transaction by or through its directors, members, partners, officers, employees or agents, within the scope of his/her authority, while they were actively engaged in the management, direction, control, conduct or transaction of the corporation or entity's business or affairs.

**Answer:**

Paragraph 10 contains no allegations and thus no response is required.

### The Hershey Defendants

11.     Defendant The Hershey Company ("Hershey Co.") is a Delaware corporation with its principal place of business at 100 Crystal A Drive, Hershey, Pennsylvania.  Hershey Co. is a public corporation with its shares traded on the New York Stock Exchange, and until April 2004, was known as Hershey Foods Corporation.  During the Relevant Period, the majority of Hershey Co.'s

consolidated revenues have come from operations in North America.  During the Relevant Period, Plaintiff purchased chocolate candy products that Hershey Co. manufactured, sold and/or distributed, directly and/or through its predecessors, affiliated companies, and/or subsidiaries.

**Answer:**

Admitted in part and denied in part. Hershey Defendants admit that The Hershey Company is a Delaware Corporation with its principal place of business at 100 Crystal A Drive, Hershey, Pennsylvania.  Hershey Defendants further admit that The Hershey Company manufactures certain chocolate candy products, and that it has manufactured, sold, and/or distributed these products in the United States.  Hershey Defendants admit that The Hershey Company was known as Hershey Foods Corporation until 2004 and that it is a public corporation with stock traded on the New York Stock Exchange.  Hershey Defendants admit that they report financial results, including revenues, in quarterly and annual SEC filings and press releases.  These reports are publicly available, and Hershey Defendants respectfully refer to the written reports for their contents.  Hershey Defendants deny the remaining allegations contained in Paragraph 11.

12.    Defendant Hershey Canada Inc. ("Hershey Canada") is a Canadian corporation with its principal place of business at Airport Corporate Centre, 5750 Explorer Drive, Suite 500, Mississauga, Ontario.  Hershey Canada is a wholly-owned subsidiary of Hershey Co. and manufactures, distributes, and sells

confectionary, snack, refreshment and grocery products in Canada.  During the Relevant Period, Hershey Canada manufactured and sold chocolate candy products to purchasers in Canada and the United States directly or through its predecessors, affiliates and/or subsidiaries.

**Answer:**

Admitted in part and denied in part. Hershey Defendants admit that Hershey Canada is a Canadian Corporation with its principal place of business at Airport Corporate Centre, 5750 Explorer Drive, Mississauga, Ontario.   Hershey Defendants further admit that Hershey Canada is a wholly-owned subsidiary of The Hershey Company, and that Hershey Canada distributes and sells confectionery products in Canada.   Hershey Defendants admit that Hershey Canada has engaged in transactions with its parent corporation, The Hershey Company. Hershey Defendants deny the remaining allegations contained in Paragraph 12.

13.    Hershey Co. and Hershey Canada's (together, "Hershey") operations are significantly integrated.   Hershey's selling and marketing organization is comprised of the North American Commercial Group, the International Commercial Group, and the Global Growth and Innovation Group. In its 2010 Annual Report, Hershey stated that it intended to "leverage [Hershey's] marketing and sales leadership in the United States and Canada." Current President and Chief Executive Officer of Hershey Co. John P. Bilbrey served as both a Senior Vice President of Hershey Co. and as President of "Hershey North America" during the relevant period, and many other officers and senior managers of Hershey are defined as having "North American" responsibilities. Hershey has manufacturing

plants in Pennsylvania, California, Illinois, Virginia and Smiths Falls, Ontario, with distribution centers in Illinois, California and Mississauga, Ontario.

**Answer:**

Admitted in part and denied in part. Hershey Defendants admit the existence of, at various points in time, a North American Commercial Group, International Commercial Group, and Global Growth and Innovation Group. Hershey Defendants further admit that these groups are part of The Hershey Company's selling and marketing organization. Hershey Defendants also admit that John P. Bilbrey was formerly Senior Vice President of The Hershey Company and President of Hershey North America. Hershey Defendants admit that they report financial results, including revenues, in quarterly and annual SEC filings and press releases. These reports are publicly available, and the Hershey Defendants respectfully refer to the written reports for their contents. Hershey Defendants admit the past existence of manufacturing plants in Pennsylvania, California, Illinois, Virginia, and Smiths Falls, Ontario and distribution centers in Illinois, California and Mississauga, Ontario. Hershey Defendants deny the remaining allegations contained in Paragraph 13.

14. Hershey is the largest manufacturer of chocolate candy products in the United States with an estimated 43% of the U.S. market share (measured in dollar

sales volume). Hershey manufactures such chocolate candy product brands as Almond Joy, 5th Avenue, Heath, Hershey's Milk Chocolate, Hershey's Milk Chocolate with Almonds, Hershey's Extra Dark, Hershey's Special Dark, Hershey's Pot of Gold, Hershey's Sticks, Hershey's Kisses, Krackel, Miniatures, Mounds, Mr. Goodbar, Milk Duds, Hershey's Nuggets, Pay Day, Reese's Peanut Butter Cups, Reese's Pieces, Reese Sticks, Skor Bars, Symphony, Take Five, Whoppers Malted Milk Balls and York Peppermint Patties.

**Answer:**

Admitted in part and denied in part. Hershey Defendants admit that they manufacture a variety of chocolate candy product brands, including Almond Joy, Cadbury, 5th Avenue, Heath, Hershey's Milk Chocolate, Hershey's Milk Chocolate With Almonds, Hershey's Extra Dark, Hershey's Special Dark, Hershey's Pot of Gold, Hershey's Kisses, Krackel, Miniatures, Mounds, Mr. Goodbar, Milk Duds, Hershey's Nuggets, Pay Day, Reese's Peanut Butter Cups, Reese's Pieces, Reese Sticks, Skor Bars, Symphony, Take Five, Whoppers Malted Milk Balls and York Peppermint Patties. Hershey Defendants deny the allegations regarding Hershey's "market share," which regularly changes given extensive competition between the confectionary companies. Hershey Defendants deny the remaining allegations contained in Paragraph 14.

15.    Additionally, Hershey manufactures and distributes in the United States certain chocolate candy products pursuant to separate licenses with the

Cadbury Defendants and Nestlé. For example, pursuant to a licensing agreement with Nestlé, Hershey sells the Kit Kat bar in the United States.

**Answer:**

Hershey Defendants admit that The Hershey Company manufactures and distributes certain products in the United States under the terms of licensing agreements, respectfully refers to the written agreements for their terms, and otherwise deny the allegations contained in Paragraph 15.

16. Approximately 90% of Hershey's sales are in the United States and 95% are within North America.

**Answer:**

Hershey Defendants admit that they report financial results, including sales, in quarterly and annual SEC filings and press releases. These reports are publicly available, and Hershey Defendants respectfully refer to the written reports for their contents and otherwise deny the allegations contained in Paragraph 16.

17. Hershey Co. and Hershey Canada were both members of the conspiracy alleged in this Complaint because of their participation in the conspiracy through the actions of their officers, employees and representatives.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 17.

18.     Alternatively or in addition, Hershey Canada was a member of the conspiracy alleged in this Complaint because of, among other reasons, its status during the Relevant Period as the alter ego or agent of Hershey Co., as evidenced by, among other things, Hershey Co.'s domination or control over: (i) the prices at which Hershey Canada sold chocolate candy products; (ii) the hiring and firing of officers or members of the Board of Directors of Hershey Canada; (iii) the budgets for Hershey Canada; (iv) the capitalization of and/or loans to Hershey Canada; (v) the transfer of officers or employees between Hershey Co. and Hershey Canada; (vi) financial benefits provided to officers or employees of Hershey Canada; and (vii) the business plan or operation of Hershey Canada. Hershey Co. also used Hershey Canada as its instrumentality and conduit to obtain information about other Defendants' and/or co- conspirators' production, pricing or sale of chocolate, which information Hershey Co. then used to charge Plaintiff and others prices for chocolate candy products that were higher than Hershey Co. would or could have charged in the absence of the collusion among Defendants and their co-conspirators. During the Relevant Period, Hershey Co. dominated or controlled Hershey Canada with respect to the unlawful activities as alleged in this Complaint.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 18.

**The Mars Defendants**

19.     Defendant Mars, Inc. is a Delaware corporation with its headquarters located at 6885 Elm Street, McLean, Virginia 22101. Mars, Inc. is a private company and worldwide manufacturer of chocolate candy products and other food products with $21 billion in annual sales. During the Relevant Period, Mars, Inc. manufactured, sold and/or distributed chocolate candy products, directly and/or through its predecessors, affiliated companies, and/or subsidiaries, to customers throughout the United States and North America, including in Kansas.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 19 and therefore deny them.

20.     Defendant Mars Snackfood U.S., LLC ("Mars Snackfood") is headquartered at 800 High Street, Hackettstown, New Jersey, and is a business unit of Defendant Mars, Incorporated. Mars Snackfood directly and/or through its predecessors, affiliated companies and/or subsidiaries, manufactures and sells chocolate candy products throughout the United States, including in Kansas.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 20 and therefore deny them.

21.     Defendants Mars, Inc., and Mars Snackfood (collectively, "Mars") are the second largest manufacturer of chocolate candy products in the United States, with an estimated 24% share of the U.S. market. Mars manufactures such chocolate candy product brands as Dove Chocolate, M&Ms, Mars Bar, Milky Way, Snickers, Three Musketeers, and Twix. Mars' manufacturing facilities are located in Georgia, Illinois, Tennessee, Pennsylvania, South Carolina, Ohio, Mississippi, Texas, Nevada, California and New Jersey.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 21 and therefore deny them.

22.     Mars, Inc. and Mars Snackfood were both members of the conspiracy alleged in this Complaint because of, among other reasons, their participation in the conspiracy through the actions of their officers, employees and representatives. During the Relevant Period, Plaintiff purchased chocolate candy products that Mars manufactured, sold and/or distributed, directly and/or through its predecessors, affiliated companies, and/or subsidiaries.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 22 and therefore deny them.

