**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: CHOCOLATE** | : | **MDL DOCKET NO. 1935** |
| **CONFECTIONARY ANTITRUST** | : | **(Civil Action No. 1:08-MDL-1935)** |
| **LITIGATION** | : | |
| _____ | : | **(Judge Conner)** |
| | : | |
| **THIS DOCUMENT APPLIES TO:** | : | |
| **DIRECT PURCHASER PLAINTIFFS** | : | |
| | : | |

## <u>MEMORANDUM</u>

Presently before the court are two motions in limine to exclude expert testimony (Docs. 1062, 1066) filed by Defendants The Hershey Company ("Hershey"), Mars, Inc. ("Mars"), and Nestlé U.S.A., Inc. ("Nestlé"), (collectively "Defendants"), and a motion for class certification (Doc. 995) filed by Direct Purchaser plaintiffs.  For the reasons that follow, the motions in limine will be denied and the motion for class certification will be granted.

## I.   <u>INTRODUCTION</u>

This is a multi-district antitrust case brought pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as various state antitrust and consumer protection statutes.  Specifically, Direct Purchasers allege that Defendants, multi-

national corporate entities who produce approximately seventy-five percent of America's chocolate confectionary products,[1] conspired to implement three price increases on chocolate from 2002 through 2007.  During this period, Direct Purchasers allege that various market-based factors made the chocolate candy market ripe for collusive pricing efforts, including: formidable cost barriers to market entry, stable raw material costs, the Defendants' hedging of certain commodities markets, and a plateau of consumer demand as the American population sought healthier alternatives to chocolate confectionary products. Direct Purchasers also contend that chocolate candy items are fungible, commodity-like products, which augments the market's vulnerability to collusion.[2]

In addition to market forces, Direct Purchasers argue that the chocolate candy industry is structured in a manner that is conducive to collusive behavior. Direct Purchasers assert that the industry is highly concentrated in that a small number of manufacturers control a large percentage of the market.  This concentration creates a mature market where few key players exist and demand

---

[1] As used in this Memorandum, "chocolate confectionary products" and "chocolate candy products" refer to single and King sized chocolate bars, and other mass-produced chocolate products manufactured by Hershey, Mars, and Nestlé and packaged for sale to various retail customers.  Examples of some of Defendants' more popular items are Hershey's Milk Chocolate Bar®, M&M's®, and Nestlé Crunch Bar®.

[2] A product is considered fungible and commodity-like when price is the determinative factor in the purchasing decision, as compared to other characteristics such as brand preference.  (Doc. 999, at 27).

does not fluctuate significantly. As a result of the small number of market players, company executives often attend the same business events, such as trade association meetings and, consequently, have numerous occasions to interact informally. (Doc. 998, at 28). Direct Purchasers further argue that, in sharp contrast to the oligarchy that controls chocolate manufacturing, the large class of direct purchasers of chocolate products arrives at the marketplace in many different forms, including distributors, wholesalers, "big-box" stores, and supermarkets, as well as small convenience store chains and individual "mom and pop" shops. (Doc. 418 ¶ 55). Consequently, no single customer or small group of customers possesses the ability to exercise meaningful influence over pricing decisions. (Id.)

　　　As the result of a confluence of these factors, Defendants allegedly conspired to fix prices in violation of applicable antitrust and consumer protection statutes. Because of the diffuse nature of the customer base purportedly victimized by this anti-competitive behavior, Direct Purchasers assert that this litigation presents the paradigm for disposition by class action. (See Doc. 998, at 4-8).

Defendants, on the other hand, argue that the diverse nature of the customer base makes this matter unsuitable for class action disposition. (Doc. 1028, at 1). According to Defendants, the complex mixture of "trade spend programs"[3] and customer-specific pricing negotiations, makes it impossible to determine the actual price paid for chocolate confectionary products with evidence common to the class. (Id.)

---

[3] The parties do not specifically define "trade spend". However, the court finds the explanation provided by Direct Purchasers' expert, Dr. James T. McClave, instructive: "Each of the defendants spends some of its revenues on promotional activities. These promotional dollars are known in this industry as 'trade spend.' Manufacturers engage in trade spending in order to obtain certain benefits for themselves, including product placement and display, product promotions, and increased advertising of their products designed to increase the volume of sales. Defendants make trade spend payments to their merchant customers in exchange for the customer's carrying out specified promotional arrangements." (Doc. 999-1, at 51). The following are typical trade spend programs: (1) "Every Day Low Pricing," which may be provided to retailers who offer a consistently low price; (2) "Brand Specific Promotion," which promotes a certain brand, for example, by displaying it in the front of the store; (3) "End-Cap Fees With Price Promotion," for customers who set up end-cap displays with an accompanying price discount (an example of an end-cap display is a chocolate product which is featured at the end of a grocery aisle); and, (4) "Combination Programs," for combining sales of chocolate products with an accompanying item. (Doc. 1028, at 20; see also Doc. 1087, at 16-23).

II.  **PROCEDURAL HISTORY**

Currently a total of ninety-one actions are associated with the above-captioned multidistrict litigation.  On April 7, 2008, the Judicial Panel on Multidistrict Litigation consolidated all pre-trial matters in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1407(a).  (See Doc. 1).  On May 25, 2011, plaintiffs Direct Purchasers filed a motion for class certification and, *most significantly*,[4] narrowed the class to the following:  "All persons and entities who directly purchased single serving standard and King size chocolate candy for re-sale directly from Defendants between December 9, 2002 and December 20, 2007."  (Doc. 998, at 2-3 n.2).

The court held a three-day hearing on Direct Purchasers' motion for class certification in November 2011.  The parties have submitted detailed briefs and numerous exhibits and the court proceeds with the benefit of a full record on Direct Purchasers' request for class certification. [5]

---

[4] Suffice it to say that the court's analysis would have been materially different had the definition of the Direct Purchaser Class remained as initially proposed in the Consolidated Class Action Complaint.  (See Doc. 418, ¶ 37).

[5] The court notes that the briefing on Defendants' motions in limine concluded after the hearing on class certification.  In addition, Defendants' expert, Dr. John H. Johnson, IV, submitted a rebuttal declaration on January 6, 2012 (Doc. 1129), subsequent to the hearing.

## III.   **LEGAL STANDARDS**

### A.   **Class Certification**

Class certification under Rule 23(b)(3) requires a two-step process.  First, a party wishing to be certified as a class must meet the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  *In re* Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 n.6 (3d Cir. 2009); Behrend v. Comcast Corp., 655 F.3d 182, 189 (3d Cir. 2011).  A court must find that each of these requirements are met before a class can be certified under Rule 23.  See Hydrogen, 552 F.3d at 310; Behrend, 655 F.3d at 189.  Second, a proposed class seeking certification under Rule 23(b)(3) must show that issues common to the proposed class members "predominate" over issues affecting individual class members – the class must be "sufficiently cohesive to warrant adjudication by representation." *In re* Ins. Brokerage Antitrust Litig., 579 F.3d 241, 266 (3d Cir. 2009) (quoting Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 623 (1997)).

These determinations require a court to conduct a "rigorous analysis" of the relevant evidence to determine whether the elements of Rule 23 have been met. Hydrogen, 552 F.3d at 310.  In considering the evidence, the court should address all relevant legal and factual issues and make preliminary inquires into the merits of the case.  See Behrend, 655 F.3d at 190 (citing Hydrogen, 552 F.3d at 317); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 166 (3d Cir. 2001) ("A class certification decision requires a thorough examination of the factual and legal allegations . . . [and therefore] courts should make whatever factual and

6

legal inquiries are necessary under Rule 23.") (internal citations omitted).

Importantly, Rule 23 determinations are not binding on the ultimate trier-of-fact.
Id.

It is the burden of the plaintiff class to prove, by a preponderance of the
evidence, each requirement of Rule 23.  Id.  If a court determines that the Rule 23
requirements have been satisfied after conducting a rigorous analysis of all relevant
evidence and resolving all necessary disputes, then class certification is
appropriate.

**B.    Expert Witness Testimony and Defendants' Motions in Limine**

**1.    Application of Daubert at Class Certification**

As a threshold matter, the court must determine whether Federal Rule of
Evidence 702 and the Supreme Court's decision in Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993), present any barriers to the court's
consideration of the expert opinions of Drs. Tollison and McClave.[6]  If the court is
required to undertake a Rule 702 and Daubert analysis at the class certification
stage, then the court must determine whether the Direct Purchasers have
nonetheless surmounted these barriers.  Rule 702 places district courts in the role of
"gatekeeper," requiring courts to "'ensure that any and all [expert] testimony . . . is

---

[6] The court notes that Defendants filed motions to exclude the opinions of Dr.
Tollison and Dr. McClave *prior* to the hearing on class certification.  (See Doc. 1063;
Doc. 1066).

not only relevant, but reliable.'" <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 147 (1999) (quoting <u>Daubert</u>, 509 U.S. at 589).

Whether the strictures of <u>Daubert</u> apply at the class certification stage appears to be an open question in the Third Circuit. Defendants cite to the Supreme Court's recent decision in <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S.Ct. 2541 (2011), for the proposition that <u>Daubert</u> applies at the class certification stage. However, <u>Wal-Mart</u> addressed the issue in *obiter dictum*, and merely expressed its "doubt" of the soundness of the trial court's conclusion that <u>Daubert</u> did not apply at this stage. <u>See</u> <u>id</u>. ("The District Court concluded that <u>Daubert</u> did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so, but even if properly considered, [the expert witness's] testimony does nothing to advance respondents' case.") (citation omitted).

Similarly, Direct Purchasers misapprehend the Third Circuit's decision in <u>Behrend v. Comcast Corp.</u>, 655 F.3d 182 (3d Cir. 2011), as limiting <u>Daubert's</u> application at class certification.[7] Like the Supreme Court in <u>Wal-Mart</u>, the Third Circuit in <u>Behrend</u> acknowledged that the issue of whether <u>Daubert</u> applied to expert testimony proffered at class certification was not before it. <u>See</u> <u>id.</u> at 204 n.13 (noting that Comcast failed to raise the <u>Daubert</u> issue in either the district

---

[7] The Supreme Court recently granted certiorari in <u>Behrend</u> on the following issue: "Whether a district court may certify a class action without resolving whether the plaintiff class has introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." 133 S.Ct. 24 (June 25, 2012).

court or the court of appeals).  At the suggestion that <u>Wal-Mart</u> implicitly sanctions a <u>Daubert</u> analysis at the class certification stage, the <u>Behrend</u> majority was circumspect:  "it need not turn class certification into a mini-trial."  <u>Id.</u>; <u>see also</u> <u>Bitler v. A.O. Smith Corp.</u>, 391 F.3d 1114, 1122 (1st Cir. 2004) ("<u>Daubert</u> does not require a district court to linger at the 'gate,' as if caught in Zeno's paradox, unable to proceed to the main trial without first conducting a series of mini-trials with regard to every objection raised against a party's expert witnesses.").  The <u>Behrend</u> court interpreted <u>Wal-Mart</u> "to require a district court to evaluate whether an expert is presenting a model which could evolve to become admissible evidence, and not requiring a district court to determine if a model is perfect at the certification stage."  <u>Id.</u>  This interpretation comports with the general principal of <u>Daubert</u> that "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect."  <u>In re</u> Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994).  <u>Behrend</u> does not, as Direct Purchasers suggest, authorize a "<u>Daubert</u>-light" review at the class certification stage.