23.     Alternatively, Mars Snackfood was a member of the conspiracy alleged in this Complaint because of, among other reasons, its status during the Relevant Period as the alter ego or agent of Mars, Inc. as evidenced by, among other things, Mars, Inc.'s domination or control over: (i) the prices at which Mars Snackfood sold chocolate candy products; (ii) the hiring and firing of officers or members of the Board of Directors of Mars Snackfood; (iii) the budgets for Mars Snackfood; (iv) the capitalization of and/or loans to Mars Snackfood; (v) the transfer of officers or employees between Mars, Inc. and Mars Snackfood; (vi) financial benefits provided to officers or employees of Mars Snackfood; and (vii) the business plan or operation of Mars Snackfood. Mars, Inc. also used Mars Snackfood as its instrumentality and conduit to obtain information about other Defendants' and/or co-conspirators' production, pricing or sale of chocolate candy products, which information Mars, Inc. then used to charge Plaintiff and others prices for chocolate candy products that were higher than Mars, Inc. would or could have charged in the absence of the collusion among Defendants and their co-conspirators. During the Relevant Period, Mars, Inc. dominated or controlled Mars Snackfood with respect to the unlawful activities alleged in this Complaint.

**<u>Answer:</u>**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 23 and therefore deny them.

24.     Mars has significant integration of U.S. and Canadian operations. Throughout the Relevant Period, executive officers and senior managers of Mars, Inc. have no U.S. designation, indicating that they have global responsibilities. Mars' website states that "Mars North America" is headquartered in New Jersey, and also lists one media contact for "North America."

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 24 and therefore deny them.

## The Nestlé Defendant

25.     Defendant Nestlé USA, Inc. ("Nestlé") is a Delaware corporation with its principal place of business at 800 North Brand Boulevard, Glendale, California. Nestlé USA is a wholly-owned subsidiary of Nestlé S.A. During the Relevant Period, Plaintiff purchased chocolate candy that Nestlé USA manufactured, sold and/or distributed, directly and/or through its predecessors, affiliated companies, and/or subsidiaries.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 25 and therefore deny them.

26.     Nestlé is the third largest manufacturer of chocolate candy products in the United States, with an estimated market share of over 8%. Nestlé manufactures such product brands as Butterfinger, Baby Ruth, Nestlé Chunky, Nestlé Crunch, Nestlé Milk Chocolate, Nestlé Turtles, Goobers and Wonka Bars.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 26 and therefore deny them.

27.    In addition to sales of Nestlé's brands of chocolate candy products in the United States, Nestlé also receives additional income under a license agreement with Hershey, to which Nestlé has granted a perpetual, exclusive license in the United States for brands including the Kit Kat bar. The Kit Kat bar is the world's number two chocolate bar after Snickers.

**Answer:**

Hershey Defendants admit the existence of certain licensing agreements between The Hershey Company and Nestlé and respectfully refer to the written agreements for their terms.  Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 27 and therefore deny them.

## The Cadbury Defendants

28.    During the Relevant Period, Cadbury plc was a British entity with its principal place of business at 25 Berkeley Square, London, W1J 6HB, United Kingdom.   During the Relevant Period, Cadbury licensed several popular chocolate candy products to Hershey Co. for sale in the United States, including

Almond Joy, Mounds, and York Peppermint Patties. Cadbury plc organized its business by geographic region and included the U.S. and Canada in its Americas region. During the Relevant Period, Cadbury plc manufactured, sold, and/or distributed via license chocolate candy products in the United States, including in Kansas. In February 2010, Kraft Foods Inc. ("Kraft") announced that it had successfully acquired control of Cadbury plc and its subsidiaries.

**<u>Answer:</u>**

Hershey Defendants admit the existence of certain licensing agreements between The Hershey Company and Cadbury and respectfully refer to those agreements for their terms.  Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 28 and therefore deny them.

29.     During the Relevant Period, Defendant Cadbury Holdings Ltd. (formerly known as Cadbury Schweppes plc) was a major international food and beverage company incorporated under the laws of the United Kingdom, with its headquarters located at 25 Berkeley Square, London WIJ 6HB, United Kingdom. Cadbury Holdings Ltd. operated as a wholly-owned subsidiary of Cadbury plc. As part of Kraft's acquisition of Cadbury plc, Cadbury Holdings Ltd. is now listed as a subsidiary of Kraft. Cadbury Holdings Ltd.'s principal businesses are confectionary and beverages and it has confectionary operations in the U.S. and Canada.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 29 and therefore deny them.

30.     During the Relevant Period, Defendant Cadbury Adams Canada, Inc. ("Cadbury Adams Canada") was a Canadian corporation with its principal place of business at 5000 Yonge Street, Suite 2100, Toronto, Ontario. Cadbury Adams Canada operated as subsidiary of Defendant Cadbury Holdings Ltd. As part of Kraft's acquisition of Cadbury plc, Cadbury Adams Canada is now listed as a subsidiary of Kraft. Cadbury Adams Canada manufactures and sells a wide array of confectionary products. During the Relevant Period, Cadbury Adams Canada manufactured and sold chocolate candy products to purchasers in the United States and Canada, directly or through its predecessors, affiliates and/or subsidiaries, including in Kansas.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 30 and therefore deny them.

31.     During the Relevant Period, Defendant Cadbury Adams USA, LLC ("Cadbury Adams USA") was a limited liability company organized under the law of the state of Delaware with its principal place of business at 389 Interpace Parkway, Suite 1, Parsippany, New Jersey. Cadbury Adams USA operated as subsidiary of Defendant Cadbury Holdings Ltd. As part of Kraft's acquisition of

Cadbury plc, Cadbury Adams USA is now listed as a subsidiary of Kraft. During the Relevant Period, Cadbury Adams USA manufactured and sold chocolate candy products to purchasers in the United States and Canada, directly or through its predecessors, affiliates and/or subsidiaries, including in Kansas.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 31 and therefore deny them.

32.    Defendants Cadbury Holdings Ltd., Cadbury plc, Cadbury Adams Canada and Cadbury Adams USA are collectively referenced herein as "Cadbury." During the Relevant Period, Plaintiff purchased chocolate candy products that Cadbury manufactured, sold and/or distributed, directly and/or through its predecessors, affiliated companies, and/or subsidiaries.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 32 and therefore deny them.

33.    During the Relevant Period, Cadbury licensed Hershey Co. to manufacture and distribute chocolate candy products such as Almond Joy, Mounds, and York Peppermint Patties worldwide, including in Kansas. Cadbury also licensed Hershey Co. to manufacture and distribute Cadbury and Caramello branded products in the United States. During the Relevant Period, Cadbury

Holdings Ltd. manufactured, sold and/or distributed chocolate candy products, directly and/or through its predecessors, affiliated companies, licensees, and/or subsidiaries, to customers throughout the United States and North America, including in Kansas.

**Answer:**

Hershey Defendants admit the existence of certain licensing agreements between The Hershey Company and Cadbury and respectfully refer to the licensing agreements for their terms.   Hershey Defendants lack sufficient knowledge or information to form an opinion as to the truth of the remaining allegations contained in Paragraph 33 and therefore deny them.

34.    Under the license agreements between Cadbury and Hershey, Hershey senior management was required to meet quarterly with the senior management of Cadbury to discuss "the marketing, promotion and sales of the Licensed Products in the Territory." Hershey also agreed to "review and consult" with Cadbury before adopting any marketing plan for the Licensed Products and to provide Cadbury with its annual marketing plan.

**Answer:**

Hershey Defendants admit the existence of certain licensing agreements between The Hershey Company and Cadbury, respectfully refer to the licensing agreements for their terms, and otherwise deny the allegations contained in Paragraph 34.

## Unnamed Co-Conspirators and Agents

35.     Mars Canada, Inc. ("Mars Canada") is a Canadian corporation with its principal place of business at 37 Holland Drive, Bolton, Ontario. Mars Canada is the Canadian division of Mars, Inc. Before May 8, 2007, Mars Canada was known as Effem Inc. During the Relevant Period, Mars Canada participated as a co-conspirator with Defendants in the activities described herein.

**<u>Answer:</u>**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 35 and therefore deny them.

36.     Nestlé S.A. is a Swiss company with its principal place of business at Ave Nestlé 55, Caisse Postale 353, Vevey, Vaud CH-8100 Switzerland. Nestlé S.A. is the world's largest food and beverage company. Nestlé S.A. participates in numerous markets, including beverages, biscuits, frozen food, health food, ice cream, infant nutrition, pasta sauces, pet food, soups, seasonings, and chocolate candy products. During the Relevant Period, Nestlé S.A. participated as a co-conspirator with Defendants in the activities described herein.

**<u>Answer:</u>**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 36 and therefore deny them.

37.     Nestlé Canada Inc. ("Nestlé Canada") is a Canadian corporation with its principal place of business at 25 Sheppard Avenue West, Floors 18-22, North York, Ontario. Nestlé Canada is a wholly-owned subsidiary of Nestlé S.A. During the Relevant Period, Nestlé Canada participated as a co-conspirator with Defendants in the activities described herein.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 37 and therefore deny them.

38.     Various other persons and entities not named herein as Defendants, including, but not limited to, ITWAL Ltd, a national network of independent, diversified retail and food service wholesale distributors based in Canada, have participated as co-conspirators with Defendants. Plaintiff reserves the right to amend this pleading to name other Defendants, including but not limited to the unnamed co-conspirators identified above. Each Defendant acted as the agent of or for other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiff.

**Answer:**

Denied.    The Hershey Defendants deny the allegations contained in Paragraph 38.

## RELEVANT PRODUCT AND RELEVANT MARKET

39.    Chocolate is one of the most popular products sold in the United States. It is made from the seed of the cacao tree (also known as "cocoa") and is made primarily of cocoa solids and cocoa fat. The global market for chocolate is in the billions of dollars.