Although the Third Circuit has not squarely addressed the issue, several other jurisdictions have considered whether the admissibility of expert testimony is a relevant consideration at the class certification stage.  In <u>American Honda Motor Co. v. Allen</u>, 600 F.3d 813, 815-16 (7th Cir. 2010), the Seventh Circuit held that when an expert's report or testimony is "critical to class certification" a district court "must perform a full <u>Daubert</u> analysis before certifying the class if the situation warrants."  While not speaking to Rule 702 or <u>Daubert</u> directly, the Fifth Circuit

recognized in Unger v. Amedisys Inc., 401 F.3d 316, 323 n.6 (5th Cir. 2005), that, "[i]n many cases, it makes sense to consider the admissibility" of expert testimony at the Rule 23 certification stage, because "[i]n order to consider Plaintiffs' motion for class certification with the appropriate amount of scrutiny, the Court must first determine whether Plaintiffs' expert testimony supporting class certification is reliable." By contrast, the Eighth Circuit, in In re Zurn Pex Plumbing Products, 644 F.3d 604, 612 (8th Cir. 2011). Liability Litigation, affirmed a district court's "tailored" Daubert analysis – an examination of the expert testimony with the requirements of Rule 23 in mind. The Eighth Circuit noted that a full Daubert analysis would have been "impractical" because the parties had engaged in bifurcated discovery, resulting in a limited evidentiary record at the class certification stage that would have "prevented . . . [a] full and conclusive Daubert inquiry." Id. at 612-13. The court also stated that it was "not convinced that the approach of American Honda would be the most workable in complex litigation or that it would serve case management better" than the district court's circumscribed analysis. Id. at 612.

Despite the paucity of relevant precedent in the Third Circuit and the discordant views percolating in the circuits, the court finds that a thorough Daubert analysis is appropriate at the class certification stage of this MDL in light of the court's responsibility to apply a "rigorous analysis" to determine if the putative

class has satisfied the requirements of Rule 23.[8]  See *In re* Hydrogen Peroxide

Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008).  The court is particularly persuaded

by Judge Jordan's concurring and dissenting opinion in Behrend.  Indeed, Judge

Jordan portends the instant matter, stating:

> [S]imple logic indicates that a court may consider the
> admissibility of expert testimony at least when
> considering predominance.  A court should be hard
> pressed to conclude that the elements of a claim are
> capable of proof through evidence common to the class if
> the only evidence proffered would not be admissible as
> proof of anything.

655 F.3d at 215, n.18.   In this litigation, Direct Purchasers' proof of predominance

rests entirely on the shoulders of their expert witnesses.  The testimony of Dr.

McClave and the testimony of Dr. Tollison are integral to the court's determination

of whether the Direct Purchasers can both prove and quantify their antitrust injury

with evidence common to the class.  Hence, the court must evaluate the reliability

and fitness of the proffered testimony of Dr. Tollison and Dr. McClave.[9]

---

[8] A leading treatise on class actions states that "as part of its rigorous analysis
at the class certification stage, [a] Court should determine under the Daubert
standard whether expert evidence is sufficiently reliable to be considered and then
weigh the significance of expert evidence relevant to any class certification
requirement."  1 Joseph M. McLaughlin, McLaughlin on Class Actions § 3:14
(8th ed. 2011).  Moreover, though the Supreme Court's statement in Wal-Mart was
only dictum, "it betray[ed] no hesitation."  Id.

[9] At the class certification hearing, the court timely notified counsel that it
intended to address Defendants' motions to exclude expert testimony in
conjunction with the court's ruling on class certification.  (Doc. 1085, at 6).

## 2.    **Daubert** Analysis

Admissibility of expert testimony is a question of law governed by Federal

Rule of Evidence 702,[10] which provides:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill, experience, training,
> or education, may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably to the facts of
> the case.

FED. R. EVID. 702; see also Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316,

321 (3d Cir. 2003) (explaining that the Rule 702 requirements constitute "the 'trilogy

of restrictions on expert testimony: qualification, reliability and fit'" (quoting

Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003))).  Expert testimony must be

both reliable and relevant, but balanced with the overarching "liberal policy of

admissibility," favoring the admission of any evidence that may assist the trier of

fact.  Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting

Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).

---

[10]  Rule 702 applies generally to any expert with "scientific, technical, or other
specialized knowledge," and though Daubert dealt only with scientific testimony,
the Court later expanded Daubert's "general principles" to all subject matter
described in Rule 702.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149
(1999).  Hence, under Kumho Tire, the economic testimony offered by Drs. Tollison
and McClave qualify as "technical, or other specialized knowledge" subject to the
Daubert standard.

### a. Dr. Robert D. Tollison

Direct Purchasers submit the expert reports and testimony of Dr. Robert D. Tollison on the nature of, and ramifications flowing from, the economic structure of the chocolate confectionary market. (Docs. 999, at 17-58; 1049-2, at 1-25; Doc. 1085, at 273-290; Doc. 1086, at 4-69). Dr. Tollison has an extensive resume, (see Doc. 999-1, at 3-31), which the court will briefly summarize as follows: Ph.D in economics (University of Virginia 1969); Senior Staff Economist of the President's Council of Economic Advisers (1971-72); Director of the Bureau of Economics, Federal Trade Commission (1981-83); Professor of Economics, including over forty years of graduate level instruction, presently holding an endowed chair at Clemson University; author of over 200 papers in peer-reviewed journals and an additional 120 papers in invited collections; author or co-author of 14 books, including seven editions of a basic economics textbook; and court-qualified expert in numerous legal actions. (See generally Doc. 1085, at 273-285). At the class certification hearing, Defendants expressed no objection to Dr. Tollison's expert qualifications in the fields of economics, industrial organization, and econometrics. (Id. at 285). Accordingly, the court accepted Dr. Tollison as an expert in each of these fields. (Id.)

The crux of Dr. Tollison's testimony is his opinion that various features of the chocolate confectionary industry create an environment which is conducive to price-fixing. In addition, Dr. Tollison utilizes the econometric analyses undertaken by Dr. McClave to assert class-wide antitrust injury.

13

The reliability and fit of Dr. Tollison's opinions are readily assessed. His opinions are founded upon basic economic precepts and industry characteristics, adequately supported by record evidence. Specifically, Dr. Tollison researched the structural characteristics of the chocolate confectionary industry, (Doc. 1086, at 6-9; Doc. 999, at 26), noting inelastic market demand for products, (Doc. 1086, at 10-13; Doc. 999, at 29-30), high barriers to market entry and Defendants' acquisition of significant market power, (Doc. 1086, at 20-29; Doc. 999 at 31-32), the "reasonably interchangeable" nature of the chocolate products at issue, (Doc. 1086, at 36-40; Doc. 999, at 27-28), and the myriad of opportunities for executive discourse in informal settings, (Doc. 1086, at 29-36; Doc. 999, at 32-35). He also examined manufacturer conduct in relation to price increases generally, as well as the timing of the three, lock-step price increases at issue in the present litigation. (Doc. 1086, at 41-47; Doc. 999, at39-41). Finally, he examined the economic performance of the industry to determine the impact of collusive price-fixing on the Direct Purchaser class. (Doc. 1086, at 54-56; Doc. 999, at 48-50).

Quite frankly, there is nothing particularly controversial or unique in the *conceptual* or *foundational* aspects of Dr. Tollison's opinions. Obviously, Defendants vigorously dispute Dr. Tollison's conclusions, but the court finds that these disputes go to the weight, and not the admissibility, of Dr. Tollison's expert testimony. To be sure, Defendants also disagree with a number of findings upon which Dr. Tollison bases his opinion. For example, Defendants challenge Dr. Tollison's finding that

chocolate products are branded yet "reasonably interchangeable" by consumers.[11]

There is no doubt that the chocolate confectionary industry is heavily branded,

saturated with iconic marketing symbols, such as the M&M™ characters or the

familiar foil wrap twist of the Hershey Kiss™.  These symbols are powerful branding

mainstays designed to generate both customer demand and customer loyalty.

Nonetheless, Dr. Tollison reasonably relied upon a Hershey-generated analysis

demonstrating consumer willingness to substitute brands based upon availability.

---

[11] Defendants rely on the expert report and testimony of Dr. Peter Rossi who disagrees with Dr. Tollison with regard to the degree of substitutability between chocolate candy products.  (See Doc. 1086, at 279).  Dr. Rossi asserts that chocolate candy products are *not* highly fungible, and that the product differentiating effect of branding on consumer preferences has been significant.  (Doc. 1032, at 7 ("Each of the major chocolate candy brands is associated with a specific type and quality of product and a specific consumption experience.")).

Whether Dr. Tollison or Dr. Rossi is correct in their assessment of the degree of substitutability between the products produced by Hershey, Nestlé and Mars is a question appropriately deferred to trial on the merits of the Direct Purchasers antitrust claim.  It does not render class certification inappropriate because, as Dr. Rossi conceded at the class certification hearing, the resolution of this issue will be common to the class. (Doc. 1086, p. 279 ("Q: . . . [W]hether you are right or Dr. Tollison is right [on the degree of substitutability between products] or it ends up somewhere in between, that is an issue that is common for each member of his class, is that correct? A: Yes.")).

(See Doc. 999, at 28 and n.24).[12]  Thus, Dr. Tollison addressed the impact of

branding in his opinion based upon the evidentiary record.[13]

In their Brief, Defendants assert that "[o]ther courts have rejected the

opinions of Dr. Tollison when, as here, they consisted of only assumptions,

conjectures, and speculation."  (See Doc. 1065, p. 19-20).  The court has reviewed

each of the three cases cited by Defendants, and the court concludes that

Defendants have overstated their relevance to the motion to exclude Dr. Tollison's

expert testimony.  Reading Intern., Inc. v. Oaktree Capital Management LLC, No.