**Answer:**

Admitted in part and denied in part.  Hershey Defendants admit that chocolate consists of various ingredients (which can include cocoa solids and cocoa fat). Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 39 and therefore deny them.

40.    The term "chocolate candy products," as used herein, refers to chocolate bars and other chocolate-based confectionary products, as well as boxed chocolates and seasonal novelty chocolates packaged to be sold at retail.

**Answer:**

Paragraph 40 contains no allegations and thus no response is required.

41.    The market for the production of chocolate candy products in the United States is concentrated, and during the Relevant Period that market was dominated by Defendants and their co-conspirators.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 41.

42.     The market for the manufacture of chocolate candy products is mature and, but for the conspiracy alleged herein, manufacturers/sellers, including Defendants and their co- conspirators, compete primarily on price.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 42.

43.     Because of their high collective market share globally as well as in the United States and Canada, Defendants are together able to exercise their market power, including the ability to fix, maintain, and raise prices in the United States market for chocolate candy products (hereinafter the "Relevant Market"). The United States market for chocolate candy products is by far the largest such market in the world, as measured by dollar sales volume. Defendants collectively have approximately 76% of the Relevant Market.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 43.

44.     The Relevant Market has significant barriers to entry. The manufacture of chocolate candy products is highly technical, requiring considerable understanding of food technology, including hardware such as processing machinery and computers, software, and formulation technology. Specific, and often proprietary, information is required to create and maintain an effective production system that results in a high-quality product.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 44.

45.     Further, any new entrant to the market must be able to spend significant sums on advertising and product proliferation. Advertising spending can be divided into two different costs: (1) introductory advertising costs, and (2) maintenance advertising costs. Introductory costs are those incurred in order to enter the market or launch a new product. For example, in 2000, Mars spent $40 million to introduce its new Snickers "Cruncher."   Maintenance advertising costs are those incurred to maintain a company's presence and share in the market. Between 2002 and 2007, Hershey Co. reported spending an average of approximately $100,000,000 per year on advertising. These substantial marketing costs are necessary to create the illusion of differentiated products and to gain market share in an industry where the products are, in actuality, quite fungible.

**Answer:**

Hershey Defendants admit that they report financial results, including advertising spending, in quarterly and annual SEC filings and press releases. These reports are publicly available, and Hershey Defendants respectfully refer to

the written reports for their contents.  Hershey Defendants deny the remaining

allegations contained in Paragraph 45.


46.    Access to supply channels is also critical to gain a foothold in the Relevant Market, as wholesale distributors, chain grocery stores, mass merchandisers, chain drug stores, vending companies, wholesale clubs, convenience stores, dollar stores, concessionaires, and department stores form the most significant distribution channels for sales of Defendants' chocolate candy products. This sort of widespread distribution of chocolate candy products is necessary, yet extremely costly for a company looking to enter the market.

**Answer:**


Admitted in part and denied in part.  Hershey Defendants admit to selling

chocolate products to wholesale distributors, chain drug stores, vending

companies, wholesale clubs, convenience stores, dollar stores, concessionaires, and

other outlets.  Hershey Defendants deny the remaining allegations contained in

Paragraph 46.


47.    While barriers to entry in the Relevant Market are very high, there are essentially no barriers to expansion in this market. Defendants typically operate at significantly less than full capacity. Consequently, in the absence of collusion, they would have the ability to compete against one another for market share by manufacturing more products, by introducing new products, and/or by vigorous competition on pricing.

**Answer:**

Denied.   Hershey Defendants deny the allegations contained in Paragraph

47.

## TRADE AND COMMERCE

48.     During the Relevant Period, Defendants and their co-conspirators
engaged in business that affects or is within the flow of interstate commerce, and
the effect of that business on interstate commerce is substantial. In particular:

(a)     Defendants and their co-conspirators sold and shipped
substantial quantities of chocolate candy products in a continuous and
uninterrupted flow in interstate commerce to customers located in States other than
the States in which the Defendants produced the chocolate candy products;

(b)     data, information, correspondence and/or financial material
were exchanged between each Defendant in the State in which each is located,
incorporated, or has its principal place of business and other States; and

(c)     money flowed between banks outside of the State in which each
Defendant is located, incorporated, or has its principal place of business and other
States.

**Answer:**

Admitted in part and denied in part.   Hershey Defendants admit that The

Hershey Company has manufactured, sold, and/or shipped chocolate candy

products in the United States.  Hershey Defendants admit that Hershey Canada has

engaged in transactions with its parent corporation, The Hershey Company, but deny the remaining allegations contained in Paragraph 48 with respect to Hershey Canada. Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 48 as they relate to the other Defendants and therefore deny them.

49. The effect of Defendants' and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiff's claims.

**Answer:**

Denied. Hershey Defendants deny the allegations contained in Paragraph 49.

## DEFENDANTS' UNLAWFUL CONDUCT

### Defendants Coordinated Their Price Increases.

50. In the early 2000's, growth in the chocolate candy products business slowed significantly. In the United States, for example, the business experienced a growth rate of approximately 9.10% in 2000, but only 0.80% in 2001. Further, as a result of factors such as growing concerns over health issues, the chocolate candy products business was projected to experience steadily declining growth rates through at least 2008.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 50 and therefore deny them.

51.     In the face of this drop in demand and the prospect of declining revenue, Defendants colluded in order to increase their prices, revenues and profits. Starting in late 2002, pursuant to an unlawful agreement to fix prices, Defendants engaged in a series of coordinated price increases on their chocolate candy products in the United States.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 51.

52.     Defendants sell their chocolate candy products primarily on the basis of price. Despite brand loyalty, each Defendant's chocolate candy products are substitutable for one another. Price is the most important competitive factor in the sale of chocolate candy products, and the standardized nature of chocolate candy products hinders substantial and material non- price competition.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 52.

53.    On or about December 6, 2002, Mars announced price increases of approximately 10.7% on its regular-sized chocolate bars ("Singles"), and approximately 22% on its Multi-Pack Six-Packs for several of its chocolate bars (Milky Way, Snickers, 3 Musketeers, Snickers Almond, Twix Caramel Cookie), all to be effective December 9, 2002. Mars asserted publicly that the price increases were driven by the rising cost of raw materials, labor and transportation.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 53 and therefore deny them.

54.    On or about December 9, 2002, Hershey announced a U.S. price increase of approximately 10.7% for its regular-sized chocolate bars ("Standard Bars"), approximately 13.6% for its King Size bars, approximately 7.6% for its Six-Packs of bars, and approximately 15.4% for its 10-Packs of bars, all to be effective January 1, 2003. Hershey stated publicly that the price increases were the result of increases in raw ingredient costs.

**Answer:**

Admitted in part and denied in part.  Hershey Defendants admit that on or about December 11, 2002, The Hershey Company announced a U.S. price increase, effective January 1, 2003, of approximately 10.8% for its Standard Bars, 13.5% for its King Size bars, approximately 7.7% for its 6-Packs of bars, and approximately 15.5% for its 10-Packs.  Hershey Defendants also admit that The Hershey Company made certain public statements about this price increase and respectfully refer to those statements for their contents.  Hershey Defendants deny the allegations contained in Paragraph 54 as they relate to Hershey Canada.

55.    On or about December 12, 2002, Nestlé instituted a price increase of approximately 10.3% on its regular-sized chocolate bars ("Singles"), approximately 14.5% on its king-size bars ("Kings"), and approximately 16.8% on its multi-count packs ("10-pack"). Nestlé asserted publicly that the price increases were caused by increases in raw material, packaging, labor and transportation costs.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 55 and therefore deny them.

56.    On or about November 19, 2004, Mars announced a second price increase on its bags of chocolate candy products ("Peg Packs," "Small Bags," "Medium Bags," "Large Bags," "X-Large Bags," and "Travel Cups"), ranging from 2.9% to 15.6%, effective on November 19, 2004.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 56 and therefore deny them.

57.    On or about on December 17, 2004, Mars also instituted price increases of approximately 5.5% on its Singles, approximately 8.5% on its Multi-Pack Six Packs, and approximately 4.7% on its King-Size Packs.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 57 and therefore deny them.

58.    On or about December 15, 2004, Hershey instituted a second price increase of approximately 5.5% on its Standard Bars, approximately 4.7% on its King Size bars, approximately 8.5% on its 6-Packs, approximately 5.5% on its Variety Packs, and increases ranging from approximately 2.5% to 7.6% on its Chocolate Packaged Candy, Large Chocolate Peg bags, Kisses Peg Bags, and Travel Cups.

**Answer:**

Admitted in part and denied in part.  Hershey Defendants admit that, on or about December 15, 2004, The Hershey Company announced a price increase of approximately 5.6% on its Standard Bars, approximately 4.8% on its King Size bars, approximately 8.8% on its 6-Packs, and approximately 5.6% on its Variety Packs, effective December 15, 2004.  Hershey Defendants further admit that, on or about December 15, 2004, The Hershey Company announced price increases ranging from approximately 2.5% to 7.8% for certain Chocolate Packaged Candy products, effective February 14, 2005.  Hershey Defendants deny the allegations contained in Paragraph 58 as they relate to Hershey Canada.

59.     On or about December 22, 2004, Nestlé instituted a price increase of approximately 5.7% on its Singles, approximately 4.8% on its Kings, approximately 7.7% on its 6-Packs of chocolate bars, approximately 7.5% on Chocolate Peg Bags and Chocolate Miniatures, and additional price increases on other chocolate candy products.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 59 and therefore deny them.

60.    Defendants again attributed this second round of price increases to increased input costs.

**<u>Answer:</u>**

Admitted in part and denied in part.  Hershey Defendants admit that The Hershey Company made certain public statements about its December 2004 price increases and respectfully refer to those statements for their contents. Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 60 as they relate to other Defendants and therefore deny them.

61.    Defendants instituted a third round of coordinated price increases in March and April of 2007. On or about March 23, 2007, Mars instituted price increases of approximately 5.3% on its Singles, Multi Packs, 6-Packs and Variety Packs; approximately 4.5% for its King- size bars, and approximately 15% for its Dove Packages.   Mars again cited alleged cost increases for raw materials, advertising and labor costs.