---

[12] The court finds particular merit in Dr. Tollison's pointed clarification of the
factual basis for his conclusions:

> Substitutability is not an absolute (either/or) but a relative term.
> Products can be more or less substitutable.  So the fact that a product
> has some characteristics counter-indicative of substitutability (such as
> branding) does not end the inquiry because it does not necessarily
> negate the presence of other characteristics that are indicative of
> substitutability.  Moreover, the inquiry is not one of economic
> philosophy, but is a purposive inquiry.  The purpose is to see if there is
> sufficient substitutability to suggest that consumers make their choices
> in some substantial part on the basis of price.
>
> * * *
>
> I did not conclude that these products were perfect substitutes; I
> concluded that they are reasonably interchangeable.  The fact that this
> industry's products are differentiated along a variety of dimensions
> (ingredients, brand, packaging, size) does not mean they are not
> substitutes for one another.  (Doc. 1048-2, at 5-8).

[13] The court has carefully reviewed the factual findings underpinning Dr.
Tollison's opinions.  The vast majority are undisputed.  Those that are disputed,
such as the commodity-like nature of the products identified in the revised
description of the class (Kings and singles), are sufficiently supported by record
references.  Hence, the court adopts Dr. Tollison's factual premises for purposes of
its Rule 23 analysis.

03-Civ.-1985, 2007 WL 39301 (S.D.N.Y. Jan. 8, 2007), an antitrust case involving movie theaters in New York City, criticized not the methodology or credentials of Dr. Tollison, but the conclusions drawn from Dr. Tollison's report by counsel. <u>Id.</u> at *12. Moreover, <u>Reading International</u> did not evaluate Dr. Tollison's opinions in the context of a motion to exclude his testimony under Rule 702, but on a motion for summary judgment. It is therefore inapposite to the instant motion in which the court must assess admissibility. Similarly, in <u>American Copper & Brass, Inc. v. Halcor S.A.</u>, 494 F. Supp. 2d 873 (W.D. Tenn. 2007), the court denied a motion for reconsideration of its order dismissing a complaint for failure to state a claim. <u>Id.</u> The denial, however, was not based on a Rule 702 analysis of Dr. Tollison's opinion regarding the global nature of the market for copper tubing. It was based upon the lack of *allegata* supporting plaintiff's contention that there was a conspiracy in the copper tubing market. <u>Id.</u> at 879. Thus, <u>American Copper & Brass</u> is also inapposite.

Finally, <u>*In re* OSB Antitrust Litigation</u>, No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007), dealt not with admission of Dr. Tollison's testimony under Rule 702, but whether his analysis was sufficient to establish antitrust impact of the proposed classes. In <u>*In re* OSB</u>, plaintiffs alleged horizontal price-fixing of oriented strand board, a wood product used in housing. Plaintiffs sought to certify two classes: one class of plaintiffs who had indirectly purchased OSB for their own use, and another class of plaintiffs who had purchased houses that contained OSB. <u>Id.</u> at *1. The court found Dr. Tollison's analysis to be probative of antitrust impact to the class

17

who had purchased OSB for their own use, but not to the class of plaintiffs who had purchased homes containing OSB.  Id. at *9-12.  Essentially, the court did not agree with Dr. Tollison that a price increase in a single housing component was "passed through" to the house-purchaser, creating a class-wide increase in housing prices.  Like Reading International and American Copper & Brass, In re OSB did not address a Rule 702 challenge to the admissibility of Dr. Tollison's testimony.

**b.    Dr. James T. McClave**

Direct Purchasers also present the expert reports and testimony of Dr. James T. McClave.  The central feature of Dr. McClave's expertise is the use of econometric models to demonstrate class-wide impact and to quantify the extent of the overcharge on a class-wide basis.  Dr. McClave has a Ph.D. in statistics (University of Florida 1971).   He has nearly thirty years of teaching experience at the college level.  He has authored or co-authored six textbooks in the field of statistics, four of which continue to be used in the academic setting and two of which are beyond their tenth iteration.   (Doc. 1085, at 15-16).  Remarkably, approximately 480 colleges and universities have had occasion to utilize one or more of his textbooks.  He has engaged in litigation consulting for about thirty-five-years, including the provision of expert reports or testimony in fifty antitrust cases.  He is no stranger to this circuit, having testified in the Eastern District of Pennsylvania in Behrend v. Comcast.  See 655 F.3d 182, 200 (3d Cir. 2011).  The Defendants acceded to Dr. McClave's expertise in the field of statistics, but not in the field of econometrics.  Based upon his educational background and his

18

extensive experience, the court finds that Dr. McClave is properly qualified as an expert in both econometrics and statistics.

Dr. McClave employs a multiple regression analysis to establish class-wide antitrust injury.[14] Multiple regression analysis is the comparing of variables to determine the influence that one variable, the independent or explanatory variable, has on another variable, the dependant variable. In this litigation, Dr. McClave uses price as the dependent variable and shows the impact of various explanatory variables on price. At the class certification hearing, Dr. McClave reviewed several models which he constructed, demonstrating consistent and statistically significant overcharges.

The court finds that Dr. McClave's opinions meet the requirements of reliability and fit. Dr. McClave explains that he inserts a "dummy variable" in his models which shows "the amount, if any, by which the prices during the conspiracy period were elevated *after accounting for the effects of the other (competitive)*

---

[14] The analyses utilized by Dr. McClave have been accepted by many courts as reasonable and reliable methods of proving class-wide damages. (Doc. 1085, p. 99) See *In re* Scrap Metal, 537 F.3d at 532-34 (approving multiple regression as a standard acceptable scientific method); DRAM, 2006 WL 1530166, at *10 ("[T]he before/after methodolog[y] . . . [has] already [been] upheld [] as [a] valid means for proving damages on a class-wide basis, and this court has found no reason to reject [it] at this stage of the proceedings."); In re Bulk (Extruded) Graphite, 2006 WL 891362, at *15 (approving multiple regression analysis to estimate damages); In re Flat Glass, 191 F.R.D. at 5-87 (stating that properly constructed multiple regression models are one of the most mainstream ways to estimate damages in antitrust litigation); Urethane, 237 F.R.D. at 452 (accepting Dr. Tollison's assertion that "before and after," multiple regression analysis, and price indices comparison are proper methods to prove class-wide damages).

*explanatory variables on price*." (Doc. 999-1, at 12 (emphasis in original); Doc. 1085, at 112-114, 117); <u>see also</u> Michael O. Finklestein, *et al.*, <u>Regression Estimates of Damages in Price-Fixing Cases</u>, L. & Contemp. Problems, (1983), at 145-169, at 157 (stating "one might fairly argue that the effect of a conspiracy should be measured by the dummy variable model, since it is not tilted against finding a conspiracy effect, but rather is neutral as between conspiracy and other factors."). Dr. McClave further explains: "The dummy variable approach directly tests whether the reasons the defendants provided to their customers to justify the class period price increases are supported by the data. That is, I can directly test whether the price increases are in fact due to the increases in costs, the predominant reason that defendants gave for the increases." (Doc. 999-1, at 12). Dr. McClave's models demonstrate inflated prices during the class period which cannot be explained by non-collusive conduct. (<u>Id.</u> at 13). The court finds that Dr. McClave's analysis provides reliable, relevant, and reasonable support for the assertion that damages can be estimated and quantified on a class-wide basis. (<u>Id.</u> at 13). <u>See also</u> Section IV.E., *infra* (Predominance and Superiority).

In service of their argument that the testimony of Dr. McClave should be excluded under Rule 702, Defendants cite three cases which purportedly found Dr. McClave's testimony to be deficient. In <u>DAG Enters., Inc. v. Exxon Mobil Corp.</u>, 226 F.R.D. 95 (D.D.C. 2005), the court considered whether the plaintiff in an unfair competition and fraudulent misrepresentation case should be permitted to extend the deadline for discovery in order to supplement Dr. McClave's expert report.

Apparently, certain data that would have enhanced the accuracy of Dr. McClave's analysis was not obtained due to attorney negligence. Id. at 100-02. The court denied the request, and observed that a contrary ruling would effectively bless the filing of a new expert report. Id. at 101. Critically, the court made no suggestion that Dr. McClave's methodology was unsound; it merely noted that insufficient data (owing to attorney negligence) could marginalize his analysis. Thus, the facts and procedural posture of DAG Enterprises are distinguishable and this case does nothing to undermine Dr. McClave's qualifications to offer expert opinion testimony.

In City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548 (11th Cir. 1998), the Eleventh Circuit largely reversed a district court decision excluding Dr. McClave's testimony. In Harcros, an antitrust case involving the market for chlorine, Dr. McClave offered testimony regarding market shares in the Alabama chlorine market, the frequency with which companies retained chlorine contracts with municipalities from year to year, and statistical data regarding contract bidding, including the frequency of tie bids, prices bid, winning bid prices, and costs. Id. at 562. Concluding that the district court's opinion committed "fundamental legal errors," the court reinstated Dr. McClave's testimony, with one narrow exception. Id. at 564-67. The Eleventh Circuit upheld the exclusion of McClave's assertions regarding the existence of a conspiracy, and his characterization of certain chlorine bids as "signals" to co-conspirators, because such assertions were outside his competency as a statistician. Id. at 565. This

limited exclusion has no application to the court's present analysis. Dr. McClave's opinions are based strictly upon statistics and econometrics, and he has not rendered any assertions outside his realm of expertise.

In <u>Pierson v. Orlando Health</u>, No. 6:08-cv-466, 2010 WL 3447496 (M.D. Fla. Aug. 30, 2010), the court also addressed a Rule 702 challenge to the admissibility of Dr. McClave's testimony. <u>Pierson</u> involved a suit for breach of contract, where Dr. McClave's statistical analysis was offered to model lost wages for an orthopaedic surgeon. The court noted expressly that Dr. McClave had extensive experience in the fields of statistics and econometrics, but found that his analysis failed to account for wage and employment variations between the relevant geographic markets — Chicago, Orlando, and Northern California. <u>Id.</u> at *3-5. The court in <u>Pierson</u> found that Dr. McClave lacked sufficient facts or data to support his analysis.