**<u>Answer:</u>**

Hershey Defendants deny the existence of any "coordinated price increases." Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 61 and therefore deny them.

62.    On or about April 4, 2007, Hershey announced price increases effective April 7, 2007 of approximately 5.2 % for Standard Bars, Standard Size Variety Packs, and 6 Packs, and approximately 4.5% for King Size Bars and King Size Variety Packs. Hershey again publicly attributed the price increases to alleged raw material and other cost increases.

**Answer:**

Admitted in part and denied in part.  Hershey Defendants admit that on or about April 4, 2007, The Hershey Company announced price increases, effective immediately, of approximately 5.3% for Standard Bars, Standard Size Variety Packs, and 6 Packs, and approximately 4.5% for King Size Bars and King Size Variety Packs.  Hershey Defendants also admit that The Hershey Company made certain public statements about this price increase and respectfully refer to those statements for their contents.  Hershey Defendants deny the allegations contained in Paragraph 62 as they relate to Hershey Canada.

63.    On or about April 5, 2007, Nestlé instituted price increases of approximately 5.4% on its Singles, approximately 4.6% on its Kings, approximately 4.6% on its 6 Pack Trays, as well as additional price increases on other chocolate candy products.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 63 and therefore deny them.

64.     Defendants' repeated public assertions that the price increases resulted from increased input costs were false and pretextual.  The price increases resulted from an express agreement among Defendants and their co-conspirators to fix, raise, stabilize, and maintain prices on chocolate candy products in the United States.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 64.

65.     Cocoa beans account for more than 25% of the cost of the inputs for Defendants' chocolate candy products. The price of cocoa beans either decreased or remained stable from 2003 through 2007. Although there were sporadic increases in the price of cocoa, they were short-lived and offset by futures contracts and/or forward purchasing. Defendants use these forward purchasing and futures contracts to cover future manufacturing requirements and to take advantage of downward market fluctuations when possible and to reduce risks associated with upward fluctuations in input costs.

**Answer:**

Admitted in part and denied in part.  Hershey Defendants admit that cocoa is used to manufacture chocolate candy products.  Hershey Defendants further admit that they enter into certain futures contracts of various lengths. Hershey Defendants deny the remaining allegations contained in Paragraph 65.

66.   Sugar accounts for approximately 16% of the cost of the inputs for Defendants' chocolate candy products. Sugar prices were stable during the Relevant Period, with the exception of a brief spike in late 2005 following the 2005 hurricane season. Sugar prices fell in 2006 as sugar crops recovered.

**Answer:**

Admitted in part and denied in part.  Hershey Defendants admit that sugar is used to manufacture chocolate candy products.  Hershey Defendants deny the remaining allegations contained in Paragraph 66.

67.   No other input accounts for more than 15% of Defendants' total input costs for chocolate candy products. And no other input, labor, or other cost levels explain Defendants' price increases.

**Answer:**


Denied.  Hershey Defendants deny the allegations contained in Paragraph

67.


68.    Prior to Mars' announcement of the first collusive price increase in December 2002, Defendants had been unable to successfully implement any announced price increase in the Relevant Market since 1995.  A chocolate manufacturer that announced a price increase under the market conditions existing during the Relevant Period would face significant negative market repercussions if its competitors failed to take a similar price increase.  If the competitors failed to match the announced price increase, the prospect of significant lost sales would force the manufacturer to rescind the announced price increase. Rescinding the increase would cause significant disruption in the marketplace because, upon learning of a planned price increase, Defendants' customers incur substantial management time and expense to plan for and implement the increase.   A manufacturer therefore loses significant customer goodwill by announcing and then rescinding a price increase. In announcing the first collusive price increase in December 2002, however, Mars was confident that the increase would be successful because the Defendants had expressly agreed on it.

**Answer:**


Denied.  Hershey Defendants deny the allegations contained in Paragraph

68.


69.    Defendants implemented the price increases despite not only stable input costs, but also flat or declining demand. Absent their unlawful agreement, Defendants could not have profitably increased prices in these conditions. The five-year Compound Annual Growth Rate for Manufacturer Shipments of

Chocolate for all subcategories over the period from 2002 to 2006 was 1.0%, as reported by the U.S. Department of Commerce. In his earnings presentation to investors following the December 2002 price increase announcement, Hershey's then- chairman and CEO Richard Lenny reduced estimates of sales growth. REUTERS reported on December 13, 2002: "The largest U.S. chocolate maker, which has been posting flat shipment growth, had previously forecast sales growing 3 percent to 4 percent. However, the candy market is showing signs of slack demand, increased competition, and inventory reduction by retailers." In a December 16, 2007 newspaper article, Villanova University marketing professor, William Madway, described the U.S. chocolate candy products industry as "a mature, bordering on declining, industry."

**Answer:**

Hershey Defendants deny involvement in an "unlawful agreement." Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations regarding the U.S. Department of Commerce or Professor William Madway and therefore deny them.  Hershey Defendants admit the existence of certain public articles and respectfully refer to the publications for their contents.  Hershey Defendants deny the remaining allegations contained in Paragraph 69.

70.    Defendants' conspiracy was successful in overcoming the downward pressure that this stable-to-declining demand put on prices for chocolate candy products. In a competitive market, such declining demand would cause increased competition and declining prices. This static or declining demand dramatically reduced Defendants' ability to profitably take unilateral price increases and likewise increased their incentive to collude to avoid price competition.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 70.

71.    Defendants' unlawful agreement allowed them to simultaneously increase profits and profit margins on sales of U.S. chocolate candy products despite this stable or declining demand. For example, in July 2003, Hershey reported that its second quarter net profits rose to $71.5 million compared with $63.1 million for the same period in 2002. Hershey attributed the increase in profits, in part, to the implementation of the price increase announced in December 2002 and implemented in January 2003. Hershey also credited decreasing raw material costs with improving profit margins, despite its pretextual reasons for the price increases.

**Answer:**

Hershey Defendants deny involvement in an "unlawful agreement." Hershey Defendants admit that they report financial results, including profits and income, in quarterly and annual SEC filings and press releases.  These reports are publicly available, and Hershey Defendants respectfully refer to the written reports for their contents.   Hershey Defendants deny the remaining allegations contained in Paragraph 71.

72.    Likewise, in 2004 Hershey posted a record-breaking net income of more than $574 million. Hershey publicly attributed its extraordinary profits to

marketplace momentum, as well as record sales, earnings, and returns. In reality, Hershey's soaring profits resulted in significant part from the unlawfully inflated prices for its chocolate candy products.

**Answer:**

Hershey Defendants admit that they report financial results, including profits and income, in quarterly and annual SEC filings and press releases.  These reports are publicly available, and Hershey Defendants respectfully refer to the written reports for their contents.  Hershey Defendants deny the remaining allegations contained in Paragraph 72.

73.    Pursuant to their unlawful agreement, none of the Defendants took the others' price increases as an opportunity to increase sales and market share by holding steady or reducing its own prices. Absent the unlawful agreement, each Defendant's best interest would have been to increase unit sales by offering lower prices than its competitors. Indeed, throughout the Relevant Period, Hershey and Nestlé had significant excess capacity for producing chocolate candy products. Pursuant to the unlawful agreement, however, the Defendants refrained from engaging in price competition, with the result that each of Defendants' respective market shares remained stable throughout the Relevant Period.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 73.

74.     Defendants' unlawful agreement was facilitated by the fact that the Relevant Market is highly concentrated. Hershey is the largest manufacturer of chocolate candy products in the United States, with a 43.3% market share (in dollar sales volume) in 2005. Mars is the second largest producer in the United States, with a 24.3% market share; Nestlé is third with an 8.9% market share. Together with Cadbury's chocolate candy line licensed to Hershey, these four Defendants collectively control 76% of the Relevant Market.

**Answer:**


Hershey Defendants deny involvement in an "unlawful agreement." Hershey

Defendants admit the existence of certain licensing agreements between The

Hershey Company and Cadbury and respectfully refer to those agreements for their

terms.  Hershey Defendants deny the allegations regarding "market share," which

regularly changes given extensive competition between the confectionary

manufacturers.  Hershey Defendants lack sufficient knowledge or information to

form a belief as to the truth of the remaining allegations contained in Paragraph 74

and therefore deny them.


75.     This concentration facilitated Defendants' coordination, making it easy to both enter into and monitor compliance with the cartel agreement. Defendants' collective dominance of the Relevant Market prevented Plaintiff and other purchasers from responding to Defendants' price increases by switching to other suppliers. The concentration also made it easy for Defendants to ensure that none of them "cheated" on the cartel by secretly offering lower prices to purchasers. Defendants monitored each other's prices and sales through direct communications, industry trade publications, and trade association activities. As

noted above, each Defendant's market share has in fact remained relatively stable throughout the Relevant Period.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 75.

76.    Defendants' collusive agreement was also easy to maintain because each Defendant sells chocolate candy products directly to grocery retailers, drug stores, convenience stores, movie theaters, vending machine operators and mass merchandiser stores, as well as to distributors. There are many thousands of retailers of chocolate candy products in the United States. Thus, with a multitude of buyers, each representing only a small part of each Defendant's total United States sales, Defendants had little incentive to cheat on their collusive pricing arrangements.  Each sale made by Defendants was small, while the potential penalty for cheating on the unlawful agreement, sparking significant price competition and losing their supracompetitive price for all Relevant Products, was large.

**Answer:**

Hershey Defendants deny any involvement in a "collusive agreement." Hershey Defendants admit that they sell chocolate candy products to a variety of customers, including grocery retailers, drug stores, convenience stores, movie theaters, vending machine operators, mass merchandiser stores, and distributors. Hershey Defendants deny the remaining allegations contained in Paragraph 76.