Defendants assert that Dr. McClave's class-wide analysis of the effect of alleged price fixing in the chocolate confectionary industry suffers from <u>Pierson</u>-like infirmities. Specifically, Defendants' expert, Dr. James Johnson, IV, roundly criticizes Dr. McClave for relying upon price information from a single customer: Walgreens. Dr. Johnson opines that Dr. McClave's analysis fails to consider the wide variations in price paid by Defendants' customers. (<u>See</u> Doc. 1031, at 36 ("Although [Dr. McClave] purports to adjust prices for certain discounts in his impact analysis, he in fact ignores the majority of these adjustments. Furthermore, in his damages analysis, Dr. McClave derives an average overcharge (which he uses in all of his damages calculations) based only on Walgreens' list prices.")).

22

The court finds that Dr. McClave has properly accounted for price variations for several reasons. First, to the extent possible, Dr. McClave uses the list prices provided by Defendants. However, because list prices are not available for all Defendants for the entire period in question, Dr. McClave utilizes price data from a "typical" customer — Walgreens, which is one of the largest purchasers of relevant product. (Doc. 1085, at 100-101, 103-104, 106, 108-109; Doc. 999-1, at 45-46). Dr. McClave uses Walgreens data because he was able to secure it in relation to all three Defendants for the years 1993 through 2007, a longer time frame than any other available transactional data. Second, Dr. McClave establishes that Walgreens' data is representative of the class members because "the median price [paid by] all class members is almost identical to the penny to Walgreens [sic] median price." (Id. at 45-46; see Doc. 1085, at 103, 106-110). Third, when questioned by the court, Dr. McClave credibly testified that he conducted extensive research to determine that Walgreens was the best example of a typical customer. (See Doc. 1085, at 152-155, 157-159). The court finds that although there *are* limitations to Dr. McClave's analysis, they are not fatal to admissibility under Rule 702. Dr. Johnson's criticism goes only to the weight of Dr. McClave's analysis. The court finds that Dr. McClave's methodology, while imperfect, is nevertheless reasonable and reliable.

### c. **_Daubert_ Findings**

In summary, the court finds that the expert opinions presented by Drs. McClave and Tollison meet the requirements of Rule 702 and the standard announced in <u>Daubert</u>. Defendants' motions in limine to exclude the testimony of these experts will be denied. Any dispute as to the bases for these opinions or the merits of the experts' conclusions goes to the weight, not to the admissibility, of the expert testimony.

## IV. <u>FINDINGS OF FACT PERTINENT TO CLASS CERTIFICATION AND DISCUSSION OF MATTERS THAT REMAIN IN CONTENTION</u>[15]

### A. <u>Price Increases in the Chocolate Confectionary Market</u>

Direct Purchasers contend that the monolithic structure of the chocolate confectionary business, combined with market susceptibility and the inability of purchasers to gain any sort of foothold to control market prices, resulted in a environment rich for market collusion. From the mid-1990s until 2002, prices in the chocolate candy market remained stable. (Doc. 418 ¶ 59). Direct Purchasers attribute this unvarying trend in prices to the manufacturers' collective concern that a unilateral price increase by a single manufacturer would cause chocolate candy consumers to switch to a cheaper substitute, costing the manufacturer who

---

[15] When ruling on a Rule 23 motion, the district court must make factual determinations on merits issues which are essential to the disposition of the Rule 23 motion. <u>See</u> <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 167 (3d Cir. 2001) (citing Moores Fed. Practice § 23.61[5]). Sections IV and V of this Memorandum constitute the court's compliance with these directives. <u>See</u> <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305, 317-18 (3d Cir. 2009).

raised prices an immediate loss of market share. Thus, Direct Purchasers surmise, collusion was necessary to successfully increase chocolate confectionary product prices across the board.

The first anticompetitive price increase allegedly occurred on December 7, 2002, when Mars announced a price increase of 10.7 percent on standard single sized bars in the United States. (Pls.' Ex. 19;[16] Doc. 998, at 12). Almost immediately thereafter, Hershey announced a price increase on December 9, 2002, followed by Nestlé on December 11, 2002. (Pls.' Ex. 20, 21; Doc. 998, at 12). On December 12, 2002, Mars then announced a list price increase on King sized bars as well. (Pls.' Ex. 22). All three companies blamed the rising cost of raw materials as the reason for the list price increases. (See Pls.' Exs. 19, 20, 21).

In December 2004, another wave of price increases swept across the chocolate industry when, within the span of a week, Defendants raised prices of singles and Kings. On December 15, 2004, Hershey announced a price increase for standard and King size products. (Pls.' Ex. 23). Two days later, Mars followed Hershey's lead, announcing its own price increase on singles and King size products. (Pls.' Ex. 24). Nestlé announced a similar price increase on December 22, 2004. (Pls.' Ex. 25).

---

[16] Direct Purchasers' Exhibits appear to be numbered twice. For ease and clarification, the court will utilize the exhibit numbers as they were submitted under seal.

The final, allegedly collusive, price increase occurred in 2007, when Mars guided the way and announced a price increase for singles and Kings on March 23, 2007. (Pls.' Ex. 26). On April 4, 2007, Hershey announced its own price increase on standards and Kings. (Pls. Ex. 27). Nestlé rounded out the trio by raising its prices on April 5, 2007. (Pls.' Ex. 28).[17]

## B. The Parties' Opposing Arguments on Incentives to Raise Prices

Direct Purchasers argue that, because these companies have competed for years to win customer loyalty, there is an obvious and improper incentive to increase prices collectively, *to wit*: increasing revenue for all manufacturers without jeopardizing customer loyalty to an individual product line. (Doc. 1028, at 9-10). Direct Purchasers claim such an incentive is particularly acute in the chocolate candy industry because of the way in which retailers price single-serve chocolate candy, *scilicet*: charging consumers the same line price for all single serve chocolate candy products regardless of the brand or manufacturer. (Id. at 10). In the industry, this practice of uniform pricing is commonly referred to as "line pricing." (See id. at 11).

_____

[17] As noted, Defendants cited the rising costs of expenses, both direct and indirect, and increases in the cost of commodities, as the catalyst for their three, lock-step price increases. (Pls.' Exs. 26, 28). Indeed, Defendants provide an extensive rationale for the price increases. (See Doc. 1028, at 12-18). The court makes no findings with respect to the merits of Defendants' justification, as it is not directly relevant to class certification. This evidence is relevant only to their defense on the merits of Direct Purchasers' allegations of a conspiracy. In the context of Rule 23, the court must focus its findings on issues pertinent to class certification. See Marcus v. BMW of N. Am., Inc., 687 F.3d 583, 590 (3d Cir. 2012).

Defendants, on the other hand, claim that line pricing merely encourages manufacturers to follow suit when one manufacturer elects to raise its prices. Defendants posit that, when a single manufacturer raises prices, retailers are, at least potentially, the main beneficiaries because the standard retail practice is to raise the prices of all brands, even those which are not the subject of a manufacturer's price increase. The purpose behind this standard practice is obvious: to secure additional revenue. In other words, line pricing provides retailers with the opportunity to obtain profits that manufacturers would have otherwise enjoyed. (See id. at 11; Defs.' Ex. 48, at 91) (statement of CVS representative acknowledging that "CVS would have raised the retail price for Hershey [single] bar and [K]ing-size bar chocolate candy products in 2007 to match those of Mars, even if Hershey had not issued a price increase announcement . . . ."); Defs.' Ex. 128, MARSUS0733754 (Mars memorandum stating that the reason for an increase in King size pricing after Hershey had increased prices was because "the market would move to the higher price with or without us.")).

According to Defendants, manufacturers have an incentive to raise prices, not because of collusive behavior, but because of the natural business drive to increase corporate profits, especially when the risk of losing market share is relatively low. Defendants explain that industry-wide price increases must occur rapidly to stave off efforts by Direct Purchasers to front-load orders from manufacturers who have not yet increased their list prices, thereby allowing Direct Purchasers to stock-pile products at a lower price, and ultimately sell them at an

inflated price. Defendants contend that this practice of stock-piling may jeopardize a manufacturer's supply chain, providing further incentive to follow with dispatch a competitor's price increases.

## C. **Merit Facts Relevant to Class Certification**

### 1. **Evidence of Collusion**

The record contains evidence supporting the proposition that Defendants had advance knowledge of each other's planned price increases.[18] (See generally Doc. 1086, at 41, 51-52). For example, Hershey was quite clearly aware of Mars' planned December 2002 price increase in September 2002, three months before the price increase was actually announced. (Pls.' Ex. 3, at 166) (acknowledging team was formed in September to plan action to be taken in light of Mars' proposed price increase); (Pls.' Ex. 29) (Hershey document from September 2002 outlining its plan to address Mars' December 2002 scheduled price increase). A December 20, 2004 letter from Richard A. Lenny, President and CEO of Hershey Foods to the Hershey Foods Board of Directors reflects that Hershey knew on December 20, 2004, that Nestlé intended to raise its price on "loose bars," (see Pls.' Ex. 33 ("We've now received confirmation that both Mars and Nestlé have also raised prices on loose

---

[18] To be clear, the court does not adopt the Direct Purchasers' theory that each price increase was proceeded by the surreptitious exchange of information at the executive level. Nor is the court required to make such a finding at the class certification stage. See Marcus, 687 F.3d at 591 (only factual findings necessary to determine class certification need to be made at the Rule 23 stage). The court finds only that there is sufficient evidence in the record to support this proposition for purposes of its Rule 23 analysis.

bars")),  despite the fact that Nestlé did not publically announce its price increase until December 22, 2004.  (Pls.' Ex. 25).  Finally, the close proximity of the manufacturers' respective price increases is strong, albeit circumstantial, evidence of collusion; it is undisputed that manufacturers announced each of the three price increases which are the subject of this litigation within days of one another.

In addition to evidence of advanced knowledge of pricing plans, there is evidence that high-ranking executives within the companies had numerous opportunities to associate informally through trade association meetings and various other events.  For instance, programs from the 2004, 2005, and 2006 Grocery Manufacturers of America ("GMA") Executive Conference show that executives from all three Defendant companies attended.[19]  (Pls.' Exs. 36, 39, 41); (see also Pls.' Ex. 37) (Letter dated November 17, 2004 from GMA inviting Brad Alford, President and CEO of Nestlé, to join the GMA Industrial Affairs Council which was chaired by Mr. Lenny, CEO of Hershey); (Pls.' Ex. 38) (GMA Industrial Affairs Council meeting agenda showing attendance by executives from all three Defendant manufacturers). These facts provide circumstantial evidence of facile communications among top corporate executives.