77.     Defendants had ample opportunity and means to conspire, using not only electronic and telephonic communications, but also in-person meetings. For example, Defendants' high-ranking executives with pricing authority routinely met at numerous trade association meetings during the Relevant Period.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 77.

## The Canadian Investigation

78.     In July 2007, the Canadian Competition Bureau began a criminal investigation into price-fixing in the market for chocolate candy products sold in Canada. Cadbury has effectively admitted guilt in the Canadian conspiracy, entering the Canadian immunity program and presenting highly incriminating evidence, described in detail in affidavits filed by the leading Canadian investigator, against Hershey, Mars and Nestlé.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents.  Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 78 and therefore deny them.

79.     The affidavits state that the price-fixing communications and exchanges of confidential pricing information were often made at the most senior levels of the companies involved.  In the case of Cadbury, Hershey and Nestlé, "the alleged conspiracy was brought about and sanctioned at the highest levels of the companies involved. The companies reached an agreement or arrangement whereby they would collaborate on increasing transaction prices for chocolate confectionary by raising list prices and/or reducing trade spend to customers."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents.  Hershey Defendants otherwise deny the allegations contained in Paragraph 79.

80.     The affidavits disclose approximately 20 bulletins and letters written by ITWAL Ltd. ("ITWAL"), a national network of independent, diversified retail and food service wholesale distributors based in Canada, to numerous executives and other employees of the four chocolate companies. The affidavits also disclose numerous meetings of high ranking executives of the Canadian companies, particularly Cadbury, Nestlé and Hershey.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are

publicly available and reflect their contents.  Hershey Defendants otherwise deny the allegations contained in Paragraph 80.

81.    At least thirteen individuals employed by Cadbury were "cooperating witnesses" in the investigation, supplying the Canadian Competition Bureau with emails and information about telephone calls and private meetings involving Hershey, Mars, Nestlé, Cadbury and ITWAL.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 81.

82.    The Bureau's affidavits allege that the collusion began in February 2002 and continued until November 2007, during which time the chocolate manufacturers and ITWAL "did by agreement, threat, promise or by like means, attempt to influence upward, or to discourage the reduction of, the price at which Cadbury, Hershey, Mars and Nestlé supplied or offered to supply or advertise chocolate confectionary products within Canada."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are

publicly available and reflect their contents. Hershey Defendants otherwise deny

the allegations contained in Paragraph 82.

83.     On February 21, 2002, ITWAL wrote letters to the senior
management of each Canadian chocolate manufacturer, including Robert Leonidas
of Nestlé Canada; Rick Meyers of Hershey Canada; Don Robinson of Mars; and
Arthur Soler of Cadbury Adams Canada. The letter was entitled "TAKE ACTION
NOW!!" and stated as follows:

>   At the 'end of the day' it is only the suppliers' control
>   and discipline of the [discounting] that can restore
>   functionality in the marketplace. The problem is very
>   serious and completely out of control on the part of the
>   suppliers. I am being forced to re- examine how we
>   operate in the market and I am not sure it would be in the
>   best interest of [Nestlé, Hershey, Mars, or Cadbury]. I
>   urge you to meet and take action before this chocolate
>   bar "bubble bursts."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an

Ontario court in November 2007 by the Canadian Competition Bureau, which are

publicly available and reflect their contents. Hershey Defendants otherwise deny

the allegations contained in Paragraph 83.

84.     The initial letter was followed by at least twenty "TAN [Take Action
Now] Information Bulletins" written to the senior executives and additional sales
employees of the companies outlining the steps that the companies should take to

address the problems, as well as confirming the actions actually taken by the companies and the success of the conspiracy.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 84.

85.    For example, "TAN Information Bulletin #4" dated April 5, 2002, was sent to the following people: Arthur Soler and Tim Mason of Cadbury Adams Canada; Don Robinson and Roy Benin of Mars Canada; Rick Meyers of Hershey Canada; and Bob Leonidas and Matt Hall of Nestlé. TAN Information Bulletin #4 stated, "it appears your efforts to 'dry up' this activity [discounting chocolate bars] may be starting to work. ... I want to take this opportunity to thank each of you for responding to our TAN initiative. It is very positive and encouraging already. Potential gray marketers have been identified and, in some cases, cut off. Others have had their volumes reviewed and capped or monitored in the situations where buying through a distributor." The bulletin also referred to the distributor's "recommended floor price model"; "an ongoing internal audit procedure" that the chocolate companies set up to "monitor account activities"; and the hiring of third party investigators "with results already being achieved."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are

publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 85.

86.   Another bulletin dated December 12, 2002, sent to Don Robinson, David Jones, Roy Benin and Kurt Hatherly of Mars Canada, Rich Meyers and Marc Morneau of Hershey Canada, Bob Leonidas, Matt Hall, Todd Hoffman and Al Kehoe of Nestlé Canada, and Tim Mason, Peter Allen and Doug Tyler of Cadbury Adams Canada, summarized the accomplishments for the year. The bulletin stated: "congratulations to you all as we wind up the year with respect to your concerted and committed efforts to clean up the dysfunctional retail trade spending"; that there was "significantly less diversion of bars re: back door at retail grocery, dollar stores, vending"; and that the efforts of cartel members "reduced unreasonably low retail prices."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents.  Hershey Defendants otherwise deny the allegations contained in Paragraph 86.

87.   Another bulletin dated April 25, 2003, sent to David Schulthorp of Cadbury Adams Canada, Yves Dalcort, Don Robinson, Roy Benin and David Jones of Mars Canada, Bruce Brown, Mike Vissers and Shawn Allen of Hershey Canada, Bob Leonidas, Matt Hall, Todd Hoffman and Al Kehoe of Nestlé Canada, and Tim Mason, Lance Berrisford and Doug Ross of Cadbury Adams Canada, provides: "[w]e have had considerable discussion on the disfunctionality of 2/99¢ pricing on single bars" and reports a breach of the agreement at "Dollarama," stating "[w]ith a price increase just having been implemented, this situation becomes even more incredible."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 87.

88.     Bulletins continued to be sent to the sales staffs of the chocolate companies at least through October 2003, where a bulletin requested the "presence of persons in leadership positions at the upcoming meeting," referred to as "our upcoming October 28th business review," being planned to "discuss the inequity in the Market Place."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 88.

89.     The Bureau's affidavits also outline numerous secret meetings involving senior executives of the chocolate companies, including Eric Lent, General Manager of Hershey Canada Inc., Martin Lebel of Mars Canada Inc., Robert Leonidas, President and CEO, Sandra Martinez de Arevalo, President of the Confectionary Business, and Lynn Hashinsky and Steve Morris of Nestlé Canada Inc., and thirteen unnamed cooperating witnesses of Cadbury Adams Canada.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 89.

90.    The meetings took place in coffee shops, restaurants and at industry trade association conventions between February 2004 and September 2007. In addition to these meetings, the competitors communicated by email throughout the conspiracy.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 90.

91.    On February 23, 2004, the senior executive of Cadbury Adams Canada met with Robert Leonidas, Nestlé Canada's CEO, and discussed "trade spending practices" and Cadbury's plans to reduce discounts, rebates and allowances to customers. Cadbury's executive believed that Leonidas agreed with him on reducing discounts and that he had an open line to call Leonidas if there were any issues in the market, including discount practices.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 91.

92.     Beginning on June 1, 2005, three cooperating witnesses at Cadbury were copied on internal emails disclosing ITWAL acting as the liaison on coordinating a price increase in 2005:

> At ITWAL I was informed by a reliable source that both Nestlé and Effem have been to customers hinting at 2005 price increases. No details or confirmation. I suggested that we would seriously consider appropriate actions once firm details known, and that I would be concerned about the other leading player not following which my contact said they would inquire about.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 92.

93.     At the annual meeting of the Confectionary Manufacturers Association of Canada in June 2005, Robert Leonidas, Nestlé Canada's CEO reportedly told Cadbury Adams Canada's top executive words to the effect of "I want you to hear it from the top—I take my pricing seriously" or "We are going to take a price increase and I want you to hear it from the top," and then handed his competitor an envelope containing Nestlé Canada's confidential pricing information. The witness told authorities that Mr. Leonidas would have left the meeting with the idea that the witness' company would follow a price increase led by Nestlé Canada. The witness told the officials that he did not open the envelope until later "because you shouldn't talk about pricing. I didn't want to be rude to Bob, so I said OK, was neutral, but I didn't want him to think, in any way, that I was coordinating with him."  The envelope contained a document about a planned 2005 price increase by Nestlé Canada.

**<u>Answer:</u>**


Hershey Defendants admit the existence of certain affidavits filed in an

Ontario court in November 2007 by the Canadian Competition Bureau, which are

publicly available and reflect their contents. Hershey Defendants otherwise deny

the allegations contained in Paragraph 93.


94.     The same witness told his assistant to go to Mr. Leonidas's office on July 6, 2005, to pick up something. After arranging the time of the meeting, the assistant was met by Mr. Leonidas downstairs.  Mr. Leonidas said something to the effect that "it was better not to be seen in his office" and handed the assistant an envelope. It also contained confidential information about a planned price increase by Nestlé Canada.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 94.

95.     Upon hearing a report on the contents of the envelope, Cadbury Adams Canada's top executive had his assistant forward the information to others at Cadbury Adams Canada, stating "if Nestlé is going to take a price increase then we will too."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 95.

96.     Cadbury Adams Canada subsequently announced a price increase on July 29, 2005 averaging 5.2% effective October 31, 2005, so as to align its prices on a number of common formats with those of Nestlé Canada. Hershey announced an increase on August 23, 2005, effective October 31, 2005. Mars Canada announced a price increase averaging 6% on September 6, 2005, effective November 7, 2005.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 96.

97.     An email chain at Cadbury Adams Canada on July 6, 2005, indicated that a letter containing confidential Nestlé Canada's price increase information was circulating around Cadbury Adams Canada's office. The draft price increase announcement, dated July 15, 2007, stated that Nestlé was increasing prices approximately 5 to 7% effective October 31, 2005, for base confectionary and April 18, 2006, for seasonal confectionary.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 97.