Direct Purchasers also present evidence that the cited reasons for the rise in chocolate confectionary prices—i.e., high direct and indirect costs and high

---

[19] Although the court highlights this as an example, it also notes that the conference had numerous attendees from many different entities, in both the private and public sector.

commodity costs—were pretextual, specifically: (1) a November 6, 2002 internal email from Hershey noting that the cost for raw materials was "favorable" at $33.6 million, but, stating that packaging costs were "unfavorable" at $61,500 (Pls.' Ex. 42); (2) a financial report from Mars stating that 2002 and 2003 growth was "funded by all time low commodity costs," but also stating that a decline in new product sustainability in 2005 was due to a rise in commodity costs to pre-2000 levels and soaring energy costs (Pls.' Ex. 43); (3) a Nestlé Operations Team Meeting Discussion Note summary from March 1, 2002, stating that cocoa butter prices had risen slightly, but that the United States and Canada are under budget; and, (4) Hershey commodity cost data showing stability during much of the class period. (Pls.' Ex. 45). The court finds that this documentation is significant circumstantial evidence of pretext.

Unsurprisingly, Direct Purchasers' experts and Defendants' experts present diametrically opposed versions of the impact of outside costs on chocolate confectionary products during the class period.

### 2. Trade Spend

According to Defendants, implementing trade spend programs requires scores of salespeople across the country working with Direct Purchasers to devise appropriate plans and pricing to fit individual needs. (Id. at 21). Defendants argue that the variables of trade spend and other discounts, incentives, or rebates, change the actual transaction prices paid by *each* Direct Purchaser, thereby making impact

and damages an individualized question, and making this antitrust litigation unsustainable in the context of Rule 23. (Id. at 21).

Direct Purchasers counter that they may have paid different transaction prices, but all Direct Purchasers paid a higher base price due to the alleged collusion. Trade spend, discounts, and rebates are standard business promotions in the chocolate confectionary products industry and, according to Direct Purchasers, they allow Defendants to market individual products while securing overall higher profits. Both sides presented extensive expert witness testimony on all matters pertinent to the issue of class certification. (See Docs. 1085-1087).

## V. CLASS CERTIFICATION ANALYSIS AND RELATED FACTUAL FINDINGS

The court will examine each criterion for class certification *seriatim*.[20]

### A. Rule 23(a)(1): Numerosity

Rule 23(a)(1) provides that, in order for a representative party to sue on behalf of members of a class, "the class [must be] so numerous that joinder of all members is impracticable[.]" FED. R. CIV. P. 23(a)(1). This rule does not require the putative class to show direct evidence of the exact number of potential class members, but it must present sufficient evidence to show that joinder would be impracticable. See Marcus, 687 F.3d at 596. In the instant case, Defendants do not

---

[20] Although Defendants do not challenge all Rule 23 requirements, the court must nonetheless determine that all requirements have been satisfied by a preponderance of the evidence. See Hydrogen, 552 F.3d at 310; Behrend, 655 F.3d at 189.

contest that Direct Purchasers' proposed class of over 2,900 members satisfies the numerosity requirement. (See Doc. 998-1, at 1-7). Based upon the estimated number of class members, the court finds that joinder of all class members would be impracticable. The numerosity requirement of Rule 23(a)(1) is satisfied.

### B. Rule 23(a)(2): Commonality

Rule 23(a)(2) requires the presence of "questions of law or fact common to the class" as a prerequisite to class certification. FED. R. CIV. P. 23(a)(2). One common question of law or fact is sufficient to satisfy the requirements of Rule 23(a)(2). See In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 n. 10 (3d Cir. 2009). To satisfy the commonality requirement, Direct Purchasers underscore the central claim of this litigation: the existence of a conspiracy to fix prices. That evidence common to the class will focus on Defendants' allegedly collusive conduct is manifest. (See Doc. 998, at 14). The overarching issue in this case is whether Defendants conspired to fix prices of chocolate confectionary products in violation of Section 1 of the Sherman Act. Numerous legal and factual issues will be common to the class including, *inter alia*, evidence of a conspiracy, the identities of the actors in the conspiracy, the duration of the alleged conspiracy, and any alleged concealment of the conspiracy. (See Doc. 998-1, at 1). The commonality requirement of Rule 23(a)(2) is satisfied.

C. **Rule 23(a)(3):  Typicality**

Rule 23(a)(3) requires that "the claims . . . of the representative parties" must be "typical of the claims . . . of the class[.]"  FED. R. CIV. P. 23(a)(3).  "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class."  Marcus, 687 F.3d at 598 (citing Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 913 (3d Cir. 1992)).  In a nutshell, the court must be satisfied that "the incentives of the [class representatives] are aligned with those of [the absentees]."  Beck v. Maximus, Inc., 457 F.3d 291, 295-96 (3d Cir. 2006).

Direct Purchasers argue that the class representatives' claims are typical to all class members in that they arise out of the same alleged antitrust violations by Defendants.  (Doc. 998-1, at 1-7).  The claims are typical because they rest upon the same legal theory, and allege the same injury.  (Id.)  Defendants contend that the named plaintiffs' injury cannot be typical because the evidence will show that most putative class members paid different net prices.  In other words, Defendants argue that the class representatives' claims are not typical because the ultimate price paid by each customer must be proven individually and, consequently, proof of damages cannot be "typical" in any sense of the word.[21]  (Doc. 1028, at 28).

---

[21] Many of Defendants' arguments *contra* typicality under Rule 23(a)(3) are also presented in the context of Rule 23(b)(3).  By necessity, the court will revisit these arguments, in Part V.E.1. *infra*.

That customers paid different prices or purchased different brands of products does not defeat typicality.  See Marcus, 687 F.3d at 599 ("When a class includes purchasers of a variety of products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types.") (collecting cases); *In re* Flat Glass Antitrust Litig., 191 F.R.D. 472, 480 (W.D. Pa. 1999) (acknowledging that, in cases alleging price-fixing, "the overarching scheme is the linchpin of plaintiffs' complaint, regardless of the product purchased, the market involved or the price ultimately paid.  Furthermore, the various products purchased and the differences in damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong"); *In re* Dynamic Random Access Memory (DRAM) Antitrust Litig., No. M 02-1486 PJH, 2006 WL 1530166, at *4 (N.D. Cal. 2006) ("In cases involving an alleged price-fixing conspiracy, the representative plaintiff's claim is usually considered typical even though the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class.").  Relevant caselaw addresses the typicality requirement in terms of liability issues, not damages issues.  All members of the putative class are direct purchasers of chocolate confectionary products (singles and Kings) and allege that they made their purchases at supracompetitive prices.  This is sufficient under Rule 23(a)(3).  Differences in

purchasing, even those which impact damages calculations, do not preclude a finding of typicality.

The court concludes that the claims of the class representatives will appropriately match those of the class with unified legal theories and consonant factual support. <u>See generally</u> <u>*In re* Schering Plough</u>, 589 F.3d at 599. The court finds that the requirements of Rule 23(a)(3) are satisfied.

### D. <u>Rule 23(a)(4): Adequacy</u>

Pursuant to Rule 23(a)(4), class representatives must "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). According to the Third Circuit, Rule 23(a)(4) adequacy is satisfied by showing that (1) Class Counsel is competent and qualified to conduct the litigation; and (2) class representatives have no conflicts of interests. <u>See</u> <u>New Directions Treatment Servs. v. City of Reading</u>, 490 F.3d 293, 313 (3d. Cir. 2007).

With respect to the first prong, the court notes that Direct Purchasers' team of attorneys is experienced and has demonstrated active, very competent, and very professional representation throughout these proceedings.[22] Lead counsel have ably performed their duties as interim Class Counsel. The court concludes that Class Counsel for the Direct Purchasers are fully capable of litigating this case.

---

[22] This description of professional representation applies with equal force to the conduct of defense counsel during the course of these proceedings, and the court commends *all* counsel for their exemplary efforts during the course of these proceedings.

Once again invoking net price disparity, Defendants claim that members of the putative class of Direct Purchasers paid a wide range of different prices for the same brands of chocolate confectionary products and, therefore, the interests of the class representatives cannot be considered "aligned" with those of the class. (See Doc. 1028, at 29). The court finds Defendants' argument unavailing, and unsupported by the prevailing legal authority, as the ultimate prices paid by plaintiffs does not jeopardize the question of the adequacy of class representation. *In re* Flat Glass, 191 F.R.D. at 480 (stating that the ultimate price paid by each class member for a product is not the focus in a case alleging price-fixing). In the instant case, all class members made purchases of the same product type (chocolate confectionary singles and Kings), all class members seek to prove the existence of the same conspiracy, all class members claim the same type of injury, and there is no evidence that the class members' individual interests would be antagonistic to each other or that shared legal representation would somehow cause harm to individual class members. See *In re* Schering Plough, 589 F.3d at 602 (finding no conflict between the named class members and the class which they sought to represent). The same allegations of a conspiracy to fix the price of chocolate confectionary products will be made for all class members. The fact that class members ultimately paid a different price for certain products is a damages conundrum which Class Counsel has chosen to address through expert witnesses. It does not impact the court's assessment of adequacy under Rule 23(a)(4).

Having determined that all of the requirements of Rule 23(a) have been satisfied by a preponderance of the evidence, the court will address Direct Purchasers' request to proceed under Rule 23(b)(3).

### E.      Rule 23(b)(3): Predominance and Superiority

Rule 23(b)(3) certification is proper if a court determines "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).  The dual requirements of Rule 23(b)(3) are referred to as predominance and superiority.  Hydrogen, 552 F.3d at 310; Behrend, 655 F.3d at 190.

### 1.      Predominance

Predominance measures whether a class seeking certification is "sufficiently cohesive" so that "adjudication by representation" is the proper mechanism for proceeding with the litigation.  Hydrogen, 552 F.3d at 311 (quoting Amchem Prods., Inc. v. Winsdor, 521 U.S. 591, 623 (1997)).  Without relaxing the standard which applies to Rule 23 certification, courts recognize that the predominance test is "readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  Behrend, 655 F.3d at 191 (citing Amchem Prods., 521 U.S. at 625).  Although this requirement is similar to the commonality requirement found in Rule 23(a), predominance inquiries are more scrupulous and require that "[i]ssues common to the class must dominate over individual issues."  Hydrogen,

552 F.3d at 311 (quoting *In re* Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 313-14 (3d Cir. 1998) (internal quotations omitted)).