98.     On February 15, 2006, the top executive of Cadbury Adams Canada again met with Robert Leonidas in Toronto and discussed the price of seasonal chocolate. Mr. Leonidas said that he wanted Cadbury Adams Canada to take a price increase, but Cadbury's executive refused to commit to do so at that time. On October 30, 2006, however, Cadbury Adams Canada announced a price increase

on seasonal chocolate, to take effect February 5, 2007, of 5% on Halloween products, and 4% for Easter products.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 98.

99.    On July 4, 2007, another cooperating witness met Sandra Martinez de Arevalo, President of Nestlé Canada's confectionary business in Toronto. According to the witness, Ms. Martinez suggested that the witness' company lead a price increase in 2007 and that Nestlé wanted to raise prices in the third quarter of 2007. The witness responded that the company was not prepared to increase in 2007, but might in 2008. He further told Ms. Martinez that "he would follow on chocolate but not lead."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 99.

100. On July 5, 2007, another cooperating witness at Cadbury Adams Canada received a call from Nestlé Canada employee Steve Morris, who stated that Nestlé Canada was thinking about a price increase in early March 2008. Morris was told by the cooperating witness that Cadbury Adams Canada was thinking of a price increase too, and they discussed that Mars Canada would probably follow.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 100.

101. On September 19, 2007, during an event in Vancouver, the top executive at Cadbury Adams Canada and Robert Leonidas discussed the fact that it was public information that Nestlé Canada was taking a price increase in February 2008 of 4 to 6% on all products, and stated words to the effect of "You don't need to say anything."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 101.

102.   On January 3, 2007, Bert Alfonso, then Senior Vice President and Chief Financial Officer of Hershey Co. (USA) wrote an email to the newly-appointed head of the Hershey Canada business, Eric Lent, and the head of Cadbury in Canada, introducing the two individuals and stating: "In keeping with the good advice from 'The Godfather,' keep close to your competition, I am including contact info below in an effort to introduce you both. All kidding aside, I know Eric is looking forward to meeting you."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 102.

103.   On January 4, 2007, the top Cadbury Adams Canada executive had a telephone conversation with Eric Lent.  On March 15, 2007, Lent proposed to meet with the Cadbury Adams Canada executives.

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 103.

104.   Another Cadbury Adams Canada witness first met Eric Lent at a dinner hosted by the Food and Consumer Products of Canada trade association in Ontario, on September 27, 2007. Mr. Lent told him that Nestlé Canada was "taking a price increase" and "so we should take advantage" or "we should increase our prices too."  When the Cadbury witness balked at the discussion, Lent allegedly replied: "Don't worry, we can talk about it. Bob [Leonidas] and I talk all the time. It's public knowledge that Nestlé is taking its prices up."

**Answer:**

Hershey Defendants admit the existence of certain affidavits filed in an Ontario court in November 2007 by the Canadian Competition Bureau, which are publicly available and reflect their contents. Hershey Defendants otherwise deny the allegations contained in Paragraph 104.

105.   As set forth in detail above, Defendants agreed to raise, maintain, fix, and/or stabilize prices of chocolate candy products in Canada during the Relevant Period. These facts establish and confirm that Defendants similarly fixed prices in the United States.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 105.

106.   For example, the market structure in Canada is essentially the same as that in the United States, with the same dominant suppliers – the Defendants – collectively controlling approximately 64% of the Canadian market. That

Defendants could not achieve parallel price increases in Canada without expressly agreeing to fix prices confirms that they also could not achieve parallel price increases in the United States without expressly agreeing to fix prices.

**Answer:**

Hershey Defendants deny the allegations regarding "market share," which regularly changes given extensive competition between the confectionary manufacturers. Hershey Defendants deny the remaining allegations contained in Paragraph 106.

107. During the Relevant Period, each of Hershey, Mars and Nestlé has had integrated management of its Canadian and United States operations. Hershey's Canadian and United States operations responsible for selling and marketing chocolate candy products were organized under the "North American Commercial Group" as well as the "International Commercial Group" and the "Global Growth and Innovation Group." Mars management responsible for selling and marketing chocolate candy products in the United States and Canada were fully integrated in that several executive officers and senior managers of Mars had world-wide responsibility for selling and marketing chocolate candy products. Nestlé sold and marketed its chocolate candy products both in the United States and Canada as a single geographic zone known as zone "AMS." The same executive officers and key management personnel were responsible for marketing and selling chocolate candy products in both Canada and the United

**Answer:**

Hershey Defendants admit the existence of the North American Commercial Group, International Commercial Group, and Global Growth and Innovation

Group. Hershey Defendants further admit the existence of certain licensing agreements between The Hershey Company and Nestlé and between The Hershey Company and Cadbury and respectfully refer to those agreements for their terms. Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of or otherwise deny the remaining allegations contained in Paragraph 107 and therefore deny them.

108.   Defendants' senior executives in the United States were aware of and condoned the conspiracy in Canada. For example, many of Defendants' executives received copies of the large volume of documents reflecting the organization and progress of the Canadian conspiracy. Some of the documents reflecting the collusion were sent to seven executives of Cadbury, five executives of Mars, five executives of Hershey, and four executives of Nestlé. Moreover, thirty of Defendants' executives and employees are already known to be participants in the Canadian conspiracy. The number of meetings and communications among the highest level of management of the Canadian units, and the large number of executives involved, indicates that the executives in the United States were aware of the Canadian activities.

**Answer:**

Hershey Defendants deny the allegations contained in Paragraph 108 as they relate to the Hershey Defendants.  Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 108 as they relate to the other defendants and therefore deny them.

109.   Despite their knowledge of the Canadian conspiracy, the United States executives of Hershey, Mars and Nestlé did nothing to stop that conduct over a five-and-a-half year period. It is not plausible that the same executives who control 76% of the United States chocolate candy market would conspire or condone a conspiracy with regard to 5% of their North American business in Canada and not conspire or condone a conspiracy with regard to the 90% of their North American business in the United States.

**Answer:**

Hershey Defendants deny the allegations contained in Paragraph 109 as they relate to the Hershey Defendants.  Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 109 as they relate to the other defendants and therefore deny them.

110.   Defendants' price increases in Canada were roughly contemporaneous with and roughly the same magnitude of the price increases that Defendants took pursuant to their unlawful agreement in the United States.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 110.

111.   Defendants' price-fixing in the Canadian market would not have been effective unless they had also fixed prices in the United States market because of: (1) the low cost to transport chocolate candy products between the United States and Canada; (2) the low cost of import/export duties and quotas for chocolate

candy products between Canada and the United States; (3) a meaningful correlation between the market price and market price movements of chocolate candy products sold in the United States and Canada, such that a price change and the magnitude of the change in one location is generally reflected in the other; (4) the existence of large and common customers in the United States and Canada; (5) the closely similar production inputs to manufacture chocolate candy products in the United States and Canada; (6) the supply and demand features in the United States and Canada that are sufficiently homogenous such that conditions that occur in or affect the United States chocolate candy market also affected the market in Canada, and vice versa; (7) the need for Defendants and their coconspirators to make business decisions about the production and sale of chocolate candy products based on the production, manufacturing and sale of chocolate candy products in both the United States and Canada; (8) the cost structure to produce chocolate candy products was such that an increase in manufacturing costs in the United States would cause Defendants to shift production to Canada and import product into the United States and vice versa; and (9) the need for Defendants and their coconspirators to monitor, measure and control supply and pricing of chocolate candy products sold both in the United States and Canada.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 111.

112.  During the Relevant Period, and as a result of Hershey's licensing agreements with Nestlé and Cadbury, Defendants each sold complimentary chocolate candy products in Canada and the United States. For example, pursuant to these arrangements, Hershey manufactured and sold its Kit Kat candy bar in the United States, while Nestlé manufactured and marketed Kit Kat in Canada; Hershey manufactured and marketed the Oh Henry chocolate bar in Canada, while Nestlé manufactured and marketed the Oh Henry bar in the United States; Nestlé manufactured and marketed Hershey's Rolo brand candy bar in Canada, while Hershey manufactured and marketed it in the United States; and Cadbury

manufactured and marketed its Cadbury brand bar in Canada while Hershey manufactured and marketed the Cadbury bar in the United States.

**Answer:**

Hershey Defendants admit the existence of certain licensing agreements between The Hershey Company and Nestlé and between The Hershey Company and Cadbury and respectfully refer to those agreements for their terms. To the extent that the allegations contained in Paragraph 112 mischaracterize these agreements, Hershey Defendants deny them.

113. During the Relevant Period, Defendants manufactured significant quantities of a processed input known as "block chocolate" in Canada that they imported into the United States for processing into chocolate candy products. Due in large measure to cost savings advantages of lower sugar supply prices in Canada (Canada does not regulate the price of refined sugar to the same extent as it is regulated in the United States), and because there are no quotas on block chocolate imports into the United States, Defendants manufactured, or at times purchased, significant amounts of block chocolate which they then imported into the United States for their own use in manufacturing chocolate candy products.

**Answer:**

Hershey Defendants deny the allegations contained in Paragraph 113 as they relate to the Hershey Defendants. Hershey Defendants lack sufficient knowledge

or information to form a belief as to the truth of the remaining allegations contained in Paragraph 113 and therefore deny them.

114.   During the Relevant Period, upwards of 95% of Canadian exports of chocolate candy products were exported to the United States. Canadian-imported chocolate amounted to over 60% of the chocolate candy products imported into the United States during the Relevant Period, and Defendants both exported and imported significant quantities of finished chocolate candy products between the United States and Canada. From locations in the United States, Defendants processed and manufactured chocolate candy products for export to Canada. Conversely, from locations within Canada, Defendants processed and manufactured chocolate candy product for export to the United States. Government-supplied data show that from 2002 to 2008, 300 million kilograms of Canadian chocolate candy products were exported to the United States and that 100 million kilograms of United States chocolate candy products were exported to Canada. Canada was the source of over $700 million in chocolate imports to the United States annually between 2004 and 2006.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 114 and therefore deny them.