Resolving the question of whether the predominance requirement has been met necessarily depends on the nature of the claims and the strength of the evidence proffered in support of the claims. Therefore, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether" issues are common to the class, or must be resolved on an individual basis. Id. at 311 (quoting *In re* New Motor Vehicles Can. Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008)). Hence, class certification is not appropriate when proof of the elements of the underlying cause of action requires the court to delve into individual circumstances. Id. at 311 (citing Newton, 259 F.3d at 166). Furthermore, the Third Circuit has made clear that a district court errs as a matter of law if it fails to resolve all relevant legal and factual disputes essential to a determination of whether the Rule 23 factors have been met, including an appropriate assessment of expert testimony proffered. Id. at 320, 323. Expert opinion evidence is subject to the same "rigorous analysis" as other evidence, and the court need not blindly accept it simply because it meets the Daubert requirements for admissibility at trial. See id. at 323 (explaining that the Third Circuit in *In re* Initial Public Offering Securities Litig., 471 F.3d 24, 42 (3d Cir. 2006), rejected the notion that "an expert's testimony may establish a component of a Rule 23 requirement simply by being not fatally flawed . . . "). In assessing expert testimony of antitrust injury, the district court must be keenly aware that,

38

Plaintiffs' burden at the class certification stage is *not to prove* the element of antitrust impact, although in order to prevail on the merits each class member must do so. Instead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members.

Behrend, 655 F.3d at 197 (citing Hydrogen, 552 F.3d at 311-12) (first emphasis supplied).

Finally, it bears reiterating that Hydrogen Peroxide and its progeny do not require district courts to supplant the role of the ultimate trier-of-fact, thereby turning class certification into a "mini-trial." Rather, "a district court may inquire into the merits only insofar as it is 'necessary' to determine whether a class certification requirement is met." Behrend, 655 F.3d at 199 (citing Hydrogen, 552 F.3d at 316). As the court explained in Behrend, "[to] require more contravenes [the United States Supreme Court's decision in Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)] and runs dangerously close to stepping on the toes of the Seventh Amendment by preempting the jury's factual findings[.]" Id. at 199-200.

### a. Predominance in Class Actions Alleging Antitrust Claims

Direct Purchasers allege violations of Section 1 of the Sherman Act, 15 U.S.C. § 15. The elements of a Section 1 Sherman Antitrust claim are: (1) a conspiracy in violation of the antitrust laws,[23] (2) individual injury as a result of the violation, and (3) measurable damages. Hydrogen, at 311 (citing 15 U.S.C. § 15; Am. Bearing Co. v. Litton Indus. Inc., 729 F.2d 943, 948 (3d Cir. 1984)).

### (i) Individual Injury

The element of "individual injury," also known as antitrust impact, requires each individual class member to show that they were adversely impacted by the price-fixing conspiracy. This showing is critical to the predominance issue because proper evaluation "may call for individual, as opposed to common, proof." See Hydrogen, 552 F.3d at 311 (referencing New Motor Company, 522 F.3d at 20). At the class certification stage, plaintiffs are not tasked with the duty to prove actual antitrust impact. Rather, plaintiffs must show "that the element of antitrust impact is *capable of proof* at trial through evidence that is common to the class rather than individual to its members." Id. at 311-12 (emphasis supplied).

---

[23] Defendants candidly acknowledge that Direct Purchasers' evidence of the alleged conspiracy is "common to the class." (See Doc. 1028, at 30). In the interest of brevity, the court incorporates by reference its discussion of commonality under Rule 23(a)(2) set forth in Part IV.B. of this Memorandum. There is little doubt that the conspiracy element of the antitrust claims *sub judice* will be provable with evidence common to the class.

Direct Purchasers submit the expert reports and testimony of Dr. Tollison and Dr. McClave to show that evidence common to the class will prove class-wide impact. Dr. Tollison opines that the structure of the chocolate confectionary industry *facilitates* collusive pricing. (See Doc. 1086, at 6; Doc. 999, at 22). Dr. Tollison buttresses his conclusions by factual findings, including the following which the court will adopt: (1) the chocolate confectionary market is comprised of products which are "reasonably interchangeable"; (Doc. 1086, at 36-40; Doc. 999, at 11-12);[24] (2) the chocolate confectionary market is inelastic, meaning demand is not greatly influenced by price changes (see Doc. 1086, at 9-15; Doc. 999, at 13); (3) the chocolate confectionary market is highly concentrated and mature which leads inexorably to narrow profit margins,[25] (see Doc. 1086, at 15-23; Doc. 999, at 30; see also Doc. 999-1, at 11); (4) the chocolate confectionary market has high barriers to market entry[26] (see Doc. 1086, at 24-29; Doc. 999, at 30-32, n.16); and, (5) the top

---

[24] See e.g. Doc. MARSUS0638014 (Mars executive stating "consumer[s] would not drive to another store [if their brand were unavailable, they] would switch brands"); Doc. HSY0770045 (2002 Hershey study concluding that if a consumer's preferred brand were not available, seventy-five percent of the time they will switch to another brand).

[25] See U.S. Census Bureau documents showing the slow growth of the chocolate confectionary market during the relevant time period: U.S. Census Bureau, Current Industrial Reports: Confectionary, Series MA20D(93)-1, MA20D(94)-1, MA20D(96)-1, MA20D(97)-1, MA20D(98)-1, MA20D(99)-1, MA20D(00)-1, MA20D(01)-1, MA20D(02)-1, MA20D(03)-1, MA20D(04)-1, MA20D(05)-1, MA20D(06)-1, MA20D(07)-1, MA20D(08)-1.

[26] See e.g. IRI presentation showing new chocolate candy products fail in the marketplace over fifty percent of the time. (Dr. Tollison, Doc. 999, at 16 n. 16).

executives of the major manufacturers have frequent opportunities for informal discussions[27]. (Doc. 1086, at 29-36; Doc. 999 at 32). The court concludes that evidence common to the class will establish a confluence of circumstances that would facilitate collusive pricing practices in the chocolate confectionary market. (See Doc. 998-1 (compiling cases)).

Several of Dr. McClave's findings are pertinent to the issue of individual injury. Dr. McClave uses Defendants' transactional data to assess whether Defendants' allegedly collusive pricing impacted all class members. (Doc. 999-1, at 3; see Doc. 1085, at 177-178). He employs a multiple regression analysis which, as previously noted, is the comparing of variables to determine the influence that one variable, the independent or explanatory variable, has on another variable, the dependent variable. (See Doc. 1085, at 96, 116-117; Doc. 999-1 at 7; Doc. 998-1, at 22, 24). Obviously, in this case, price is the dependent variable. (See Doc. 1085, at 96:12-18, 96:21-97:2, 98:2-8; Doc. 999-1, at 7; Doc. 998-1, 22, 24). Dr. McClave utilizes explanatory variables which are relevant, and he reasonably excludes certain outlier or extraordinary products or transactions from the models, such as products

---

[27] See e.g. Ex. 2 Chocolate Industry Trade Association Brochures, Docs. MARSUSA0167545066, NUSA-MDL-0060285-87, NUSA-MDL-0384237-89, NCA_0019-20, NCA_0589-623 at 590, MARSUS0668859 CHL00321487-89, NUSA-MDL-0301257-58 CHL00824290, WCF00000035-38. In addition, Dr. Tollison points out that authoritative experts attribute trade association events to at least forty percent of past public antitrust cases. (Dr. Tollison, Doc. 999, at 16-17 n. 37 (citing George A. Hay & Daniel Kelly, An Empirical Survey of Price Fixing Conspiracies, 17 J. L. & Econ. 13 (1974)); Richard Posner, A Statistical Study of Antitrust Enforcement, 13 J.L. & Econ. 365 (1970)).

that were sold only in one of the two specified periods or products that he could not confidently classify or quantify. (Id.)  Based on this data, Dr. McClave concludes that ninety-eight percent of class members were impacted by the price increases. (See Doc. 999-1, at 3).  Furthermore, Dr. McClave's analysis shows that Direct Purchasers paid nearly identical prices — within a range of one-and-one-half cent — for each unit of a particular chocolate confectionary product.  (See Doc. 1085, at 110; Doc. 999-1, at 3).  Dr. McClave reasonably concludes that all products sold by Defendants were subject to collusive price increases.[27]  (Doc. 999-1, at 5).

Defendants respond with the opinion of Dr. John H. Johnson, IV, who attacks Dr. McClave's arguments regarding class-wide impact.  According to Dr. Johnson, Dr. McClave myopically assumes that *any* change in price during the class period shows impact and that these impacted prices rose above competitive levels.  (Doc. 1031-1, at 62 ¶ 110; see Doc. 1086, at 166; 347).  Dr. Johnson criticizes the assumption that, but-for Defendants' allegedly collusive conduct, list prices would not have increased during the class period, which Dr. Johnson claims does not comport with the reality of pricing in the chocolate confectionary product market.  (See Doc. 1086, at 343-345; Doc. 1028, at 62 ¶ 110).  Dr. Johnson contends that Dr. McClave's calculations do not account for healthy, competitive market price increases, which are "a critical component of any antitrust analysis."  (Id. at 64 ¶ 112).  Dr. Johnson

---

[27] Dr. McClave notes that the sole exception to this conclusion involves Nestlé's Wonka singles bar, which entered the market in 2005 and experienced a sales plateau prior to the 2007 price increase.  (Id. at 5 n.7).

concludes that "[o]ne simply cannot determine whether a customer has been harmed by alleged anticompetitive pricing without assessing what prices would have been 'but-for' those actions."  (Id. at 64 ¶ 112; see Doc. 1086, at 338-339).

Dr. McClave effectively rebuts Dr. Johnson's assertions.[28]  (See Doc. 1049-1). Dr. McClave explains that he actually conducted the "but-for" pricing calculus that Dr. Johnson claims is absent, and Dr. McClave conclusively determined that "nearly all class members were subject to one or more of the price increases and the prices that class members paid as a result of those increases were supracompetitive. [And,] that the impact from the conspiracy as alleged was generalized and widespread and that nearly all class members were impacted."  (Id. at 7).  He observes, and the court concurs, that *list prices* are quite relevant to the underlying claims because Direct Purchasers allege that Defendants colluded to increase *list prices*, thereby raising the starting point for price negotiations, ultimately inflating

---

[28] As the parties properly recognize, many similar arguments can be made for both impact and damages inquiries.  See EPDM, 256 F.R.D. at 88 (recognizing that impact and damages analyses, although distinct elements, are often conflated and the terms confused).  In this light, the court will also address Dr. McClave's "but-for" analysis in the discussion on damages, see Part III.E.1.(a)(ii).  (See also Doc. 1085, p. 90).

the prices paid.[29]  The court is persuaded that Dr. McClave reasonably defines an impacted customer as one who "tak[es] at least one transaction at a supracompetitive price."  (Doc. 1049-1, at 9).  With this definition, Dr. McClave refutes Dr. Johnson's count of un-impacted customers, observing: "[A] customer may show a 'negative overcharge' in the aggregate but still have suffered at least one transaction at the elevated, supracompetitive price."  (Id. at 9).  Dr. McClave also explains the manner in which his statistical analysis is useful to estimate

---

[29] As explained by the Seventh Circuit:

> An agreement to fix list prices is, as the Defendants' able counsel reluctantly conceded at the argument of the appeal, a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices. Anyway sellers would not bother to fix list prices if they thought there would be no effect on transaction prices. Many sellers are blessed with customers who are "sleepers," that is, customers who don't shop around for the best buy; and even for those who do bargain for a lower price, the list price is usually the starting point for the bargaining and the higher it is (within reason) the higher the ultimately bargained price is likely to be.