115.   The opportunity for arbitrage, and the fact of arbitrage, between the United States and Canada is so extensive, and, as detailed above, the sales and prices of chocolate candy products in the United States and Canada are so interdependent, that Plaintiff alleges, in the alternative, that there is a single market for the manufacture/sale of chocolate candy products in the United States and Canada. As such, when Defendants and their co-conspirators colluded on the sale of chocolate candy products in Canada, their actions either directly affected the

price of chocolate candy products sold to Plaintiff or, in conjunction with these conspiracy communications, they also directly conspired not to compete in the sale of chocolate candy products sold to Plaintiff and others in the United States.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 115.

116.   The Canadian investigation conducted during the Summer and Fall of 2007 coincided with a number of terminations of Hershey's senior executives. Hershey Co. CEO Richard H. Lenny announced his retirement on November 11, 2007, at age 56. On November 30, 2007, Hershey Co. announced that its Senior Vice President, Global Chief Growth Officer, and former head of United States Confectionary and Chief Marketing Officer, Thomas K. Hernquist, resigned at age 49.

**Answer:**

Hershey Defendants admit that the employment relationships between Richard Lenny and The Hershey Company and between Thomas Hernquist and The Hershey Company ended in 2007.  Hershey Defendants deny the remaining allegations contained in Paragraph 116.

## United States Department of Justice Investigation

117.   On December 21, 2007, the Wall Street Journal reported in an article titled "Chocolate Makers Face Probe Over Pricing" that the United States Department of Justice's Antitrust Division ("DOJ") had begun an inquiry into Defendants' pricing practices for chocolate confectionery products in the United States. On December 20, 2007, Mars spokeswoman Alice Nathanson said the company had been contacted by the DOJ "regarding their inquiry concerning pricing practices in the U.S. chocolate confectionery industry." Nestlé spokeswoman Laurie MacDonald similarly stated that "Nestlé USA is aware of a preliminary investigation into the marketing practices in the U.S. chocolate industry." Cadbury spokeswoman Luisa Girotto would neither confirm nor deny whether Cadbury had been contacted by the DOJ, and Hershey spokesman Kirk Saville declined to comment.

**Answer:**

Hershey Defendants admit the existence of certain public articles and respectfully refer to them for their contents.  Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 117 or otherwise deny them.

118.   In April 2008, the Wall Street Journal reported in an article entitled "U.S. Probes Chocolate Price Fixing" that the DOJ had confirmed it was "investigating the possibility of anticompetitive practices in the chocolate manufacturing industry," according to DOJ spokeswoman Gina Talamona.

**Answer:**


Hershey Defendants admit the existence of certain public articles and respectfully refer to them for their contents.  Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 118 or otherwise deny them.


119.   Similarly, competition regulators in other countries have also begun investigations into Defendants' conduct. On February 11, 2008, the New York Times reported in an article entitled "German Cartel Office Raids Chocolate Makers" that the Federal Cartel Office in Germany raided the offices of Nestlé, Kraft, and Mars, and that "[a]uthorities suspect that the companies may have colluded to raise the prices of their products." On February 20, 2008, the Associated Press reported that both Hersey and Mars had also confirmed that they had received requests for information from the European Commission.

**Answer:**


Hershey Defendants admit the existence of certain public articles and respectfully refer to them for their contents.  Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 119 and therefore deny them.

**In Re: Chocolate Confectionary Antitrust Litigation MDL**

120.   In late 2007 and early 2008, multiple lawsuits were filed in federal courts across the country alleging a conspiracy by Defendants to fix, maintain or stabilize prices of chocolate candy in violation of the Sherman Act and the Kansas Restraint of Trade Act.

**Answer:**

Hershey Defendants admit that lawsuits have been filed in federal courts that

allege "a conspiracy by Defendants to fix, maintain or stabilize prices of chocolate

candy in violation of the Sherman Act and the Kansas Restraint of Trade Act."

Hershey Defendants deny any involvement in such a conspiracy.

121.   On April 7, 2008, the Judicial Panel on Multidistrict Litigation began transferring those cases for coordinated proceedings as Case No. 1:08-MDL-01935-CCC before the Honorable Christopher C. Conner, United States District Judge in the United States District Court for the Middle District of Pennsylvania (the "MDL Court").

**Answer:**

Hershey Defendants admit the allegations contained in Paragraph 121.

122.   On March 4, 2009, the MDL Court considered a Motion to Dismiss brought by Defendants and several conspirators who were named in the MDL actions. Defendants claimed that the allegations in the Amended Complaints before the MDL Court failed to raise a plausible inference of an agreement to fix prices.

Further, Cadbury plc, Cadbury Holdings, Mars Canada, Nestlé S.A., and Nestlé Canada moved to dismiss on the basis of an alleged lack of in personam jurisdiction, claiming that they "do not sell chocolate candy in the United States, maintain no facilities inside the U.S., and have no pricing authority in the U.S. chocolate market." In denying the Motion to Dismiss, the MDL Court found that the alleged market conditions for chocolate candy products and the existence of the Canadian conspiracy raised a plausible inference of conspiracy.

**Answer:**

Hershey Defendants admit that the MDL Court considered a motion to dismiss and respectfully refer to the March 4, 2009 Order for its contents.  Hershey Defendants otherwise deny the allegations contained in Paragraph 122.

123.   In a August 11, 2009 Order, the MDL Court found that while there was insufficient basis for personal jurisdiction over Mars Canada, Nestlé S.A. and Nestlé Canada, the operations of Cadbury plc and Cadbury Holdings were mere alter-egos of Cadbury USA, and thus were subject to personal jurisdiction. Specifically, the MDL Court noted that Cadbury's management control was centralized in Cadbury's "Chief Executive Officer's Committee" ("CEC") which had responsibility for day-to-day operations and the implementation of strategy for all the Cadbury entities. The MDL Court also noted that executives and employees were often "seconded," and sometimes even concurrently shared, between the entities. For example, Jim Chambers served as the President and CEO of Cadbury USA and the head of Cadbury's American Confectionary business unit, giving him responsibility for all Cadbury's chocolate products in the United States, Canada, and Mexico, regardless of whether it was manufactured by Cadbury USA. Mr. Chambers was also a member of the CEC.

**Answer:**


Hershey Defendants admit that the MDL court considered whether it had personal jurisdiction over certain defendants and respectfully refer to the August 11, 2009 Order for its contents.   Hershey Defendants otherwise deny the allegations contained in Paragraph 123.


124.   On April 28, 2011, certain plaintiffs in the MDL action reached a settlement with Cadbury Holdings Ltd., Cadbury plc, and Cadbury Adams Canada, Inc. Cadbury agreed to pay $1,312,500 for the Direct Purchaser Plaintiffs in that action, $250,000 to the Indirect End User Plaintiffs in that action, and $250,000 to pay for notice of the settlement to all Settlement Classes. Cadbury also agreed to cooperate in the prosecution of the litigation against the remaining Defendants. The Cadbury settlement does not provide any money for class members; instead, the settlement money will be used solely to pay litigation costs. Plaintiff timely opted- out of that settlement.

**Answer:**


Hershey Defendants admit a settlement was entered into and respectfully refer to it for its contents. Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 124 and therefore deny them.

## TOLLING AND/OR PRESERVATION OF THE STATUTES OF LIMITATIONS AND FRAUDULENT CONCEALMENT

125. The statutes of limitation as to Defendants' continuing antitrust violations were tolled and/or the causes of action were preserved by the pendency of the class action complaints against Defendants for conspiring to fix prices of chocolate candy products in violation of the Sherman Act and the Kansas Restraint of Trade Act.

**<u>Answer:</u>**

Denied. Hershey Defendants deny the allegations contained in Paragraph 125.

126. The statutes of limitations as to Defendants' continuing antitrust violations were also tolled and/or the causes of action were preserved by Defendants' fraudulent concealment as alleged below.

**<u>Answer:</u>**

Denied. Hershey Defendants deny the allegations contained in Paragraph 126.

127. During the Relevant Period, Plaintiff believed in good faith at the time that it was paying competitive prices for chocolate candy products purchased from Defendants and their co- conspirators. Plaintiff did not know Defendants and/or their co-conspirators had entered into the conspiracy not to compete on the sale of chocolate candy products sold to Plaintiff and others in the United States.

**Answer:**

Hershey Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 127 and therefore deny them.

128. Defendants' and their co-conspirators' conspiracy was self-concealing, which prevented Plaintiff from discovering its existence. Notwithstanding the self-concealing nature of their conspiracy Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiff by, without limitation, and upon information and belief, one or more of the following acts:

(a)   Providing Plaintiff and others with false or misleading explanations for changes in the price of chocolate candy products, such as rising input costs, so as to create the illusion that such price changes were the result of unilateral conduct when, in fact, they were the product of collusion;

(b)   Individually issuing price announcements for chocolate candy products so as to create the illusion of competitive pricing in the industry when, in fact, the pricing was not competitive;

(c)   Instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy;

(d)   Confining the anticompetitive, unlawful plan to a limited number of people and key officials at each Defendant company;

(e)   Avoiding either references in publicly-available documents regarding conduct which would constitute an antitrust violation or anticompetitive act; and

(f)     Conducting covert, secret conspiracy communications or meetings in the United States, Canada and/or in Europe.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 128.

129.   Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon because of the self-concealing character of the conspiracy and/or because of Defendants' and their co-conspirators' fraudulent concealment of the conspiracy.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 129.

**COUNT 1**
**Conspiracy to Fix Prices in Violation of the Sherman Act, 15 U.S.C. § 1**
**(All Defendants)**

130.   Plaintiff incorporates by reference the allegations above, as if fully set forth herein.

**Answer:**

Hershey Defendants incorporate by reference the responses set forth in Paragraphs 1 to 129, inclusive, as though fully set forth herein.