In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 656 (7th Cir. 2002).

impact on a class-wide basis <u>and</u> to identify any customers who were not harmed, and thus eliminate them from the class.[30]  (<u>Id.</u> at 10).

Based upon the Direct Purchasers' expert testimony, the court finds that proof of antitrust injury may be accomplished with evidence common to the class despite the facts that: (1) chocolate confectionary products are heavily branded and (2) many class members paid different net prices for these products.[31]  <u>See</u> <u>In re Urethane</u>, 237 F.R.D. at 451 (finding "that the issue of antitrust injury in this case is susceptible to common proof on a class-wide basis notwithstanding arguable product-specific and customer-specific pricing disparities."); <u>McDonough v. Toys R' Us, Inc.</u>, 638 F.Supp.2d 461, 490 ("[P]redominance requires only a viable method whereby damages can be reasonably estimated based on common evidence.").

---

[30] Dr. McClave identifies approximately sixty-eight class members that were not impacted by the subject price increases.  (Doc. 991-1, at 4).  Direct Purchasers state that Dr. McClave's models will be further refined, and, to the extent necessary, unaffected customers may be removed at the claims phase of the litigation.  <u>See</u> <u>In re</u> OSB Antitrust Litig., Master File No. 06-826, 2007 WL 2253418, at *9 (E.D. Pa. 2007) (stating "[b]ecause the proposed class need only be ascertainable by some objective criteria, not actually ascertained, challenges to individual claims based on class membership may be resolved at the claims phase of the litigation.") (collecting cases).  The court concurs in this approach, absent unforseen circumstances.  The court also notes the possibility of "impact" in the absence of actual damages.  <u>See</u> <u>Linerboard</u>, 203 F.R.D. at 221 (stating "if plaintiffs can establish list prices were higher, they can demonstrate impact" regardless of the price ultimately negotiated for).

[31] Obviously, Defendants are not precluded from offering evidence at trial to support their argument that list prices and transactional prices are entirely unrelated.  (<u>See e.g.</u>, Doc. 1087, at 32-40)  However, at this juncture, Direct Purchasers need only show, and have shown, that they will be able to prove through common evidence that the list price increases caused antitrust injury to the Direct Purchasers.

Presently, the principal issue for the court is whether Direct Purchasers have shown, by a preponderance of the evidence, that they will be able to prove their antitrust injury with evidence common to the class.[32] See Behrend, 655 F.3d at 198. Direct Purchasers have thoroughly satisfied this burden.

### (ii)    Measurable Damages

The court is likewise satisfied that damages can be established on a class-wide basis. When calculating damages, "[t]he usual measure in an over-charge case is the difference between the illegal price that was actually charged and the price that would have been charged 'but for' the violation . . . ." Behrend, 655 F.3d at 203 (citing 2A PHILLIP E. AREEDA, ET AL., ANTITRUST LAW ¶ 392a (3d ed. 2007) (internal quotations omitted)). Because of the practical difficulties in calculating damages based on an illusory "but-for" world, courts do not require damages to be reduced to a mathematical certainty. Rather, courts require that damages be established as "a matter of just and reasonable inference." Id. at 203-04 (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931)).

---

[32] The court notes that Defendants' witnesses lend a modicum of support to Direct Purchasers' contention that list prices are the proper starting point for overall pricing negotiations. (See Doc. 1087, at 189-190 (David West of Hershey, stating that list prices were the most a customer could pay); id. at 271(Michael Tolkowsky of Mars, stating that customers receive an invoice which reflects both list prices and the discounts applied therefrom); see also id. at 163 (Dr. Johnson, stating that "when you do the mechanical calculation, if what you're asking is what is the discount off of list price from actual price paid, well, as a matter of math that's what it is.")

At the class certification stage, district courts are tasked with the duty to determine whether plaintiffs have proven by a preponderance of the evidence that damages can be quantified on a class-wide basis using common proof.  Id. at 204 (referencing Hydrogen, 552 F.3d at 325).  Certification will not be denied simply because there is some variance in the actual damages each individual plaintiff may be able to collect.  See id. at 204 (citing 7AA CHARLES ALAN WRIGHT ET AL., FED. PRACTICE AND PROCEDURE § 1781 (3d ed. 2005) (stating that "it uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate."))  At the class certification stage, district courts are not required to search for "hard factual proof, but [instead] for a more thorough explanation of *how* the pivotal evidence behind plaintiff's theory can be established."  *In re* New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 29 (1st Cir. 2008) (emphasis in original); see also Story Parchment, 282 U.S. 555, 562 (1931) ("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."); *In re* Scrap Metal Antitrust Litig., 527 F.3d 517, 535 (6th Cir. 2008) ("Indeed, we have never required a precise mathematical calculation of damages before deeming a class worthy of certification.").

Direct Purchasers propose to establish measurable damages through econometric models.  Defendants repeat the refrain that damages are not measurable on a class-wide basis because highly individualized inquiries are

48

necessary to calculate the vagaries of trade spend (which materially affects the actual net price paid by each class member).

Dr. McClave's assessment of damages is based on a "before and after" framework whereby Dr. McClave compares prices prior to the alleged collusion, the "benchmark" period, to prices during the alleged collusion, the "damages" period. (See Doc. 1085, at 102; Doc. 998-1, at 53; Doc. 999-1, at 7-9). The difference in these prices is what the parties refer to as the "overcharge." (See Doc. 1085, at 117; Doc. 998-1, at 53; Doc. 999-1, at 7). After establishing prices for the benchmark period, Dr. McClave uses standard regression analysis to control for the competitive factors put forth by Defendants, and thereby isolate any overcharges that would be better explained by collusion rather than a naturally competitive market.[33] (See Doc. 1085, at 117, 125-130; Doc. 998-1, at 53-54; Doc. 999-1, at 7, 12-13). Dr. McClave concludes that the average overcharge during the class period was 7% to 8.6% for singles and 9.5% to 11% for Kings,[34] (See Doc. 1085, at 124; Doc. 998-1, at 54; Doc. 999-1, at 13),

---

[33] To analyze this data, Dr. McClave constructs two price indices — one using commodity cost data provided by Hershey, the other using publically available market prices. (See Doc. 1085, at 131-132; Doc. 999-1, at 10). Dr. McClave relies upon Defendants' own financial statements and other documents and explains that "the materials were weighted by the volumes purchased, a standard statistical technique." (Doc. 999-1, at 10).

[34] Dr. McClave attributes the higher overcharge percentage to Defendants' habit of hedging certain commodity costs, especially cocoa, which Dr. McClave claims can "delay and [] dampen the effects of changes in the material costs." (Doc. 999-1, at 13; see Doc. 1085, at 133; Doc. 1049-1, at 17).

and therefore, that the ultimate damages amassed will be approximately $524

million for singles and $202 million for Kings, (Doc. 998-1, at 54; Doc. 999-1, at 14).

Defendants challenge Dr. McClave's damages models in two main respects.

First, Defendants contends that Dr. McClave's first-stage models[35] rely on

erroneous or imprecise data (Doc. 1031, at 82-90; Doc. 1087, 84-87, 91-109).  Second,

Defendants assert that Dr. McClave's second stage model fails to properly address

the issue of trade spend.  (Doc. 1087, p. 111-114).[36]

---

[35] The first stage model measures the impact of various factors on typical chocolate confectionary products during the class period.  (See Doc. 1085, at 100; Doc. 999-1, at 12).  Dr. McClave uses potentially relevant cost and demand factors as the explanatory variables at this stage.  (See Doc. 999-1, at 12).  Defendants' main justification for the price increases was the rising cost of raw materials.  Accordingly, Dr. McClave examines the price changes in materials used to make most chocolate confectionary products:  cocoa, sugar, dairy, corn sweeteners, peanuts, and almonds.  (See Doc. 1085, at 130;  Doc. 999-1, at 10).

[36] Dr. Johnson suggests that trade spend is wholly dependent on the individual relationship between each manufacturer and each Direct Purchaser.  (Doc. 1031-1, at 44; Doc. 1086, at 341-342 (trade spend "is a series of discounts and promotions that customers receive when they buy chocolate candy.  They're individually negotiated with the manufacturer and they represent a wide variety of different programs and different moneys that flow back to the customers."); Doc. 1087, at 6).  Defendants are free to pursue this argument as part of their refutation of damages; however, variation in trade spend will not defeat class certification as it may have little impact on damage calculations (see Doc. 1049-1, at 31), and the court is convinced that the issue of trade spend may be addressed with evidence common to the class. See supra pp. 40-42.  Moreover, to the extent that variations in trade spend beget variations in damage calculations, the result is not fatal to class certification.  See Behrend, 655 F.3d at 204 (class certification will not be denied simply because of a difference in the ultimate amount of damages a plaintiff can collect); In re Urethane, 237 F.R.D. at 451 (class certified despite "arguable product-specific and customer-specific pricing disparities.")

The court finds substantial merit in Dr. McClave's detailed rebuttal report as well as his testimony at the class certification hearing, which competently and effectively addresses Defendants' assignments of error.[37] (See Doc. 1049-1, at 36; Doc. 1085, at 179-186). The court has carefully reviewed this rebuttal report which is replete with factual support and an in-depth explanation of the statistical methods employed by Dr. McClave. (See Doc. 1049-1, at 10-29). In this report and buttressed in his hearing testimony, Dr. McClave clarifies the appropriateness of the data used in his first stage model (see Doc. 1085, at 138-141). He also effectively responds to criticisms of his second stage model. (See Doc. 1085, at 130-132, 132-135; Doc. 1049-1 at 11-15, 22-23, 26-31). Specifically, Dr. McClave reinforces his assertions that: (a) trade spend is properly excluded as it is a cost to Defendants for services rendered by customers (See Doc. 1085, at 160, 165, 168-169), and, alternatively, (b) damages can be reliably proven on a class-wide basis regardless of whether trade spend is viewed as a discount to customers or a cost to manufacturers.[38] (See Doc. 1085 at 167, 168, 174-175, 169-177; Doc. 1049-1, at 29). In addition, the court adopts Dr. McClave's assertion that monthly median prices are a reliable measure of prices actually paid by customers because actual transactional

---

[37] As previously noted, see note 14 supra, the methodology employed by Dr. McClave is widely accepted for calculating overcharges in antitrust litigation. See also In re Blood Reagents Antitrust Litigation, 283 F.R.D. 222, 241 (E.D. Pa. (2012); Linerboard, 305 F.3d at 153-55; McDonough, 638 F.Supp.2d at 490 n. 19.