131.   Beginning at least as early as January 1, 2002, and continuing until in or about 2008, with an effect that continues, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on price in the sale of chocolate candy products in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer:**

Denied.   Hershey Defendants deny the allegations contained in Paragraph 131.

132.   The contract, combination and conspiracy among Defendants and their co- conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing and sale of chocolate candy products, the substantial terms and purpose of which were:

(a)   To fix, stabilize, maintain and/or raise prices of chocolate candy products in the United States and elsewhere;

(b)   To allocate the volume of sales and/or market shares of chocolate candy products in the United States and elsewhere;

(c)   To allocate contracts to supply chocolate candy products in the United States and elsewhere; and/or

(d)     To control or reduce the output of and/or capacity to produce chocolate candy products in the United States and elsewhere.

**Answer:**

Denied.   Hershey Defendants deny the allegations contained in Paragraph 132.

133.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts:

(a)     They agreed to exchange and did exchange current and future price information about chocolate candy products sold in the United States and elsewhere;

(b)     They agreed to coordinate and did coordinate price levels and price movements of chocolate candy products sold in the United States and elsewhere;

(c)     They agreed on prices and price levels of chocolate candy products sold in the United States and elsewhere;

(d)     They agreed to eliminate or modify the practice of providing discounts, rebates and allowances to customers in connection with the sale of chocolate candy products;

(e)     They agreed to allocate and allocated chocolate candy product customers or sales volume, or both, in the United States and elsewhere among themselves;

(f)    They agreed to allocate and allocated market shares of chocolate candy products in the United States and elsewhere; and/or

(g)    They agreed to control or reduce, and did control or reduce, the output of and/or capacity to produce chocolate candy products in the United States and elsewhere.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 133.

134.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including without limitation, participating in conversations and meetings in the United States, Canada and/or elsewhere to discuss the prices of chocolate candy products to be sold and/or the volume of chocolate candy products to be produced in the United States and elsewhere; participating in conversations and attending meetings in the United States, Canada and/or elsewhere concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in the United States and elsewhere in accordance with the conspiracy; and/or exchanging information on the sale of chocolate candy products in the United States and elsewhere.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 134.

135.   As a result of Defendants' and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during times relevant to these allegations:

(a)   Price competition in the sale of chocolate candy products among Defendants and their co-conspirators to Plaintiff and others has been restrained, suppressed and eliminated;

(b)   Prices for chocolate candy products sold by Defendants and their co- conspirators have been raised, fixed, maintained and/or stabilized at artificially high and noncompetitive levels throughout the United States and elsewhere; and

(c)   Plaintiff has been deprived of the benefit of free and open competition.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 135.

136.   Plaintiff has been injured in its business or property by reason of Defendants' and their co-conspirators' antitrust violations in amounts not yet ascertained. Plaintiff's injuries as a direct purchaser of chocolate candy products are injuries of the type that the antitrust laws were designed to prevent and flow from that which makes Defendants' and their co-conspirators' acts unlawful.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 136.

137.  Because Defendants controlled approximately 76% of the Relevant Market, their collective price increases provided sufficient cover, or a "price umbrella," for non-cartel chocolate manufacturers to also increase prices without fear of losing sales or market share.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 137.

138.  Plaintiff is threatened by continuing loss and damage as a result of Defendants' and their co-conspirators' unlawful conduct. Plaintiff therefore is entitled to injunctive relief.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 138.

## COUNT II
## Violation of the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.
## (All Defendants)

139.   Plaintiff re-alleges every paragraph above as if fully set forth herein.

**Answer:**

Hershey Defendants incorporate by reference the responses set forth in Paragraph 1 to 138, inclusive, as though fully set forth therein.

140.   From at least as early as 2002, continuing to 2008, with precise dates to be ascertained in discovery and proved at trial, Defendants and other unnamed co-conspirators actively engaged in an unlawful arrangement, contract, agreement, trust, or combination designed to control and manipulate the price of chocolate candy products sold to Plaintiff, in violation of the Kansas Restraint of Trade Act, K.S.A. 50-101 and 50-112.

**Answer:**

Denied.   Hershey Defendants deny the allegations contained in Paragraph 140.

141.   Defendants each gave their assent to, and acted in furtherance of, activities prohibited by the Kansas Restraint of Trade Act. Each Defendant is fully and jointly liable for all acts in furtherance of the conspiracy committed by each other co-conspirator, and by each co- conspirator's agents, employees, representatives, trade groups and other associates, whether named or unnamed in this Complaint.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 141.

142.   Defendants' actions in violation of the Kansas Restraint of Trade Act include, but are not limited to: participating in a collusive agreement to artificially raise and maintain pricing on chocolate candy products through the implementation of coordinated price increases and production limits.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 142.

143.   Defendants affirmatively concealed from Plaintiff and the general public the existence of their illegal understandings and agreements through misrepresentations and omissions regarding this conspiracy.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 143.

144.   As a direct and proximate result of Defendants' conduct, Plaintiff directly purchased chocolate candy products at prices higher than it would have

paid and on terms that are less favorable than would have been available in a competitive market. The anticompetitive effect of Defendants' illegal arrangements, contracts, agreements, combination and conspiracy was to distort and/or artificially inflate the prices that Plaintiff paid for chocolate candy products. Defendants' actions further restrained and controlled the full and free competition in the market for chocolate candy products.

**Answer:**

Denied.   Hershey Defendants deny the allegations contained in Paragraph 144.

145.   Defendants' actions deprived Plaintiff of the right to make budgeting, accounting, resource allocations and other financial and business decisions in a full and free competitive market for chocolate candy products.

**Answer:**

Denied.   Hershey Defendants deny the allegations contained in Paragraph 145.

146.   As a result of its purchases, Plaintiff thereby suffered loss, injury and damage in an amount greater than $75,000, according to proof at trial.

**<u>Answer:</u>**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 146.

147.  Pursuant to K.S.A. 50-115, Plaintiff seeks the full consideration it paid for any chocolate candy products sold to it by Defendants whose pricing was a result of the unlawful acts of one or more Defendants.

**<u>Answer:</u>**

Hershey Defendants admit that AWG purports to seek the relief described in Paragraph 147, but deny that AWG is entitled to such relief or any relief whatsoever.

148.  Pursuant to K.S.A. 50-108 and 50-161, Plaintiff further seeks to recover treble the damages it sustained as a result of Defendants' conduct, as well as attorneys' fees, costs, and any additional remedies provided by law.

**<u>Answer:</u>**

Hershey Defendants admit that AWG purports to seek the relief described in Paragraph 148, but deny that AWG is entitled to such relief or any relief whatsoever.

149. There exists a significant threat of injury to Plaintiff because Defendants' anticompetitive actions continue through today and/or are likely to reoccur.

**Answer:**

Denied.  Hershey Defendants deny the allegations contained in Paragraph 149.

150. Pursuant to K.S.A. 50-161, Plaintiff therefore seeks to have Defendants enjoined from directly or indirectly continuing the conspiracy and/or the agreement to artificially manipulate and inflate the price of chocolate candy products.

**Answer:**

Hershey Defendants admit that AWG purports to seek the relief described in Paragraph 150, but deny that AWG is entitled to such relief or any relief whatsoever.

## AFFIRMATIVE DEFENSES

In addition to the foregoing responses, Hershey Defendants assert the following affirmative defenses to the claims raised in the AWG Complaint.

Hershey Defendants do not assume the burden of proof on these defenses where the substantive law provides otherwise.

**First Affirmative Defense**
**(Statute of Limitations)**

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitations.

**Second Affirmative Defense**
**(Lack of Standing)**

Plaintiff's claims are barred in whole or in part because Plaintiff lacks standing to bring this action against Hershey Defendants.

**Third Affirmative Defense**
**(Laches, Waiver and Estoppel)**

Plaintiff's claims are barred in whole or in part by the doctrines of laches, waiver and estoppel.

**Fourth Affirmative Defense**
**(Unclean Hands)**

Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

## Fifth Affirmative Defense
## (Lack of Injury)

Plaintiff's claims are barred in whole or in part because Plaintiff has suffered no antitrust injury.

## Sixth Affirmative Defense
## (Failure to Mitigate)

Plaintiff's claims are barred in whole or in part because Plaintiff failed to mitigate any damages suffered by Plaintiff.

## Seventh Affirmative Defense
## (Reliance Upon Other Defendants' Defenses)

Hershey Defendants incorporate by reference any affirmative defense that is pleaded by any other Defendant in this lawsuit.

## Reservation of Affirmative Defenses

Hershey Defendants have not knowingly or intentionally waived any applicable affirmative defenses and reserve the right to assert and rely on such other applicable affirmative defenses as may become available or apparent during the proceedings.   Hershey Defendants further reserve the right to amend their answer and/or affirmative defenses accordingly, and/or to delete affirmative

defenses that they determine are not applicable during the course of subsequent discovery.

## PRAYER FOR RELIEF

WHEREFORE, Hershey Defendants respectfully request that this action be dismissed with prejudice, that judgment be entered in Hershey Defendants' favor on the Complaint, that Hershey Defendants be awarded their attorneys' fees, costs and expenses, and such other relief that the Court deems just and proper.

Date: November 2, 2012                    Respectfully submitted,

_____  /s/ Craig S. Primis

Thomas D. Yannucci, P.C.

Craig S. Primis, P.C.

Jonathan D. Brightbill

Jennifer W. Cowen

KIRKLAND & ELLIS LLP

655 15th Street, NW; Suite 1200

Washington, DC 20005 (202) 879-5000

Alan R. Boynton, Jr.

MCNEES WALLACE & NURICK
LLC

100 Pine Street,

PO Box 1166

Harrisburg, PA 17108

(717) 232-8000

*Counsel for Defendants The Hershey
Company and Hershey Canada Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2012, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all Counsel of Record via transmission of Notices of Electronic Filing generated by CM/ECF.


_____ /s/ Craig S. Primis _____

Craig S. Primis, P.C.