[38] The court also concurs with Dr. McClave's decision to exclude from his analysis certain items such as fundraiser, pre-printed, and bilingual products because they are not "class products." (Doc. 1049-1, at 30).

data often contains "anomalous . . . 'statistical outliers,' [and therefore,] sound statistical practice indicates that more reliable results are obtained by excluding [] outliers, which have a disproportionate influence on the result." (Doc. 1049-1, at 30). The court also notes that these "statistical outliers" account for less than ten percent of the transactions in question. (Id.)

Contrary to Defendants' contention, Dr. McClave does not assume that the prices paid by class members were a constant percentage of Walgreens' list prices. To the contrary, he takes into account various factors outside of Walgreens' list prices when constructing his models, such as, the "difference in gross and net ('discounted') prices per customer and [the] difference in defendant prices per customer. [Therefore], the relationship between the monthly customer price and the monthly Walgreens price is not a constant percentage." (Id. at 30-31; see Doc. 1085, at 144-145). Finally, Dr. McClave squarely addresses the main subject of Defendants' opposition to class certification, to wit: the impact of trade spend on net prices paid by each class member. (See Doc. 1085, at 169-177; Doc. 1049-1, at 32-36). The court finds that Dr. McClave appropriately accounts for trade spend throughout his analysis, as he succinctly explains:

> In my initial report, I specified several multiple regression models to compare the level of trade spending prior to the class period with that during the class period. If the trade spend were the same or declining, or even modestly increasing, it would not eliminate the impact of the collusive price increases, even if it were treated as a discount. The models showed that if the trade spend level as a percentage of revenue increased at all the increase was very modest, no more than 1.5%.

(Doc. 1049-1, at 31 (citing Doc. 999-1, at 14-15); see also Doc. 1085, at 170, 172, 175).

In summary, the court finds that Dr. McClave presents statistically feasible methods for estimating damages on a class-wide basis, including his use of a "before and after" (i.e. benchmark and damages period) approach, multiple regression analysis, and a compilation of various price indices based on transactional data provided by Defendants as well as data which is publically available. (See Doc. 1085, at 102, 111-114, 131; Doc. 999-1, at 7-14; Doc. 1049-1, 10-12, 14, 15-20, 22-28). Based on Dr. McClave's opinions, the court finds that the determination of damages is susceptible to class-wide proof. At this stage in the litigation, the court finds that the evidence necessary to establish Defendants' ultimate liability is "sufficiently cohesive" such that "adjudication by representation" is the proper method for proceeding with this litigation. See Hydrogen, 552 F.3d at 311.

### (iii)    Fraudulent Concealment

Direct Purchasers allege that the statute of limitations should be tolled for the period from December 2002 to December 2003 because of the equitable doctrine of fraudulent concealment. (See Doc. 998-1, at 55-57). Defendants contend that proving fraudulent concealment necessitates an individualized inquiry into when each class plaintiff knew, or should have known, about the alleged conspiracy, which eviscerates the propriety of class certification. The court disagrees.

First, the court notes that fraudulent concealment for a single year of the alleged conspiracy is not the predominant issue in this matter. Class certification is still appropriate regardless of whether it is ultimately determined that the statute of

limitations should be tolled.  Second, the linchpin of Direct Purchasers' fraudulent concealment claim will be Defendants' conduct, i.e., precisely what they did to cover up their allegedly collusive activities.  See Linerboard, 305 F.3d at 163 ("It is the fact of *concealment* that is the polestar of fraudulent concealment.  It is the camouflage that demands attention, the cover up, the acts of obscuring or masking.")  These acts are all common to the class and will require common proof at trial.  As in Linerboard and, more recently, *In re* Blood Reagents Antitrust Litigation, 283 F.R.D. 222, 246 (E.D. Pa. 2012), Defendants have not persuaded the court that "here, unlike the typical price-fixing case, individual issues are the 'polestar' of the fraudulent concealment inquiry."  Therefore, the court finds that Direct Purchasers' allegation that the statute of limitations should be tolled is not fatal to class certification.

## 2. Rule 23(b)(3): Superiority

Rule 23(b)(3) dictates that certification is appropriate if it "is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) outlines several factors the court must consider

when deciding superiority.[39]  The factors include balancing, "in terms of fairness

and efficiency, the merits of the class action against those of alternative available

methods of adjudication."  *In re* Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534

(3d Cir. 2004) (citing In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d

283, 316 (3d Cir. 1998)).

Direct Purchasers have met the superiority requirement because their claims

uniformly attack the same course of conduct by Defendants.  See Stanford v.

Foamex L.P., 263 F.R.D. 126, 174 n.22 (S.D.N.Y. 2009) (stating "where the plaintiff's

claims attack the same course of Defendant' conduct, proceeding as a class action is

far superior to allowing piecemeal litigation of the exact same claims in countless

lawsuits potentially occurring throughout the country.")  As described *supra*, Direct

Purchasers will present common evidence of all major issues regarding Defendants'

alleged conspiracy at trial.  In addition, certification of the class will promote

efficiency.  Direct Purchasers are located throughout the United States.  Class

members number in the thousands.  Considering the abundance of common

questions of law and fact present in the instant case, litigating the claims

---

[39] Rule 23(b)(3) lists the following factors:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

FED. R. CIV. P. 23(b)(3).

individually will be highly inefficient for the parties and a waste of judicial resources. See generally *In re* Wellbutrin XL Antitrust Litigation, 282 F.R.D. 126, 144-45 (E.D. Pa. 2011); *In re* SCOR Holding (Switzerland) AG Litig., 537 F. Supp. 2d 556 (S.D.N.Y. 2008). The court recognizes that some of Defendants' largest direct purchaser customers have opted out of the current litigation. This fact augments the propriety of class action litigation to resolve the issues presented in this case, as some of the smaller Direct Purchaser plaintiffs may not otherwise have the means to pursue their claims individually. The court finds that class treatment is the fairest and most efficient device for litigating the captioned case, and the superiority requirement has been properly satisfied.

## VI.    CONCLUSION

The court finds that Direct Purchasers have established, by a preponderance of the evidence, that the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—are satisfied in the instant case. See FED. R. CIV. P. 23(a). The court further finds that a class action may be maintained under Rule 23(b)(3), because Direct Purchasers have established, by a preponderance of the evidence, predominance and superiority. See FED. R. CIV. P. 23(b)(3). Therefore, the court will grant Direct Purchasers' motion for class certification. For the reasons set forth above, the court will also deny Defendants' motions in limine.

An appropriate order will issue.

S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Date:      December 7, 2012

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: CHOCOLATE | : | **MDL DOCKET NO. 1935** |
| CONFECTIONARY ANTITRUST | : | **(Civil Action No. 1:08-MDL-1935)** |
| LITIGATION | : | |
| _____ | : | **(Judge Conner)** |
| | : | |
| THIS DOCUMENT APPLIES TO: | : | |
| DIRECT PURCHASER PLAINTIFFS | : | |
| | : | |

## ORDER

AND NOW, this 7th day of December, upon consideration of plaintiff Direct

Purchasers motion (Doc. 995) for class certification and Defendants' motions in

limine (Docs. 1062 & 1066), and for the reasons set forth in the accompanying

memorandum of law, it is hereby ORDERED as follows:

1. Defendants' motions in limine (Docs. 1062 & 1066) to exclude
the expert reports of Dr. James T. McClave and Dr. Robert D.
Tollison are DENIED.

2. Direct Purchasers' motion for class certification (Doc. 995) is
GRANTED. The following litigation class is CERTIFIED pursuant to
Federal Rule of Civil Procedure 23(a) and 23(b)(3):

> All persons and entities who directly purchased standard
> ("singles") and King size ("King") single serve chocolate candy
> for re-sale from any Defendant or any predecessor, controlled
> subsidiary affiliates or division of any Defendant, in the United
> States or for delivery into the United States at any time from
> December 9, 2002 through December 20, 2007.

Excluded from the class are governmental entities, Defendants, or any present or former parent, subsidiary or affiliate thereof. Also excluded from the class are Meijer, Inc., Meijer Distribution, Inc., Publix Supermarkets, Inc., CVS Pharmacy, Inc., Rite Aid Corporation, Rite Aid Hdqtrs Corp., Longs Drug Stores California, Inc., The Kroger Co., Safeway, Inc., Walgreen Co., Hy-Vee, Inc., Giant Eagle, Inc., Affiliated Foods, Inc., Food Lion, LLC, Hannaford Bros. Co., Kash N' Karry Food Stores, Inc., HEB Grocery Company, LP, Albertson's LLC, Great Atlantic & Pacific Tea Company (A&P), Supervalu Inc., Golub Corp. d/b/a/ Price Chopper, Brookshire Grocery Co., and United Supermarkets LLC.

3.    The Court hereby approves the following entities as Representative Plaintiffs of the Class pursuant to Rule 23(a)(3), and finds that these Representative Plaintiffs' claims are typical of the claims of the Class: Card & Party Mart II Ltd.; Jones Vend and OCS Distributing, Inc.; PITCO Foods; and The Lorain Novelty Co., Inc.  The claims of the Representative Plaintiffs and absent class members rely on the same legal theories and arise from the same alleged conspiratorial conduct by Defendants, namely, the agreement to fix, raise, maintain and/or stabilize prices of chocolate candy in the United States.  Furthermore, the defenses to these allegations are common to Defendants.

4.    The court hereby also approves the following law firms as Class Counsel pursuant to Rule 23(g), and finds that these Class Counsel have and will fairly and adequately protect the interests of the Class: Berger & Montague, P.C. and Hausfeld, LLP.

5.    The parties are directed to meet and confer on the subject of the best practicable notice to the class.  <u>See</u> Fed. R. Civ. P. 23(c)(2)(B).  The parties shall submit to the court their proposed notice.  The parties shall be mindful that their proposed notice must comport with the requirements outlined in Rule 23(c)(2)(B)(I-vii).

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge