## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: CHOCOLATE** | : | **MDL DOCKET NO. 1935** |
| **CONFECTIONARY ANTITRUST** | : | **(Civil Action No. 1:08-MDL-1935)** |
| **LITIGATION** | : | |
| | : | |
| _____ | : | **(Chief Judge Conner)** |
| | : | |
| **THIS DOCUMENT APPLIES TO:** | : | |
| **ALL INDIVIDUAL PLAINTIFF** | : | |
| **ACTIONS EXCEPT CIVIL ACTION** | : | |
| **NO. 1:12-CV-01604 (ASSOCIATED** | : | |
| **WHOLESALE GROCERS, INC.) and** | : | |
| **THE DIRECT PURCHASER CLASS** | : | |

## TABLE OF CONTENTS

I.     Introduction ......................................................... 2
II.    Procedural History .................................................. 3
III.   Summary Judgment Standard ....................................... 4
IV.    The Evidence ........................................................ 6
V.     Analysis ............................................................. 14
       A.    General Antitrust Principles ................................. 15
       B.    Parallel Pricing .............................................. 17
       C.    "Plus" Factor Evidence ...................................... 21
             1.    Motive & Market Factors .............................. 23
             2.    Behavior Against Interests ............................ 27
             3.    Traditional Evidence of Conspiracy ..................... 40
                   a.    Canadian Conspiracy ............................ 41
                   b.    Advanced Knowledge ............................ 49
                   c.    Opportunities to Collude ......................... 53
             4.    Record as a Whole .................................... 56
VI.    Conclusion .......................................................... 57

## MEMORANDUM

Presently before the court are six motions for summary judgment filed by

Nestlé U.S.A., Inc. ("Nestlé") (Docs. 1205, 1385), The Hershey Company ("Hershey")

(Docs. 1206, 1386), and Mars, Inc., and Mars Snackfood U.S. (collectively, "Mars")

(Docs. 1221, 1421).

I. **Introduction**

The pending summary judgment motions come before the court as part of multidistrict litigation consolidating ninety-one separate civil actions. Responding plaintiffs are categorized into two separate groups: the first, a group of individual purchasers of chocolate products[1] and the second, a certified class of direct purchasers of chocolate products.[2] Collectively, plaintiffs allege that in 2002, 2004,

---

[1] The individual purchaser plaintiffs are Meijer, Inc. and Meijer Distribution, Inc.; Publix Super Markets, Inc.; Affiliated Foods, Inc.; CVS Pharmacy, Inc.; Rite Aid Corporation, and Rite Aid Hdqtrs. Corp.; Longs Drug Stores California, Inc.; Golub Corporation (d/b/a Price Chopper); Giant Eagle, Inc.; Kroger Co.; Safeway, Inc.; Walgreen Co.; Hy-Vee, Inc.; The Great Atlantic & Pacific Tea Co.; Albertson's LLC; HEB Grocery Company, LP; SuperValu, Inc.; Food Lion LLC; Hannaford Bros. Co.; Kash n'Karry Food Stores, Inc.; Brookshire Grocery Co.; and United Supermarkets LLC. The court will refer to this group as "individual purchaser plaintiffs."

[2] On December 7, 2012, the court granted a motion for class certification pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) certifying the "direct purchaser class" to include:

> All persons and entities who directly purchased standard ("singles") and King size ("King") single serve chocolate candy for re-sale from any Defendant or any predecessor, controlled subsidiary affiliates or division of any Defendant, in the United States or for delivery into the United States at any time from December 9, 2002 through December 20, 2007.

(Doc. 1286 at 57). In certifying the class, the court expressly excluded governmental entities, the defendants, and the individual purchaser plaintiffs. (Id. at 57-58).

2

and 2007, the defendants,[3] multi-national corporate entities producing approximately 75 percent of America's chocolate products, conspired to implement price increases in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*  Specifically, plaintiffs contend that defendants were in possession of one another's pricing information prior to formal price increase announcements and, spurred by the success of a price-fixing conspiracy among their affiliates in Canada, tacitly agreed to follow in lock step any list price increases initiated by competitors. After years of litigation and comprehensive and exhaustive discovery, the record is fully developed.  For the reasons set forth herein, the court finds that plaintiffs cannot establish that defendants' actions were more likely than not the result of concerted and collusive action.  Therefore, the court will grant each of the pending motions and enter judgment in favor of all defendants.

## II.    Procedural History[4]

The Judicial Panel on Multidistrict Litigation consolidated all pretrial matters in the above-captioned action in the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1407(a).  (See Doc. 1). Currently a total of ninety-one civil actions are associated with this litigation.

---

[3] The defendants are Nestlé U.S.A., Inc., ("Nestlé"), The Hershey Company ("Hershey"), and Mars, Inc., and Mars Snackfood U.S. LLC (collectively, "Mars"). Unless individually identified, all references to "defendants" herein refer to all defendants collectively.

[4] The parties are quite familiar with the procedural course that this litigation has followed and, therefore, the court will highlight only the most pertinent procedural landmarks herein.

Defendants have moved for summary judgment as to the individual purchaser plaintiffs (Doc. 1205 (Nestle); Doc. 1206 (Hershey); Doc. 1221 (Mars)) and the direct purchaser class (Doc. 1385 (Nestle); Doc. 1386 (Hershey); Doc. 1421 (Mars)).  The motions have been fully briefed, and are supplemented by lengthy statements of fact and a voluminous evidentiary record.  On October 7, 2013, the court held oral argument.  On November 14, 2013, the parties reported that a final court-ordered mediation session has been unsuccessful.  (Doc. 1493).  Hence, the pending motions are now ripe for disposition.

## III.   <u>Summary Judgment Standard</u>

Through summary adjudication, the court may dispose of claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(c) (permitting courts to enter judgment where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law").  In the context of an antitrust case, the moving party's burden is "no different than in any other case." <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992) (emphasizing that there is no "special burden on plaintiffs facing summary judgment in antitrust cases") (quoting <u>Eastman Kodak Co. v. Image Tech. Servs.</u>, 504 U.S. 451, 468-69 (1992)).  As in all cases, summary judgment should be granted when, despite "drawing all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled

to judgment as a matter of law." <u>Petruzzi's IGA Supermarkets v. Darling-Delaware Co., Inc.</u>, 998 F.2d 1224, 1230 (3d Cir. 1993).

Although the nature of the parties' respective summary judgment burdens are unaltered in antitrust litigation, the Supreme Court has limited the scope of the reasonable inferences that a district court may draw from ambiguous evidence. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986) (holding that "antitrust law limits the range of permissible inferences from ambiguous evidence in an antitrust case under § 1 of the Sherman Act."); <u>also</u> <u>*In re* Baby Food Antitrust Litig.</u>, 166 F.3d 112, 124 (3d Cir. 1999).  The range of acceptable inferences that a court may derive from circumstantial or ambiguous evidence varies "with the plausibility of the plaintiffs' theory and the danger associated with such inferences." <u>Baby Food</u>, 166 F.3d at 124.  Because of the fine lines separating unlawful conduct from legitimate business practices, courts are prohibited from drawing inferences of antitrust liability when a plaintiff's evidence merely bespeaks conduct that is "as consistent with permissible competition as with illegal conspiracy." <u>Matsushita</u>, 475 U.S. at 594; <u>see</u> <u>also</u> <u>Baby Food</u>, 166 F.3d at 124 (quoting <u>Matsushita</u>, 475 U.S. at 594).

IV.   **The Evidence**[5]

The defendants are members of three distinct multinational corporate families which manufacture, market, sell, and distribute chocolate confectionary products in a global market.  Mars, Inc. is a privately held company and worldwide producer of chocolate, headquartered in Virginia, and it is the parent company of Mars Snackfood US, LLC ("Mars U.S.").  (Doc. 1296-1 at ¶¶ 48, 50).  Included in Mars' brand portfolio are such iconic brands as M&Ms, Milky Way, Twix, Snickers, and Dove.  (Id. at ¶ 52).  Mars is also the parent company of Mars Canada, Inc., ("Mars Canada"), a wholly owned subsidiary of Mars which sells chocolate and other candy products to customers in the Canadian market.  (Id. at ¶¶ 72-73).  Although Mars U.S. and Mars Canada both report to the same parent company, they are uninvolved in each other's day-to-day operations.  (Id. at ¶¶ 75-76).  It is undisputed that both Mars U.S. and Mars Canada must seek approval of their respective pricing decisions from Mars.  (Id. at ¶ 82).

The Hershey Company ("Hershey") is a publicly traded entity incorporated in Delaware and based in Hershey, Pennsylvania.  (Id. at ¶ 87).  Hershey, like Mars, manufactures and sells chocolate confectionary products along with other food and snack products.  (Id. at ¶ 89).  Hershey's notable brands include Hershey's Milk

---

[5] To the extent facts are undisputed and supported by record evidence, the court cites directly to the parties' statements of material facts.  For ease of reference, the court will cite to the last four (4) digits of the Bates stamp pagination on the respective exhibits of the parties.  All other citations, *e.g.* to the parties' briefs or the court's prior memoranda, will reflect the document's original word-processing pagination.

Chocolate Bar, Hershey Kisses, Reese's Peanut Butter Cups, Mr. Goodbar, Pay Day, and Milk Duds. (Id. at ¶ 90). Mirroring Mars' organizational hierarchy, Hershey is the parent company of Hershey Canada Inc. ("Hershey Canada"). (Id. at ¶ 106). Like Mars, the day-to-day operations and business strategies of the two entities are separate, but Hershey, the parent company, approves all domestic and international pricing decisions. (Id. at ¶ 92).

Finally, Nestlé U.S.A., Inc. ("Nestlé") is a U.S.-based company wholly owned by Nestlé S.A., a company headquartered in Vevey, Switzerland. (Id. at 132). Nestlé, like its codefendants, manufactures, sells, and distributes chocolate confectionary products in the United States, with its most popular brands including Nestlé Crunch, Butterfinger, and Babe Ruth. (Id. at ¶¶ 127, 129). As with Hershey and Mars, Nestlé is a subsidiary, subject to the oversight of its corporate parent, Nestlé S.A. (Id. at ¶ 157). Nestlé S.A. has both U.S.-based and Canada-based ("Nestlé Canada") subsidiaries. (Id. at ¶ 162). However, distinct from its codefendants, Nestlé prices its U.S. chocolate products exclusive and independent of its parent company, Nestlé S.A.[6] (Id. at ¶ 137).

It is undisputed that, collectively, the three defendants dominate the domestic chocolate confectionary market. The market is highly concentrated and composed of few sellers, with the three defendants controlling more than 75 percent

---

[6] Plaintiffs dispute this fact but offer no evidence to controvert the documents and testimony establishing it. (See Doc. 1296-1 at ¶ 137).

of the market.  (Id. at ¶ 356).  During the years 2002 through 2007, Hershey was the

largest domestic chocolate manufacturer and the domestic market share leader

accounting for approximately 42 percent of all chocolate candy sales in the United

States.  (Id.)  Mars followed with the second largest share at 28 percent of all U.S.

chocolate sales, and Nestlé was the third largest producer with an average market

share of 8 percent.[7]  (Id.)

Defendants each manufacture a wide array of chocolate products in a variety

of different package types and sizes.  (Id. at ¶ 192).  Their chocolate product

offerings are traditionally divided into two subcategories: immediate consumption

products and future consumption products.  (Id.)  Immediate consumption products

are those sold in packaging types that consumers typically buy and consume at the

time of purchase; they include single ("singles") and king size ("kings") bars.  (Id. at

¶ 193).  Future consumption products are purchased for consumption at a later

date, and include bags or boxes of candy containing "bite size" or "miniature" bars.

(Id. at ¶ 197).  The weight of singles, kings, and future consumption packs varies by

brand and manufacturer.  (Id. at ¶¶ 194, 197).  The instant antitrust litigation relates

---

[7] Although Nestlé ranks third among the major manufacturers in the U.S.,
the Nestlé brand has substantial market power abroad, and it is the market leader
in Canada. (Doc. 1296-1 at ¶ 356).

only to pricing action taken with respect to singles and kings and does not involve

packaged product pricing.[8]

The primary ingredients in each defendant's chocolate candy products are

cocoa, sugar, dairy, peanuts, almonds, fats, and oils. (Id. at ¶ 202).  It is undisputed

that from 2002 through 2007, the period in which defendants allegedly conspired to

raise the prices of singles and kings, the average market cost for cocoa increased by

53 percent. (Id. at ¶ 204).  While plaintiffs correctly assert that defendants did not

pay market price (as reflected on futures exchanges) because of hedging, plaintiffs

do not and cannot dispute that the cost of cocoa, defendants' primary raw

ingredient, was on the rise.  (Id. (plaintiffs conceding that average cost was on the

rise but demonstrating that defendants' costs, while increasing, were not as high as

those reflected on the exchange)).  Indeed, plaintiffs concede that "the futures

exchange had fluctuation in prices between January 2002 and April 2007." (Id. at

¶¶ 204-09).  Defendants posit that the 2002, 2004, and 2007 price increases were

motivated, in part, by rising ingredient, manufacturing, and distribution costs.

---

[8] The individual purchaser plaintiffs have offered no evidentiary response to
arguments raised by Mars with respect to future consumption products. Implicit
from the court's narrowing of the certified class and, more pertinently, from both
plaintiff groups' proof and arguments, is the abandonment of any claims related to
future consumption products. Although the court is unaware of any formal
withdrawal of these claims, the fact remains that proof in this matter has been
tailored to single and king size bars to the exclusion of any future consumption
products. Consequently, the court deems claims related to future consumption
products to be withdrawn and focuses its analysis solely on single and king size
bars.

Prior to 2002, pricing patterns were inconsistent.  Defendants point the court to several occasions when one manufacturer initiated a price increase and the remaining defendants followed the increase almost immediately.  (Id. at ¶¶ 372-76).  Plaintiffs concede that in January of 1979, September of 1981, January of 1986, February of 1991, and December of 1995, list price increases initiated by one defendant were almost immediately followed by the remaining defendants.  (Id.)  Plaintiffs observe, however, and the record supports the observation, that other price increases were marked by periods of substantial delay rather than lock step price increases.  (Id.)

On December 7, 2002, Mars initiated the first of three price increases that undergird this litigation, announcing a singles list price increase of 3.5 cents per bar.  Two days later, Hershey followed with an identical increase, and on December 11, 2002, Nestlé increased its list price by 3.3 cents per bar.  (Id. at ¶ 418 (Mars); ¶ 419 (Hershey); ¶ 423 (Nestlé)).  The second round of increases began on November 19, 2004, when Mars announced a price increase for future consumption products only.  On December 15, 2004, Hershey matched Mars' packaged candy price and also increased the list price of singles by 2 cents, six packs by 3 cents, and kings by 3 cents.  Mars matched the additional price increases on December 17, 2004, and Nestlé followed suit with nearly identical increases on December 22, 2004.  (Id. at ¶ 454 (Mars initial), ¶ 460 (Hershey), ¶ 461 (Mars matching), ¶ 462 (Nestlé)).  The final series of price increases was initiated by Mars on March 23, 2007, when it increased the price of singles by 2 cents per bar and kings by 3 cents per bar.  On

April 4, 2007, Hershey matched Mars' price increase, and the following day, Nestlé likewise raised list prices on singles, kings, and six packs.  (Id. at ¶ 503 (Mars), ¶ 510 (Hershey), ¶ 511 (Nestlé)).  The parties ostensibly do not dispute that each of the subject price increases generated profits for the defendants.

As an explanation for these pricing actions, defendants cite to rising production and ingredient costs and posit that the increases were determined independently of one another, in a manner consistent with each company's best interests.  Plaintiffs, on the other hand, point north to the Canadian market for a more sinister explanation of the domestic price increases.  Plaintiffs assert that, during the relevant time period (2002 to 2007), the Canadian chocolate market was marked by a sophisticated trade spend conspiracy.  According to record evidence, in 2002, a Canadian distribution company, ITWAL, commenced a campaign to encourage Canada's four largest chocolate manufacturers to curb promotions and discounts.  (Id. at ¶¶ 580-82).  ITWAL's efforts were apparently successful, triggering a series of secret meetings which resulted in agreements among the manufacturers to reign in trade spend discounting and to restrict competition.  (Id.)  As a result of these communications and conduct, the Canadian Competition Bureau criminally charged the Canadian manufacturers—three of whom share parent corporations with the domestic defendants—with conspiring to restrict competition and fix prices for chocolate products.  Hershey Canada pled guilty on June 21, 2013, to a charge with respect to conduct occurring in 2007, and charges remain pending against the other defendants' foreign affiliates.

At inception, plaintiffs' antitrust claims relied almost exclusively on the existence of the Canadian trade spend conspiracy and its impact on the domestic chocolate market. During the course of this litigation, however, plaintiffs' cross-border theory has evolved almost beyond recognition. In the first iteration, plaintiffs theorized that given "[t]he opportunity for arbitrage, and the fact of arbitrage, between the United States and Canada," coordination in Canada would not have been effective in the absence of simultaneous price-fixing efforts in the United States. (Doc. 421 at ¶ 104(i)). Plaintiffs alleged broadly that the overlap of economic, operational, and managerial factors between the two markets is "so extensive" as to effectively eviscerate the border between the countries, merging the domestic and Canadian chocolate markets into a "single market." (Id. at ¶ 104(i)). This theory quickly withered on the vine in the absence of any factual support.

Plaintiffs next posited that as a result of "significantly integrated" cross-border management, senior executives in the United States "were aware of and condoned" the conspiracy in Canada, making it "plausible" that "the same executives" conspired in the United States. (Id. at ¶¶ 28, 104(b)-(d) ("Defendants' senior executives in the United States were aware of and condoned the conspiracy in Canada.")). Plaintiffs argued that as a result of the overlap of executive level decision-makers, any conspiracy in Canada necessarily would have spilled across the border into the domestic market. (Id. at ¶ 104(c)-(d); Doc. 996 at 11 (contending at class certification that management on both sides of the border was "closely

intertwined")).  In essence, plaintiffs asserted that management simply would not have taken advantage of an opportunity to conspire in one market without also conspiring in the United States.  Discovery produced no evidence of "significantly integrated" cross-border management, and this theory was subsequently jettisoned.

With discovery revealing no facts directly connecting Canadian conduct to defendants' pricing decisions, plaintiffs creatively present an "actuation" theory in support of their conspiracy claims.  The individual purchaser plaintiffs offer the expert report and testimony of Dr. Christopher A. Vellturo, an economist who theorizes that the domestic defendants' awareness of the nature and success of the trade spend conspiracy in Canada, may have "actuated" a domestic price-fixing conspiracy.  (Doc. 1231-2 ("Vellturo Rep.") at ¶¶ 202-09; Doc. 1265-7 ("Vellturo Rebuttal") at ¶ 102).  Similarly, the direct purchaser class submits the report and testimony of Dr. Robert D. Tollison, also an economist, who notes his agreement with Dr. Vellturo's novel theory, observing that such actuation would be possible if those with price-fixing authority in the United States became aware of the nature and initial success of a Canadian price-fixing conspiracy.  (Doc. 1458-3 ("Tollison Rep.") at ¶¶ 72-74).

In the context of Rule 702 motion practice, the court concluded that this actuation theory is economically plausible and may support plaintiffs' antitrust claims provided, however, that its factual contingencies are supported by record evidence.  (See Doc. 1369 at 29-30 (holding that actuation theory is "indeed based on economic principles")).  Factual support never materialized.  Although plaintiffs

offer general averments with respect to defendants' alleged awareness of—and even participation in—the Canadian conspiracy, neither the experts nor the parties direct the court to *any* evidence establishing or tending to prove that defendants knew of, or that their domestic pricing decisions were influenced by, the Canadian trade spend conspiracy. (<u>E.g.</u>, Vellturo Dep., 135:8-23, July 10, 2012 (conceding no evidence exists to demonstrate that domestic executives had explicit knowledge of the Canadian trade spend conspiracy); Vellturo Rebuttal at ¶ 102 (no evidence proves that domestic decision-makers were aware of the Canadian trade spend agreement, its nature, or its success, or that it played a role in domestic pricing decisions)). As set forth below, this failure to produce any record evidence of a causal connection between the Canadian trade spend conspiracy and plaintiffs' allegations of an American pricing conspiracy is fatal to plaintiffs' antitrust claims.

## V.   <u>Analysis</u>

The parties raise several predicate issues which the court must resolve before reaching its conclusion as to liability within the ambit of Rule 56, but, at its core, the instant case rises or falls not on a complex or novel legal dispute but instead on a more discrete summary judgment inquiry: whether the voluminous record before the court presents any genuine disputes as to whether defendants fixed prices in violation of Section 1. It is plaintiffs' position that a reasonable trier of fact could infer from the record that the defendants exchanged information regarding future pricing action and in lock step fashion followed one another's list price increases in order to restrict competition and increase profits. Defendants, in

14

response, posit that the 2002, 2004, and 2007 price increases were driven by rising costs and self-interested business judgment.  The court begins with a general overview of Section 1 antitrust principles before addressing both the predicate issues and the Rule 56 liability issues.

### A.   General § 1 Antitrust Principles

Section 1 of the Sherman Act, 15 U.S.C. § 1 *et seq.*, proscribes any "contract, combination, . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1 ("Section 1").  The Act contemplates two types of antitrust violations: *per se* violations and "rule of reason violations," the latter of which tasks the court to conduct a more searching analysis before concluding that a defendant committed acts proscribed by Section 1.  See *In re* Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315-17 (3d Cir. 2010) (quoting Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U .S. 877, 882 (2007)); see also Rossi v. Std. Roofing, Inc., 156 F.3d 452, 461 (3d Cir. 1998).  For more than half a century, the Supreme Court has maintained that horizontal price-fixing agreements, such as that alleged by plaintiffs, are *per se* restraints of trade punishable under the Act.  United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940) (as to horizontal price-fixing, "the law does not permit an inquiry into their reasonableness"); also Leegin, 551 U.S. at 886 ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices."); Nynex Corp. v. Discon, 525 U.S. 128, 133 (1998) ("An agreement of such a kind is unlawful *per se*.").

15

Price-fixing liability under Section 1 is predicated on the existence of an agreement, spoken or otherwise, between the defendants. Baby Food, 166 F.3d at 117 ("The existence of an agreement is the hallmark of a Section 1 claim." (citing Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 999 (3d Cir. 1994)). The antitrust plaintiff must establish some "unity of purpose or common design and understanding or a meeting of the minds in an unlawful arrangement" in order to prevail on a Section 1 claim. Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005) (quoting Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771 (1984)); see also Alvord-Polk, 37 F.3d at 999. Direct evidence is typically the most compelling means by which a plaintiff may establish the existence of an unlawful agreement; however, antitrust jurisprudence is cognizant that the proverbial "smoking gun" is elusive and often nonexistent. See InterVest v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir. 2003). Consequently, courts allow antitrust plaintiffs to prove their case in one of two ways: by presenting direct evidence of an agreement, or by relying on circumstantial evidence and reasonable inferences that may be drawn therefrom. Id. (quoting Rossi, 156 F.3d at 465). In the matter *sub judice*, plaintiffs concede the absence of direct evidence, and have elected to proceed on circumstantial evidence of a domestic price-fixing conspiracy. (Doc. 1296 at 59-62; Doc. 1454 at 9-11).

An antitrust plaintiff proceeding with only circumstantial evidence must establish both "conscious parallelism" and certain "plus" factors. See Petruzzi's, 998 F.2d at 1243. Specifically, in a parallel plus case, plaintiffs must prove not only that the defendants' behavior was "consciously parallel"—that is, that each was

16

aware of the others' conduct and this awareness was an element in their decision-making process—but also "certain 'plus' factors."  Id.; also *In re* Flat Glass Antitrust Litig., 385 F.3d 350, 360 n.11 (3d Cir. 2004); InterVest, Inc., 340 F.3d at 165.  The plus factor requirement derives from concerns expressed by the Supreme Court in Matsushita, to wit: that mistaken inferences of unlawful actions could "chill the very conduct the antitrust laws are designed to protect."  Matsushita, 475 U.S. at 594; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554 (2007) ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").  It is against this legal landscape that the court must analyze plaintiffs' evidence.

### B.   Parallel Pricing

Parallel pricing is described by the Supreme Court as "the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a prefixed maximizing, supracompetitive level by recognizing shared economic interests and their interdependence with respect to price and output decisions."  Brooke Group v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993) (citing 2 AREEDA & TURNER, ANTITRUST LAW 404 (1978)).  The court must review the record evidence, including any expert witness testimony or reports, to determine whether there exists "a pattern of parallel price increases" throughout the alleged conspiracy period.  Baby Food, 166

17

F.3d at 122; also Superior Offshore Int'l, Inc. v. Bristow Group, 490 Fed. App'x 492,

498 (3d Cir. 2012) ("[A] plaintiff must show . . . that the defendants' behavior was

parallel.").  Importantly, parallel pricing does not require absolutely uniform

pricing decisions; it is sufficient that the price increases are reasonably proximate

in time and value.  Baby Food, 166 F.3d at 132 (recognizing that "parallel pricing

does not require 'uniform prices,' and permits prices within an agreed upon range"

(citing Socony-Vacuum Oil Co., 310 U.S. at 222)).

       The defendants do not—and cannot—contest the fact that their price

increases were synchronized and parallel throughout the alleged conspiracy period;

instead, defendants vigorously dispute the explanation offered by plaintiffs for the

increases, asserting that they did not blindly follow one another but exercised

independent business judgment with respect to each price increase.  The

indisputable fact remains, however, that on three separate occasions between

December of 2002 and April of 2007, when one defendant initiated a price increase

on single and king size chocolate bars, the other two defendants followed

immediately with similar price increases.

       The three lock step price increases challenged by plaintiffs proceeded as

follows.  In December of 2002, Mars' list price increase of 3.5 cents per bar on

singles was followed within two days by Hershey and two days thereafter by

Nestlé.[9]  (Doc. 1296-1 at ¶ 418 (Mars); ¶ 419 (Hershey); ¶ 423 (Nestlé)).  Similarly, in December of 2004, shortly after Mars increased prices for future consumption products, Hershey announced an increase of 2 cents per bar for singles and 3 cents per bar for kings; Mars matched within two days, and Nestlé matched within a week.  (Id. at ¶ 454 (Mars initial), ¶ 460 (Hershey), ¶ 461 (Mars matching), ¶ 462 (Nestlé)).  And in March of 2007, when Mars announced a singles increase of 2 cents per bar and a kings increase of 3 cents per bar, Hershey and Nestlé both followed with identical announcements within two weeks.  (Id. at ¶ 503 (Mars), ¶ 510 (Hershey), ¶ 511 (Nestlé)).  Defendants effectively concede that each company's pricing action was reactive to and almost entirely in step with their competitors' price announcements, but categorically deny that such action was collusive and anti-competitive rather than prudent behavior in a competitive market.

The court is compelled to conclude that defendants' pricing decisions were sufficiently parallel to enable claims under applicable antitrust laws.  See Brooke Group, 509 U.S. at 227. Defendants Hershey and Nestlé priced in lock step with Mars, the price initiator: indeed, the undisputed record evidence establishes that the singles and kings price increases in 2002, 2004, and 2007 were nearly simultaneous, implemented within days and weeks of one another, and varied in

---

[9] Nestlé emphasizes that its 2002 increase did not mirror its competitors' increase and instead was 0.2 cents per bar lower. Such a slight differential between increases, however, is de minimis and not dispositive to the court's parallel pricing analysis. Baby Food, 166 F.3d at 132 (observing that precise parallel pricing is not required to sustain Section 1 claim).

amount on only one occasion, and then only by two-tenths of a penny.  (Doc. 1296-1 at ¶¶ 418-19, 423, 454, 460-61, 503, 510-11).

Acknowledging these threshold facts, defendants nonetheless contend that the price increases were not truly parallel because each defendant's trade spend discounting practice varied, resulting in markedly different "net" transaction prices.  In other words, according to defendants, any parallelism in list pricing was rendered moot by the fact that actual net transaction prices varied across the market.  The Third Circuit has squarely addressed, and rejected, this theory.  In Flat Glass, the panel was faced with similar arguments: antitrust defendants contended that "regardless of [their] list prices, the actual transactional prices . . . declined during the period of the alleged conspiracy," thus, in defendants' view, precluding antitrust liability.  Flat Glass, 385 F.3d at 362.  The Circuit flatly repudiated this argument as "simply wrong," observing that "an agreement to fix prices is . . . a *per se* violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices."  Id. (quoting *In re* High Fructose Corn Syrup, 295 F.3d 651, 656 (7th Cir. 2002)).  The Circuit observed that while such a paradigm indeed constitutes "a failed attempt to fix prices," it is the attempt itself, not the ultimate success or profitability of the price-fixing scheme, that the Sherman Act proscribes.  Id. at 363 (quoting Socony-Vacuum Oil, 310 U.S. at 224 n.59).

In light of the Third Circuit's unequivocal holding in Flat Glass, the court rejects defendants' contention that a lack of uniformity in some—or all—transaction

20

prices precludes antitrust liability.  As to this preliminary element of a Section 1

claim, plaintiffs have presented ample, undisputed evidence from which a trier of

fact could conclude that price increases implemented by defendants were made

with awareness of their competitors' pricing decisions, and that their competitors'

actions influenced or motivated defendants' individual pricing decisions.  See

Petruzzi's, 998 F.2d at 1243 (requiring that awareness of competitors' conduct was

an "element in [each defendant's] decision-making process"); see also Baby Food,

166 F.3d at 122; Superior Offshore, 490 Fed. App'x at 498.  This is all that is required

of the plaintiffs with respect to the conscious parallelism element of their antitrust

claim.

### C.   "Plus" Factor Evidence

In some markets, evidence of conscious parallel pricing in and of itself

"permits a court to infer the existence of a conspiracy between competitors."  Baby

Food, 166 F.3d at 122.  However, given the supracompetitive nature of oligopolistic

markets, typically consisting of few large sellers and diffuse buyers, interdependent

parallel pricing "can be a necessary fact of life" while nonetheless resulting from

independent and self-interested judgment.  Id. (quoting AREEDA, ANTITRUST LAW §

1429 (1986)).  The Supreme Court has oft cautioned that when antitrust defendants

are members of an oligarchic market, proof beyond mere conscious parallelism is

required, and that lock step price increases, standing alone, cannot support an

inference of antitrust liability.  E.g., Twombly, 550 U.S. at 553-54 ("Even conscious

parallelism, a common reaction of firms in a concentrated market that recognize

their shared economic interests and their interdependence with respect to price and output decisions, is not in itself unlawful."); Brooke Group, 509 U.S. at 227 (emphasizing that parallelism is "not in itself unlawful").  To address these concerns, the Court developed a "plus factor" requirement for those price-fixing cases that rest entirely on circumstantial evidence.  See Matsushita, 475 U.S. at 594.

Given the court's finding of parallel pricing in the matter *sub judice*, the court must consider whether any plus factors tend to "show that the allegedly wrongful conduct of the defense was conscious and not the result of independent business decisions of the competitors."  Baby Food, 166 F.3d at 122.  The Third Circuit, while noting that its list is by no means exhaustive, has identified three relevant plus factors: "(1) evidence that the defendant had a motive to enter into a price-fixing conspiracy, (2) evidence that the defendant acted contrary to its interests, and (3) evidence implying [the existence of] a traditional conspiracy . . . ."  Flat Glass, 385 F.3d at 360 (quoting Petruzzi's, 998 F.2d at 1244).  As a general rule, evidence that a market is ripe for collusion, that defendants acted against their interests, or that defendants were motivated to collude is too ambiguous to support an inference of agreement, because these circumstances could just as readily be the result of unilateral independent conduct.  Baby Food, 166 F.3d at 122.  Consequently, the most important plus factor is the third, which queries whether the plaintiff has presented traditional, non-economic evidence of conspiracy.  See Flat Glass, 385 F.3d at 361 (holding that the first two factors "may not suffice—by themselves—to defeat summary judgment" and noting that "the most important evidence will

22

generally be non-economic evidence that 'there was an actual, manifest agreement

not to compete. . . .'").  The court addresses each of these three factors *seriatim.*

### 1.  *Motive & Market Factors*

The first plus factor contemplates whether market dynamics rendered the

chocolate confectionary market conducive to price-fixing conspiracies in the 2002-

2007 time period at issue.  See Flat Glass, 385 F.3d at 361.  In other words, the court

must consider whether sufficient record evidence demonstrates that "the structure

of the market was such as to make secret price fixing feasible."  Id.  Plaintiffs

contend that the chocolate confectionary market between 2002 and 2007 was

characterized by cost-prohibitive barriers to entry, reasonably stable raw materials

costs (hedged by futures contracts), flat market demand as consumers began to

pursue healthier snack options, and the concentration of less than five principal

manufacturers that had ample opportunity to interact.  (Doc. 1296 at 69-77; Doc.

1454 at 16-20).  Defendants, for the most part, do not dispute this characterization

of the chocolate confectionary market; rather, defendants argue that motive and

opportunity, standing alone, fail to establish a Section 1 violation.

In the context of Rule 56, plaintiffs have submitted reliable evidence which

tends to establish that the chocolate confectionary market in 2002, and continuing

through 2007, was ripe for collusion.  Individual purchaser plaintiffs have offered

Dr. Vellturo's expert report and testimony, which reasonably delineate the

conditions of the chocolate confectionary marketplace.  Similarly, the direct

purchaser class has offered the expert opinion of Dr. Tollison in support of their

claims.  In concluding that the market was ripe for conspiracy, both experts make the following pertinent observations:  first, the chocolate market was characterized by a few dominant sellers and high market concentration; second, new firm entry was largely precluded by substantial barriers to entry, including high cost and time investment and difficult brand introduction; third, defendants each faced similar input cost structures; and fourth, demand throughout the conspiracy period was relatively inelastic. (Vellturo Rep. at ¶¶ 165-191; Tollison Rep. at ¶¶ 13(a), 30-35). Dr. Vellturo concludes that given these facts, a price-fixing agreement "had the potential to generate enhanced profitability . . . provided each agent acted in furtherance of the conspiracy."  (Vellturo Rep. at ¶ 192).  Dr. Tollison reaches the same conclusion. (Tollison Rep. at ¶ 13).

The court has already conducted a Rule 702 assessment of Dr. Vellturo's expert analysis and report and observed that his "conclusions are indeed based on economic principles."  (Doc. 1369 at 29 (denying motion *in limine* as to Dr. Vellturo's report on market characteristics)).  The court opined that Dr. Vellturo's observations regarding the structural characteristics of the chocolate market are based upon reliable record evidence.  (See id.)  Likewise, in the context of Rule 702, the court has approved the reports and conclusions of Dr. Tollison.  (Doc. 1286 at 14 (observing that Dr. Tollison's "opinions are founded upon basic economic precepts and industry characteristics")).  Indeed, defendants do not seriously dispute the conceptual or foundational aspects of either expert's testimony, and the court conceives of no compelling reason to reconsider these rulings.  Rather, with

respect to market conditions and motive, the parties dispute whether any

reasonable inferences of liability can be drawn from the court's previous findings.[10]

Further, and importantly, defendants' own experts reach many of the same

conclusions as Drs. Vellturo and Tollison with respect to whether market conditions

were ripe for collusion.  Hershey's expert witness, Dr. Joseph P. Kalt, agrees with

Dr. Vellturo that factors such as high market concentration, high entry barriers,

collusive opportunities, and closely substitutable products tend to be more

"conducive to conspiratorial behavior."  (Kalt Dep. 223:8-225:7, Aug. 20, 2012).  And

Dr. Kalt does not dispute Dr. Vellturo's estimation that defendants collectively

controlled between 75 and 78 percent of the domestic chocolate products market

during the alleged conspiracy period, (id. at 227:7-228:16), nor does he disagree with

the conclusion that the high costs of constructing and establishing a new chocolate

manufacturing entity create substantial barriers to entry.  (Id. at 229:9-23).  Thus, at

least insofar as motive, sufficient record evidence would support a jury finding that

---

[10] Defendants do not dispute the vast majority of Dr. Vellturo's market factor
conclusions, with the exception of his finding that "actual" raw material costs
declined during the conspiracy period. The court will address this dispute *infra*.

the structure of chocolate confectionary market makes price fixing "feasible."[11]  Flat

Glass, 385 F.3d at 360.

The mere fact that a market may exhibit oligarchic tendencies and

characteristics is, without more, insufficient to establish antitrust liability.  See id.

at 361 (noting that motive "may not suffice [by itself] to defeat summary judgment

on a claim of horizontal price-fixing among oligopolists"); see also Baby Food, 166

F.3d at 122 (emphasizing that evidence that a market is ripe for collusion is too

ambiguous to support an inference of agreement because it could just as readily be

the result of unilateral independent conduct).  In Flat Glass, the Third Circuit

explicitly opined that such market structure evidence is "neither necessary nor

sufficient" to preclude summary judgment for the defendants.  Flat Glass, 385 F.3d

at 361 n.12.  Accordingly, the court must proceed to an analysis of the remaining

two plus factors.

---

[11] Defendants largely concede this point, offering cursory argument with
respect to minor variations in their respective market shares, (Doc. 1222 at 28-29
(Mars contending that share shifts between defendants indicate competition rather
than collusion), and product differentiation (id. at 27-28 (Mars contending that
differentiation rather than standardization rendered market hostile to collusive
behavior); Doc. 1319 at 23 (Nestlé positing that heavy branding and marketing
symbols belie plaintiffs' contention that chocolate products are largely fungible)).

## 2.    *Behavior Against Interests*

The second plus factor queries whether the defendants, by increasing their prices in 2002, 2004, and 2007, acted against their individual self interests.  In <u>Baby Food</u>, the Third Circuit succinctly explained that this factor is satisfied when a plaintiff puts forth reliable evidence that a defendant's pricing actions "would be irrational assuming that the defendant operated in a competitive market."  <u>Flat Glass</u>, 385 F.3d at 360-61 (holding that "in analyzing this factor, a court looks to 'evidence that the market behaved in a noncompetitive manner'") (quoting <u>*In re* Corn Syrup Antitrust Litig.</u>, 295 F.3d at 655)).  This factor, in essence, looks for evidence that the defendant's compliance with the conspiratorial agenda was economically illogical, irrational, or otherwise against its business interests.  <u>See</u> <u>id.</u> The burden placed on antitrust plaintiffs with respect to this factor is substantial, compelling them to produce evidence which "tends to exclude the possibility that [the defendants] were acting independently."  <u>Petruzzi's</u>, 998 F.2d at 1232 (quoting <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752, 764 (1984)).

Defendants cite rising materials costs in support of their position that the three targeted price increases were necessary, independent business decisions and not the result of a collusive price-fixing agreement.  (Doc. 1213 at 20-22 (Nestlé); Doc. 1222 at 30-32 (Mars); Doc. 1323 at 24-30 (Hershey)).  Defendants further argue that their pricing decisions, while parallel, were designed and implemented in such a way as to catch their respective competitors off guard and gain whatever

momentary market advantage they could achieve under the circumstances.[12]  (Doc.
1211 at 20-27 (Hershey)).  Hershey and Nestlé also assert that Mars was the singles
and kings price leader with respect to all three price adjustments, and that the
failure to follow Mars' increases would have been an irrational business practice,
"leaving money on the table." (Doc. 1213 at 18-20 (Nestlé), Doc. 1323 at 5 (Hershey)).
Finally, Nestlé argues that it is in a unique position as the minor market share
holder among the three defendant firms, holding a mere 8 percent share[13] of the
domestic market, and by default a price taker, economically compelled to follow the
price increases of its competitors or risk losing profits. (Doc. 1213 at 18-20).  The
court addresses each of these positions, and plaintiffs' responses thereto, *seriatim*.

     With respect to the question of rising costs, plaintiffs attempt to create a
factual dispute sufficient to preclude summary judgment, suggesting that the
parties' respective experts are at direct odds with regard to whether costs steadily
increased during the conspiracy period.  Plaintiffs concede that *average* market
costs for raw materials such as cocoa, sugar, and dairy were on the rise from 2002
to 2007. (Doc. 1296 at 72-75 (citing Vellturo Rebuttal at ¶¶ 38-40); Doc. 1296-1 at
¶¶ 204-06).  Nonetheless, Dr. Vellturo opines that, as a result of strategic hedging,
defendants' *actual* costs "either declined or went up only modestly during the
conspiracy period." (See Doc. 1296 at 74 (citing Vellturo Rebuttal at ¶¶ 38-40); see

---

     [12] See *infra* at pp. 32-37.

     [13] Nestlé's market share fluctuated only minimally during the conspiracy
period, resting within the 8.0 to 8.3 percent range. (Vellturo Rep. at Ex. 6-A).

also Doc. 1296-1 at ¶¶ 204-06 ("Plaintiffs do not dispute that the futures exchange had fluctuation in prices between January 2002 and April 2007" but deny "that defendants paid the costs reflected on the futures exchange.")).  Dr. Tollison similarly cites to defendants' hedging contracts in concluding that defendants' cost rationales are necessarily "pretextual."  (Tollison Rep. at ¶ 64 (observing that costs in 2002 were approaching all-time lows)).  These conclusions, however, are largely unsupported by the exhibits upon which plaintiffs' experts rely and, ultimately, irrelevant for purposes of discrediting defendants' price increase rationales.

The flaw in the experts' conclusions stems from a misapprehension of defendants' explanation for the price increases, focusing on pre-conspiracy period cost stability rather than anticipated post-2002 cost instability.  In his report, Dr. Vellturo emphasizes that input costs "were not increasing significantly . . . in the period prior to the first subject price increase at the end of 2002," referencing his own Exhibit 5 in particular.  (Vellturo Rebuttal at ¶¶ 41-42 (observing that Hershey's costs were stable prior to 2002); ¶ 45 (noting that Mars' costs were stable "prior to . . . instituting the first subject price increase in 2002")).  Dr. Vellturo concludes that defendants' price increases cannot be explained as responsive to market cost instability and must necessarily be the result of unlawful collusion.  (Id. at ¶ 34 (concluding that changes in input costs are not a viable "explanation as to what changed in 2002 that led to a clear shift in conduct in the United States by [defendants]")).  Dr. Tollison's conclusion with respect to the defendants' cost

justification also centers on contemporaneous and *post hoc* market cost analyses.

(See Tollison Rep. at ¶ 64).

Significantly, however, defendants have *not* posited that their pricing

decisions were reactionary responses to pre-conspiracy cost increases.  Defendants

have argued that their price increases were forward-looking, made in anticipation

of raw materials cost increases in 2003, (e.g., Doc. 1211 at 21-22 (Hershey noting that

2002 increase was motivated in part by consensus that raw materials costs would

begin to rise in 2003); Doc. 1223 at ¶ 396 (defendants noting that 2002 increase was

driven, in part, by predictions that political instability and drought in the Ivory

Coast would increase cocoa costs in 2003)), a rationale which Dr. Vellturo and Dr.

Tollison make no attempt to discredit or disprove and, indeed, fail to address.  Dr.

Vellturo's own exhibits reflect that cost increases, however insubstantial, were a

reality throughout the conspiracy period.  (Vellturo Rebuttal, Exs. 3, 5).  For

example, Dr. Vellturo's Exhibit 5, depicting Hershey-specific prices per pound for

commodities, reveals a consistent incline in Hershey's actual *hedged* cocoa costs, in

addition to increases in its dairy cost and fluctuating costs for its other inputs.  (See

id., Ex. 5).  Hence, Dr. Vellturo's report demonstrates that even hedged costs were

not immune to market influences during the conspiracy period.

It is rational, competitive, and self-interest motivated behavior to increase

prices for the purpose of mitigating the effect of *anticipated* cost increases.  See,

e.g., Baby Food, 166 F.3d at 129, 137-38 ("An increase in transaction prices for baby

food during a period of the economy when general food prices were increasing is

readily understandable."); see also Flat Glass, 385 F.3d at 360-61 (plaintiffs satisfy second plus factor by producing evidence establishing that defendant's conduct "would be irrational assuming that the defendant operated in a competitive market.")).  Far from tending to disprove the possibility of independent and self-interested conduct, Dr. Vellturo's report, to the extent it relates to input costs, tends to support defendants' position that their price increases were a necessary, rational, and fiscally prudent response to anticipated and eventually realized cost increases. Baby Food, 166 F.2d at 124 (to survive summary judgment, plaintiff's evidence must "tend to exclude the possibility that the alleged competitors acted independently").

Further, as Mars observes, plaintiffs' cost analyses give no consideration to other cost elements, such as increasing labor, health, and energy costs, which uncontroverted record evidence establishes were factors in defendants' pricing decisions.  (Doc. 1231-1 at ¶¶ 13-15, ¶ 116 (Nestlé's expert witness, Dr. Marshall, noting that labor, packaging, energy, and distribution costs account for nearly 55 percent of Mars' total costs); Gamgort Dep. 101:16-102:7, Mar. 11, 2011 (Mars' executive observing that Mars' 2002 price increase was the result of a "cumulative adverse impact from all of the input costs . . . [including] packaging, energy, labor costs, healthcare costs . . .")).  Dr. Tollison acknowledged on cross-examination that *any* costs which increase as a percentage of sales should be taken into consideration when pricing. (Tollison Dep. 124:6-126:13, July 14, 2011).  Nonetheless, he concedes that the cost index upon which he relied did not contemplate any costs other than raw materials.  (Id.)  Defendants have produced evidence which establishes that

31

increasing input costs, including not only raw materials but labor, health, and energy costs as well, were variables considered and consequential to their price increase decisions.  (See, e.g., Doc. 1211 at 21-22 (Hershey citing anticipated cost increase); Gamgort Dep. 101:16-102:7 (Mars' executive observing that increase was the result of a "cumulative adverse impact from all of the input costs . . . [including] packaging, energy, labor costs, healthcare costs . . .")).  More importantly, plaintiffs have failed to offer any material challenge to defendants' proffered rationale.  See Big Apple BMW, 974 F.2d at 1363 (holding that while plaintiffs "need not match, item for item, each piece of evidence proffered by the movant," they must, at minimum, "produce some affirmative evidence" responsive to defendants' evidence).  No reasonable jury could conclude, based on this evidence, that defendants' cost justifications are irrational or against their own interests.[14]

Moreover, defendants assert that their pricing decisions, while largely identical and effectively simultaneous, were nonetheless timed and orchestrated in such a way as to achieve whatever momentary pricing advantage they could over their competitors.  (See Doc. 1211 at 20-27 (Hershey detailing internal discussions and efforts of each firm leading up to and following announced price increases)).

---

[14] Even if costs were stable or demand was in decline during the conspiracy period, pricing action without consideration of changes in cost does not, by itself, tend to disprove the possibility of independent and self-interested conduct.  See, e.g., Brooke Group, 509 U.S. at 213 (observing that industry increasing prices in lockstep, twice a year and "irrespective of the rate of inflation, changes in the costs of production, or shifts in consumer demand," does not prove conspiracy but only that "the industry reaped the benefits of prices above a competitive level, though not through unlawful conduct. . .").

Robert Gamgort ("Gamgort"), a top executive at Mars during the relevant time

period, explained the tactical significance of surprise price increases as follows:

> [I]t was an attractive opportunity for us to catch people
> by surprise, catch our competitor by surprise. . . . It can
> disrupt them by if they're not ready, the retailers take –
> if they didn't do the prep work that we always did, the
> retailer takes the price up right away, starts buying
> heavily against the old price, it causes two issues, one is it
> can deplete their inventory rapidly, and the first customer
> to order would get that inventory, causing out of stocks
> with other customers.
>
> It also is an opportunity cost, which is they end up loading
> up – the retailers load up their warehouses at an old price
> and then it defers your ability to capture your costs later
> on because you sold in all your inventory at an old price.
> So it's very disruptive if you're not ready.

(Gamgort Dep. 118:19-119:9).  Gamgort also explained that, in order to achieve this

strategic advantage, management is "constantly looking for opportunities to disrupt

. . . competition." (Id. at 118:7-15).  Defendants' internal documents entirely

corroborate this assertion, reflecting, to varying degrees, aggressive in-house

pricing discussions focused on catching competition off guard.  (E.g., Doc. 1225-7

at 9883 (Mars business activity recommendation indicating desire to "disrupt[]

distracted competition" with 2002 price increase)).  The record evidence also

reveals frustration among competitors when these attempts were successful.  (See,

e.g., Doc. 1246-6 at 8856 (Hershey executive noting in email after Mars' 2004

increase that he is "angry at myself that we didn't see this coming")).  Plaintiffs

have failed to adduce any evidence which would tend to suggest that these

documents were sham portrayals in furtherance of the price-fixing conspiracy.

The unvarnished facts of record reflect independent decision-making prior to the 2002 price increase.  In July of 2002, approximately five months prior to the first price increase, Mars began evaluating potential pricing actions.  (Doc. 1256-4 at 5572-77).  Nestlé meeting notes dated September 12, 2002, reflect that Nestlé was also engaged in internal discussions, and that it desired a price increase, observing that it was paying "roughly twice as much as Hershey for cocoa"; however, given its market position, Nestlé resolved to "follow any price advance, yet we can't initiate a lead."  (Doc. 1256-6 at 5593).  Similarly, although Hershey engaged in its own price discussions and reviewed several proposals, (see, e.g., Doc. 1256-8 at 8452-53; Doc. 1256-9 at 7322), it ultimately adopted a "wait and see" approach, opting to follow but not lead a price increase.  (Doc. 1257 at 6997)).  By late September, Mars internally agreed upon a deadline of December 9, 2002, to implement an increase on singles.  (Doc. 1225-7 at 9883, 9899)).  By November, even independent market analysts predicted that because Hershey held the most advantageous forward-looking cocoa position, its competitors may begin to effect price increases which Hershey would be compelled to follow.  (Doc. 1256-2 at 6837)).  Thus, with respect to the first increase, defendants have proved without contravention that each was actively engaged in internal analyses with respect to whether, when, and by what amount to raise its prices.

Defendants' tactical approaches to the 2002 price increase varied greatly.  On December 7, 2002, consistent with its self-imposed deadline, Mars raised the price of its singles and 6-packs of singles by 3.5 cents per bar.  (Doc. 1243-1 at 4111-12). On

34

December 9, 2002, Hershey followed, increasing its prices of singles by 3.5 cents per

bar, but increasing 6-packs of singles by only 2.5 cents per bar.  (Doc. 1245-3 at

0600).  Hershey *also* increased the list price of kings and 10-packs, a move that Mars

had not taken or anticipated.  (Id.)  Two days later, on December 11, 2002, Nestlé

adopted its own strategy, increasing the list price of singles by 3.3 cents, kings by

7.9 cents, 6-packs by 2.67 cents per bar, and 10-packs by 1.54 cents per bar.  (Doc.

1242-6 at 5967-68).  In order to capitalize on this opportunity, Mars matched the

kings price increase on December 13, 2002, but decided not to follow with respect to

the 10-pack increases.  (Doc. 1225-8 at 3754-60; also Gamgort Dep. 141:4-142:15

(observing that "the market would move to the higher price with or without us")).

Clearly, the rollout of the 2002 price increase reflects not collusive but rather

independent and fiercely competitive business conduct, designed to gain market

advantage and optimize profits.  Baby Food, 166 F.3d at 136 (granting summary

judgment for manufacturers when evidence demonstrated "independent,

aggressive action, not collaborative, concerted conduct").

   The same is true of the 2004 and 2007 price increases, both reflecting

unilateral pricing decisions and divergent strategies.  In March of 2003, Hershey

warned that, despite hedging, cocoa costs would increase "substantially" in 2004,

and it contemplated a potential price increase to offset this anticipated problem.

(Doc. 1257-8 at 4888).  In May of 2003, Hershey specifically evaluated a potential

increase on the list price of singles and kings.  (Doc. 1257-9 at 6115, 6120, 6123).

Hershey has produced internal documents which reveal that the end of 2003 and

much of 2004 were marked by extensive discussions regarding potential pricing

action and weight reductions.  (E.g., Doc. 1227-9 at 7955-57 (internal presentation

discussing pricing given cost increases); Doc. 1229 at 7922-23 (internal presentation

discussing pricing triggers and responses)).  Contemporaneous Mars documents

indicate that commodity cost increases were a significant factor in its pricing

discussions.[15]  (Doc. 1258-2 at 2150, 2174-77).

Hershey's documents also reveal that in June of 2004, its pricing team had

proposed a November 2004 price increase on singles, kings, and 6-packs but

recommended a hold on packaged product price changes.  (Doc. 1227-9 at 7953).

However, when Mars initiated a packaged candy increase on November 19, 2004,

(Doc. 1260-1 at 1674-1787), it forced Hershey to abandon its earlier strategy.

Ultimately, nearly three weeks later, Hershey decided to increase prices on

packaged candy as well as singles and kings, (Doc. 1229-3 at 7039), with the

increases effective on December 15, 2004. (Doc. 1245-4 at 0601).  Shortly thereafter,

the remaining defendants matched Hershey's prices. (Doc. 1226-4 at 8813-8820;

Doc. 1261-1 at 3522-23).

In 2007, defendants were once again engaged in independent pricing

discussions, beginning with Mars' decision in the spring of 2006 to hire an outside

contractor to develop a pricing strategy.  (Doc. 1263 at 4257-58).  According to

---

[15] Plaintiffs dispute whether costs actually motivated defendants' pricing
discussions, but they do not dispute the fact that defendants were actively engaged
in internal analyses.  (Doc. 1296 at ¶ 440).

internal documents, both Mars and Hershey were concerned with anticipated increases in market costs for key inputs.  (See Doc. 1263-7 (Mars presentation reviewing market costs of key ingredients); Doc. 1263-8 (Hershey presentation noting rise in input costs and discussing potential price increase)).  On March 21, 2007, a Hershey pricing team created a proposal to increase prices on singles and kings, but it recommended a six to eight week delay in order to conduct a market study.  (Doc. 1229-5 at 9500-02).  On March 23, 2007, Mars raised its prices on singles, kings, and 6-packs. (Doc. 1226-1).  Hershey debated whether to follow Mars' three-cent increase or stick with the two-cent increase it had already planned, (Doc. 1265-9 at 5743), but ultimately matched Mars' increase on April 4, 2007, (Doc. 1245-5 at 8590), followed shortly thereafter by Nestlé, (Doc. 1242-6 at 5967-68).  As in 2002 and 2004, defendants' extensive unilateral discussions reflect not concerted action but the exercise of independent business judgment and divergent pricing tactics driven by practical efforts to maximize competitive advantage.  See Baby Food, 166 F.3d at 136 (conduct as consistent with "aggressive competitive activity" as with "collusive, price-fixing behavior" is insufficient to survive summary judgment).

In response to this evidence, plaintiffs contend that indications of "surprise" are insufficient to disprove the existence of a conspiracy, asserting that there is no reason to believe that all of the defendants' employees would be aware of tacit agreements to increase prices in lock step.  (Doc. 1296 at 96).  In the same vein, plaintiffs assert that an agreement to follow competitors' price increases does not preclude surprise at the timing or amount of a competitor's increase.  (Id.)  This

argument is unavailing because it ignores plaintiffs' own affirmative burden at this

juncture.  See Big Apple BMW, 974 F.2d at 1363 ("[A]n opponent [of summary

judgment] may not prevail merely by discrediting the credibility of the movant's

evidence; it must produce some affirmative evidence." (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256-57 (1986)).  To be clear, defendants do not rely solely

on internal indications of "surprise" in support of their motions.  Defendants have

constructed a formidable summary judgment record demonstrating that each

independently and carefully evaluated its pricing structure, and that each

strategically and competitively priced its products to realize whatever profit it

could.  In response, plaintiffs may not rely merely on general assertions that

defendants' cost-based and self-interested rationalizations are pretextual: at

summary judgment, antitrust plaintiffs, like any plaintiff, must offer affirmative

evidence which creates a genuine issue of material fact for trial.  See id.  The overt

evidence before the court establishes that defendants' actions, while parallel, were

nonetheless the result of reasoned, independent business mindedness.  Quite

simply, plaintiffs have failed to establish that defendants' actions were

unreasonable or irrational in the competitive market.

    With respect to Nestlé, the evidence is even more favorable.  Given its minor

market share with respect to the more dominant defendants, Nestlé cogently

asserts that failure to follow the price increases of its competitors would have been

detrimental to its economic self-interest.  The parties do not dispute that Nestlé, far

from being a market leader, possessed only an 8 percent market share during the

38

relevant period.  (Vellturo Rep., Ex 6-A).  Uncontroverted evidence demonstrates

that Nestlé was constrained by virtue of its market position: although it desired to

increase product prices to meet rising costs of production, it also deemed such a

move to be strategically unsound given its small market share.  (Doc. 1256-6 at 5593

(in 2002, observing increasing cocoa costs but noting that while Nestlé "will follow

any price advance . . . we can't initiate a lead.")).  At least one court has credited

such concerns, noting that given the nature of an oligopolistic market, "when there

is a strong market leader, that leader will be the price leader and other market

players will often raise prices along with the market leader in order to increase

their profit."  Holiday Wholesale Grocery Co. v. Phillip Morris, Inc., 231 F. Supp. 2d

1253, 1316 (N.D. Ga. 2002), *aff'd sub nom.* Williamson Oil Co. v. Phillip Morris USA,

346 F.3d 1287, 1316 (11th Cir. 2003).  As Nestlé emphasizes, widely accepted

economic principles support its price follower action.  See SAMPAT MUKERJEE,

MODERN ECONOMIC THEORY 450 (4th ed. 2007) (when one or more firms dominate as

price leaders, "the remaining firms in the industry—by being willing to sell all that

the market allows at the price set by the dominant firm—merely act as price-

takers").

        Having carefully reviewed the extensive Rule 56 record, the court concludes

that plaintiffs have failed to adduce sufficient evidence from which a jury could

reasonably conclude that defendants' actions were so irrational as to be against

their individual economic interests.  See Baby Food, 385 F.3d at 360-61 (antitrust

plaintiff at summary judgment must show that defendants' actions were irrational

and contrary to economic interests); *In re* Corn Syrup Antitrust Litig., 295 F.3d at

644 (plaintiff must show that defendants behaved in a noncompetitive manner);

Petruzzi's, 998 F.2d at 1232  (plaintiffs must produce evidence that "tends to

exclude the possibility that [the defendants] were acting independently").  Plaintiffs

have produced no evidence tending to discredit defendants' legitimate business

rationales for their pricing decisions.  At this juncture, plaintiffs' blanket allegations

of pretext cannot be given the benefit of the doubt.  See Big Apple BMW, 974 F.2d

at 1363 (plaintiffs must put forth "some affirmative evidence" beyond mere

allegations). Accordingly, this second plus factor weighs in favor of the defendants.

### 3.    *Traditional Evidence of Conspiracy*

Courts have been hesitant to allow an antitrust plaintiff to proceed beyond

summary judgment in the absence of evidence from which a jury could infer the

existence of "an actual, manifest agreement not to compete." Flat Glass, 385 F.3d at

361.  The Third Circuit has admonished that the first two plus factors alone "may

not suffice . . . to defeat summary judgment," Flat Glass, 385 F.3d at 361, and in that

vein, plaintiffs' focus the bulk of their efforts on what they perceive to be traditional

evidence of conspiracy.[16]  Specifically, plaintiffs assert that a trade spend

conspiracy abroad, advanced knowledge of competitors' price increases, and

frequent opportunities to conspire provide ample traditional evidence of an actual

agreement sufficient to carry their claims to trial.  The court addresses each

contention *seriatim*.

### a.    Canadian Conspiracy

The foundation of plaintiffs' claims rests largely on their hypothesis that

alleged and partially proven anticompetitive conduct in Canada somehow

facilitated a price-fixing conspiracy in the United States.  As noted *supra* at pp.

11-14, however, plaintiffs' initial hopes of discovering and proving an overt cross-

border conspiracy have been reduced to this tenuous theory:  that the initial

success of the Canadian trade spend conspiracy demonstrated to the three

domestic defendants that the nature of the market would support and disguise their

illegal agreements.  (Doc. 1296 at 88-91).  Plaintiffs' cross-border actuation theory

rests upon the reports and testimony of the individual purchaser plaintiffs' expert,

Dr. Vellturo.  (Vellturo Rep. at ¶¶ 202-09; Vellturo Rebuttal at ¶¶ 99-103).  Dr.

Tollison's report generally supports Dr. Vellturo's actuation theory.  (Tollison Rep.

at ¶¶ 72-74 (agreeing that this cross-border actuation theory is plausible if domestic

executives were aware of Canadian conspiracy and its purported success)).  In

---

[16] No one factor is dispositive to an antitrust claim. Thus, if plaintiffs present
sufficient evidence indicative of a traditional conspiracy under the third plus factor,
they may survive summary judgment despite failing to establish other factors. See
Flat Glass, 385 F.3d at 361.

response, defendants contend that Dr. Vellturo's theory, while accepted by the court for purposes of qualifying Dr. Vellturo as an expert, (see Doc. 1369 at 28-30), is fatally flawed because it assumes facts not supported by the record, namely that domestic executives were aware of the Canadian trade spend conspiracy. After careful review of Dr. Velltuso's actuation theory, and the assertions upon which it is based, the court is compelled to agree with defendants.

Anticompetitive conduct "elsewhere in time or place does not generally allow the inference of an immediate conspiracy." PHILIP E. AREEDA & HERBERT H. HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1421a (3d ed. 2012). Indeed, absent some reliable, factual link between foreign and domestic conduct, courts have declined to use foreign conduct as a plus factor for liability purposes. In re Elevator Antitrust Litig., 502 F.3d 47, 52 (2d Cir. 2007) (suggestion that "if it happened there, it could have happened here" is insufficient to establish liability). To substantiate a cross-border conspiracy theory, antitrust plaintiffs must establish a "palpable tie between these overseas activities and [defendants'] pricing actions"; otherwise, the unlawful foreign conduct "do[es] not tend to exclude the possibility of independent action in the . . . domestic market." Williamson Oil, 346 F.3d at 1317. The record is entirely devoid of any facts establishing a plausible, much less a palpable, tie between the Canadian trade spend conspiracy and domestic pricing decisions.

In his report, Dr. Vellturo tenuously opines, in pertinent part, as follows:

> From an economic standpoint, the close interrelations
> between Canadian and United States marketplaces indicate
> that anti-competitive practices and outcomes in one market
> could likely serve as facilitating devices for the establishment
> and execution of tacitly (or expressly) collusive outcomes in
> the other. Given the extensive interactions between the
> United States and Canadian operations at Defendants, I find
> that the collusive conduct and outcomes executed in Canada
> did serve as a facilitating device that actuated and helped to
> maintain anti-competitive outcomes in the United States.

(Vellturo Rep. at ¶ 203).[17]  Dr. Vellturo concludes that the catalyst for lock step price

increases in 2002 was information acquired by the defendants regarding the

effectiveness of the Canadian conspiracy.  (See id. at ¶ 203; see also Vellturo

Rebuttal at ¶¶ 22, 102 (observing that information conveyed to the domestic

defendants about the Canadian trade spend conspiracy "was an important change

in the information set that, in my opinion, led to a change in behavior")).  Dr.

Vellturo's conclusion, although economically feasible, lacks any factual foundation.

Dr. Vellturo concedes that there is no record evidence establishing that

defendants' domestic pricing decision-makers had "explicit knowledge" of any

---

[17] The court notes with interest that Dr. Vellturo's threshold statement
speaks inchoately of close interrelations which "indicate" that "anti-competitive
practices . . . in one market *could* likely serve as *facilitating* devices . . . for collusive
outcomes in the other."  (Vellturo Rep. at ¶ 203 (emphasis added)).  Despite the
myriad contingencies in this preliminary observation, Dr. Vellturo abruptly follows
with the sweeping conclusion that the "extensive interactions between the United
States and Canadian operations . . . *did* serve as a facilitating device that actuated"
defendants' price-fixing conspiracy.  (Id. (emphasis added)).  This conclusion is a
house of cards that is wholly contingent upon factual proof of "extensive
interactions" between domestic and Canadian affiliates. In the absence of such
factual proof, the house of cards necessarily collapses. See infra at pp. 44-47.

anticompetitive or unlawful activity in Canada, (Vellturo Dep. 135:8-23), vitiating his conclusion that an awareness of successful efforts in Canada directly facilitated domestic collusion.  Dr. Vellturo further concedes that there are no documents or other evidence, contemporaneous or otherwise, which indicate that defendants' domestic decision-makers were even aware of the Canadian trade spend agreement, its nature, or its success, or that the Canadian conspiracy played any role whatsoever in defendants' pricing decisions.  (Vellturo Rebuttal at ¶ 102). Indeed, the only evidence cited by Dr. Vellturo to support his conclusion that information crossed the border is evidence that the domestic defendants stayed informed as to their Canadian counterparts' *lawful* competitive activities.  (Vellturo Rep., ¶ 113 (Hershey Canada executive relayed price increase information to domestic officer after announcement was public); ¶ 138 (observing that in 2003, Hershey's domestic executives were "closely scrutinizing" the Canadian market)).

This is not to say that plaintiffs have stepped up to the plate empty-handed. When pressed during oral argument, counsel for the individual purchaser plaintiffs directed the court to several documents and suggested to the court that discovery produced ample evidence of anticompetitive behavior and unlawful communications. (Tr.  of Oral Argument, 75:20-81:25).  Specifically, counsel cites the following evidence:

(1)     An October 2002 email between Art Nemeth and Bruce Brown, two
        Hershey Canada executives, indicating that Brown had discussions
        with Mars' Canada personnel involving pricing (Doc. 1296-102 at 7468);

(2)     A November 2002 memorandum from Hershey chief executive officer
        Rick Lenny to the Hershey Board of Directors acknowledging that
        "Canada has been plagued by aggressive competitive promotions all
        year" and indicating that Bruce Brown has been appointed as acting
        general manager in Canada (Doc. 1296-51 at 6813);

(3)     A January 2003 email from Bruce Brown to Burton Snyder, then-
        interim president of Hershey International indicating that Nestlé
        Canada had announced a price increase and that "some intelligence"
        suggests that Mars Canada "is anxious to follow the price increase"
        but "would rather have Hershey or Cadbury go ahead of them"
        because Mars "suffered more than we did last year, relatively
        speaking, so they're not starting from a position of strength" (Doc.
        1296-54 at 8134);

(4)     A January 2003 email from Burton Snyder to Bruce Brown directing
        Hershey Canada to proceed with the price increase proposed by
        Brown in a prior email (Doc. 1296-103 at 8133);

(5)     A June 2005 email from Bruce Brown to J.P. Bilbrey, then-president
        of Hershey International, that "we had heard rumors swirling around
        about a potential competitive price increase (Nestlé/Cadbury) in
        Canada for Q4 2005, and had it confirmed last week, although details
        are sketchy" (Doc. 1296-130 at 9021); and

(6)     A January 2007 email from Bert Alfonso, Hershey's Vice President for
        Financial   and Planning, introducing Eric Lent, Hershey Canada's
        new vice president, to David Sculthorpe, president of Cadbury
        Canada. (Doc. 1296-144 at 5540).

Viewed in a light most favorable to plaintiffs, this evidence of executive-level

communications falls woefully short of the "extensive interactions" between

domestic and Canadian affiliates which are so crucial to the viability of Dr.

Vellturo's "actuation" theory.  Close inspection of the correspondence reveals

nothing dissolute with respect to  the *domestic* defendants. The emails represent

communications primarily among *Canadian* executives, and they pertain to

*Canadian* price increases. The only email of domestic relevance, Bert Alfonso's

45

routine introduction of a new Canadian colleague to his competitors, is entirely
innocuous. <u>Baby Food</u>, 166 F.3d at 124 (holding that "conduct as consistent with
permissible competition as with illegal conspiracy" cannot support an inference of
antitrust liability) (citing <u>Petruzzi's</u>, 998 F.2d at 1232). Despite the creative
conjurings of plaintiffs' counsel,[18] the ambiguous evidence cited by plaintiffs neither
proves nor permits the reasonable inference that the *domestic* defendants were
aware of or exposed to the nature, scope, or initial success of the Canadian trade
spend conspiracy. <u>See</u> <u>Matsushita</u>, 475 U.S. at 588 ("[A]ntitrust law limits the range
of permissible inferences from ambiguous evidence in a § 1 case."); <u>see</u> <u>also</u> <u>Baby</u>
<u>Food</u>, 166 F.3d at 124 ("The extent of what constitutes a reasonable inference in
the context of an antitrust case, however, is somewhat different from cases in other
branches of the law.").

---

[18] At oral argument, plaintiffs' counsel inventively portrayed the evidence as
follows:

> It  goes on a spectrum from we were aware that there was
> coordination in Canada and didn't put a stop to it because
> it helped us to coordinate our prices in the United States
> . . . and when you have that kind of conduct by the U.S.
> executives who have pricing authority, that kind of
> awareness at a minimum, and that kind of direction at a
> maximum, I think a jury can easily conclude, as Dr.
> Vellturo points out, that they use Canada as a facilitating
> device. That is they used it to shape the expectations of
> U.S. executives that pricing should be followed.

(Tr. at 83:15-84:5; also id. at 90:15-22 ("You have the U.S. executives at a minimum
aware of what's going on in Canada and at a maximum directing it, and Dr. Vellturo
says that is a perfect facilitating device to give comfort to, give assurances that U.S.
price increases would be followed.")).

Consequently, for a jury to accept and rely upon plaintiffs' theory that the
Canada conspiracy "actuated" domestic collusion, it would need to make an
inferential quantum leap: that a general awareness of competitive activity among
foreign subsidiaries necessarily translates to knowledge of unlawful activities as
well. Lawful sharing of competitive intelligence among subsidiaries, however, is
plainly "conduct [as] consistent with permissible competition as with illegal
conspiracy,"  and the actuation inference suggested by plaintiffs is clearly not
within "the range of acceptable inferences" the court may derive from plaintiffs'
evidence. See Baby Food, 166 F.3d at 124 (quoting Matsushita, 475 U.S. at 588).  The
same is true of the routine communications and introductions between competitors
cited  by counsel.  See id. ("Communications between competitors do not permit an
inference of an agreement to fix prices unless those communications rise to the
level of an agreement, tacit or otherwise.").  Consequently, Dr. Vellturo's opinion
fails not as a matter of theory, but for the complete lack of factual evidence in the
summary judgment record which would substantiate its application to this case.

The record is devoid of evidence tending to establish *any* tie between the
Canadian trade spend conspiracy and the lock step price increases in the United

States.[19]  Specifically, there is no reasonable inference to be derived from the record that defendants were aware of the Canadian trade spend conspiracy at the time of the 2002 price increase, nor at any point thereafter; thus, there is no substantive factual support for the experts' contention that the Canadian trade spend agreement motivated or encouraged any pricing action domestically.  The absence of any record evidence supporting an inference of actuation compels the court to

---

[19] The development of a thorough summary judgment record has illuminated and underscored material differences between what occurred in Canada and what plaintiffs allege *sub judice*.  The Canadian conduct involved concerted managerial efforts to curb transaction-level trade spend promotional practices.  (See Doc. 1296-1 at 12-15).  In contrast, the domestic conduct challenged by plaintiffs pertains to three list pricing decisions.  The Canadian and domestic behaviors are fundamentally distinct, and plaintiffs do not point to any relevant similarities which would be probative of plaintiffs' claims. Given this further attenuation, the evidence does not support the inference urged by plaintiffs:  that the initial success of a *trade spend* conspiracy in Canada assured the defendants that a domestic *price-fixing* conspiracy would succeed.  For this additional reason, the court rejects plaintiffs' actuation theory as applied to this case.

conclude that the existence of a Canadian trade spend conspiracy lends *no* support

to plaintiffs' claims of anticompetitive conduct in the United States.[20]

### b.   **Advanced Knowledge**

Plaintiffs point to a handful of internal documents indicating that defendants

were aware of—or at least anticipated—their competitor's price increases before

those increases were made public.  This evidence includes: (1) an undated,

unsigned chronology from Hershey's files indicating that an employee discovered

that Mars was "considering a price increase due to rising cocoa costs" in September

of 2002 (Doc. 1266-8 at 8243); (2) a December 20, 2004 email from Hershey chief

executive officer Richard Lenny ("Lenny") to the Hershey Board indicating that

Hershey had "received confirmation that both Mars and Nestlé have also raised

their prices on loose bars" after Hershey and Mars had increased their prices but

before Nestlé had issued its trade announcement (Doc. 1266-5 at 0092); (3) a

February 21, 2007 email from Mars' president observing, with regard to price

---

[20] Plaintiffs emphasize that this court has previously ruled that their
allegations with respect to domestic market conditions contemporaneous with the
explicit collusion in Canada "raise an inference of plausibility [of concerted action]
when juxtaposed with parallel conduct."  (Doc. 1296 at 90 (quoting *In re* Chocolate
Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576 (M.D. Pa. Mar. 4, 2009)).
Plaintiffs accurately cite this court's holding.  That decision, however, was
rendered at the Rule 12(b)(6) stage, when plaintiffs' allegations of executive-level
communications between the defendants and their Canadian counterparts *with
respect to pricing* were assumed true.  See *In re* Chocolate, 602 F. Supp. 2d at 555
(noting that the court must accept plaintiffs' factual allegations as true at Rule 12
stage).  Plaintiffs cannot simply fall back on the court's Rule 12 determination to
cure the infirmities in the present Rule 56 record.  Plaintiffs must now produce
record evidence tending to establish that the allegations upon which the court
earlier relied are true.

increase proposal, that "[Hershey] will most definately [sic] follow given their poor

earnings" (Doc. 1266-6 at 9967-68); and (4) an internal April 2007 email between

Nestlé employees reacting to Hershey's price announcement in which a Nestlé

manager responds by writing: "It's about time . . . did our [sales department

bulletin] go out?" (Doc. 1266-7 at 8091-92).  Plaintiffs posit that this evidence is

sufficient to permit a jury to find that "there was direct communication concerning

a price increase in the United States" among defendants.  (Doc. 1296 at 91).  Baby

Food is instructive with respect to this evidence, and both parties contend that its

guidance supports their position.

    In Baby Food, the Third Circuit panel addressed the issue of whether

advanced knowledge of a competitor's pricing announcements suffices to permit an

inference that the competitors had conspired to fix prices.  At summary judgment,

the Baby Food plaintiffs presented evidence that defendants' sales representatives

would frequently obtain competitive information from one another.  Baby Food,

166 F.3d at 119.  The sales managers directed and encouraged this exchange of

information.  Id. (observing that company policy required "sales representatives to

gather and report pricing information of their competitors").  Plaintiffs also

produced evidence that on at least six occasions, the defendants obtained—and

failed to explain their possession of—notice of competitors' price increases well in

advance of publicized trade announcements.  Id. at 119-20.  Notwithstanding the

defendants' admitted possession of competitors' price announcements and other

internal documents reflecting advanced notice, the district court concluded that the

50

plaintiffs' case was "sorely lacking" any evidence tending to establish a tacit or

express agreement to fix prices and granted summary judgment for the defendants.

Id. at 117.

The Third Circuit agreed with the district court on appeal.  Rejecting the

plaintiffs' contention that advanced possession of competitive price information

permits an inference of a "pervasive exchange of confidential information," the

panel wrote:

> We have previously held that communications between
> competitors do not permit an inference of an agreement to
> fix prices unless 'those communications rise to the level of
> an agreement, tacit or otherwise.' Gathering competitors'
> price information can be consistent with independent
> competitive behavior. . . . We do not believe that the mere
> possession of competitive memoranda is evidence of
> concerted action to fix prices. In a highly competitive
> industry, as is the baby food industry, it makes common
> sense to obtain as much information as possible of the
> pricing policies and marketing strategy of one's competitors.

Id. at 126 (citing Wallace v. Bank of Bartlett, 55 F.3d 1166, 1169 (6th Cir. 1995)

(exchange of price information insufficient to infer concerted action)); Alvord-Polk,

37 F.3d at 1013 (same); Market Force, Inc., v. Wauwatosa Realty Co., 906 F.2d 11677,

1173 (7th Cir. 1990) (same); Stephen Jay Photography Ltd. v. Olan Mills, Inc., 903

F.2d 988, 996 (4th Cir. 1990) (same); Amey, Inc. v. Gulf Abstract & Tile, Inc., 758

F.2d 1486, 1505 (11th Cir. 1985) (same)).

Plaintiffs at bar have failed to distinguish Baby Food in any meaningful

way and, viewed objectively, plaintiffs' evidence is even less compelling. First, in

contrast to Baby Food, plaintiffs have produced no evidence tying defendants'

advanced notice to their competitors.  More critically, plaintiffs offer no evidence

beyond their own speculation to controvert defendants' explanations as to the

sources of the "notice" they possessed.  With respect to Hershey's 2002 internal

timeline indicating that it had "learned" that Mars was considering an increase

and its 2004 email indicating that Nestlé had increased prices before Nestlé's

announcement was public, Hershey has produced evidence that the information

came from market sources.  (Doc. 1256-9 at 7321 (contemporaneous 2002 internal

presentation indicating that third party cocoa suppliers have predicted  that Mars

will increase prices); Doc. 1323, Ex. A, at ¶¶ 3-5 (former vice president of customer

marketing declaring that increase notice came from customers, not competitors)).

Dr. Tollison acknowledges that no record evidence controverts this proof.  (Tollison

Dep. 118:3-8 (noting that no record evidence indicates that Hershey received

information from Nestlé and not customers)).  Defendants' position with respect to

widespread leaks of price information in the market is corroborated by plaintiffs'

evidence, which demonstrates that a named plaintiff was aware of price increases

prior to official trade announcements.  (See, e.g., Doc. 1320-2 at 3385 (document

indicating that plaintiff Konop Companies advised customers of price increase

prior to announcement)).

　　In sharp contrast to plaintiffs' conspiracy speculations, the record reveals

that defendants were frequently surprised by both the timing and amounts of their

competitors' increases.  (See, e.g., Doc. 1225-7 at 9883 (contemporaneous Mars

document noting intent to "potentially disrupt distracted competition" with

pricing); <u>see</u> <u>also</u> Gamgort Dep. 117:10-118:15 (emphasizing element of surprise in pricing)).  Given the dearth of evidence tending to prove the exchange of price information, let alone an agreement to fix prices, the court is compelled to follow the sound guidance of <u>Baby Food</u> and hold that the meager evidence of advanced pricing information, without more, is as consistent with independent business conduct as conspiracy to fix prices.  It is therefore insufficient to establish an inference of antitrust liability. <u>See</u> <u>Baby Food</u>, 166 F.3d at 126.

### c.    <u>Opportunities to Collude</u>

Lastly, plaintiffs assert that defendants' executives with pricing authority had numerous opportunities to conspire proximate to the 2002, 2004, and 2007 price increases.  Specifically, plaintiffs contend that high level trade association contacts predating price increases in 2004 permit the inference that defendants' executives either offered pricing information to one another, a notion wholly unsupported by the record, or that defendants agreed to conspire during those meetings.  (Doc. 1296 at 91-92; Doc. 1454 at 50-51).  Defendants observe that there is nothing abnormal about regular interaction of competitors, especially in the context of trade association meetings, and that these events cannot support an inference of conspiracy.  (Doc. 1402 at 15-18; Doc. 1401 at 19-20; Doc. 1422 at 13-16).  Once more, the case law and the facts of record align with defendants.

The Third Circuit and other appellate courts have routinely held that mere opportunities to conspire, like evidence of motive or market factors, are insufficient to establish an inference of conspiracy.  <u>See</u>, <u>e.g.</u>, Baby <u>Food</u>, 166 F.3d at 133 (citing

Petruzzi, 998 F.2d at 1242 n.15) ("[E]vidence of social contacts and telephone calls among representatives of the defendants was insufficient to exclude the possibility that the defendants acted independently."); Tose v. First Penn. Bank, N.A., 648 F.2d 879, 894 (3d Cir. 1981) ("Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place."); Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 473 (3d Cir. 1985) ("Evidence of an opportunity to conspire . . . is not enough to sustain an antitrust plaintiff's burden, and, without more, does not create a jury question on the issue of concerted action."); see also Am. Chiro. Ass'n v. Trigon Healthcare, 367 F.3d 212, 227 (4th Cir. 2004) (holding that "mere contacts and communications, or the mere opportunity to conspire . . . is insufficient evidence of an anticompetitive conspiracy"); Weit v. Continental Ill. Nat'l Bank & Trust Co., 641 F.2d 457, 462 (7th Cir. 1981) (observing that "the mere opportunity to conspire, even in the context of parallel business conduct, is not necessarily probative evidence").

The evidence presented by plaintiffs shows only that several top executives from the defendant manufacturers were among hundreds of other attendees at a Grocery Manufacturers Association trade meeting in June of 2004—plaintiffs have not discovered anything more insidious.  (Vellturo Rep. at ¶¶ 130 (noting officers attendance at the trade meeting); Vellturo Dep. 321:1-20 (testimony of Dr. Vellturo indicating that he is not aware of any illegitimate communications between defendants' officers during trade meeting)).  Plaintiffs' expert, Dr. Tollison, is unable to point to anything beyond his own speculation to establish that

defendants' executives discussed collusive price increases at trade shows.  (Doc.

1395, Tollison Dep. 251:6-15 (conceding that there is not "any evidence . . . that

[defendants'] representatives . . . took advantage of the opportunity to talk at any

trade association" with the exception of a discussion regarding "substitution of

vegetable oil for animal fat").  The court rejects the suggestion that the

contemporaneous presence of defendants' officers at a trade association meeting

permits an inference of conspiracy.  This suggestion is pure conjecture, and it is

insufficient to carry plaintiffs' summary judgment burden. <u>See</u>, <u>e.g.</u>, <u>Baby Food</u>, 166

F.3d at 133; <u>Petruzzi</u>, 998 F.2d at 1242 n.15; <u>Tose</u>, 648 F.2d at 894; <u>Fragale</u>, 760 F.2d

at 473.  Limited evidence of opportunities to conspire is not a plus factor enhancing

the plausibility of plaintiffs' claims.[21]

---

[21] In previous submissions, plaintiffs have claimed that a proposed sale of
Hershey to Nestlé S.A. (in addition to a licensing agreement between those parties)
created ample opportunities to conspire. (<u>See</u> Doc. 421 at ¶ 104(g)).  This argument
is notably absent from plaintiffs' Rule 56 submissions, suggesting that the theory
has been abandoned. (<u>See</u> Doc. 1296 at 91 (failing to respond to defendants'
argument with respect to licensing agreement or Hershey sale theories); Doc. 1454
at 50-52 (same)).  In the exercise of caution, the court notes that plaintiffs have
adduced no additional evidence tending to establish that a conspiratorial
agreement flowed from otherwise ordinary and legitimate business contacts. <u>See</u>,
<u>e.g.</u>, <u>Baby Food</u>, 166 F.3d at 133; <u>Petruzzi</u>, 998 F.2d at 1242 n.15; <u>Tose</u>, 648 F.2d at
894; <u>Fragale</u>, 760 F.2d at 473.

### 4.    *Record as a Whole*

In final reply to defendants' measured responses, plaintiffs urge the court to consider the record as a whole and to refrain from parsing individual pieces of evidence or weighing each separately.  (<u>See</u> Doc. 1296 at 63).  The court is fully cognizant of the Third Circuit's mandate to view the record as a whole, and it is with this precept in mind that the court has considered each of the conspiracy allegations lodged by plaintiffs.  <u>See</u> <u>Baby Food</u>, 166 F.2d at 124 (admonishing that district courts in antitrust cases must be careful not to compartmentalize evidence and instead consider whether the totality of the record "tends to exclude the possibility that the alleged competitors acted independently"); <u>see</u> <u>also</u> <u>Big Apple</u> <u>BMW</u>, 974 F.2d at 1364 ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.").  Nonetheless, whether considered individually or collectively, the record evidence inexorably leads to one conclusion: plaintiffs have adduced *no evidence* tending to exclude the possibility that defendants acted independently.

Despite slight variations in fact which, ultimately, favor defendants, the litigation before the court is conceptually indistinguishable from <u>Baby Food</u> as it pertains to plus factor evidence in circumstantial antitrust cases.  In the end, despite exhaustive and comprehensive discovery, hundreds of depositions, the

production of thousands of documents, and the tireless efforts of all counsel,[22] the record *sub judice* is devoid of evidence—direct or circumstantial, individually or *in toto*—that shows the "reciprocal exchange of information by any executive of the defendants with price-fixing authority."  Baby Food, 166 F.3d at 137.  Ultimately, the burden is on plaintiffs to put forth evidence reasonably tending to prove that defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective."  Monsanto Co., 465 U.S. at 764 (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3d Cir. 1980)).  And this plaintiffs have failed to do.

**VI.**   **Conclusion**

Initially, plaintiffs' claims of a domestic price-fixing conspiracy were quite plausible.  The Canadian trade spend conspiracy raised the specter of Sherman Act violations in our contiguous marketplace.  Litigation and merits discovery properly ensued.  But, at the end of the day, the *probata* could not match the *allegata*.

Despite diligent efforts on the part of plaintiffs' counsel and nearly unfettered access to defendants' records, plaintiffs are before the court with nothing more than speculation as to the who, what, when, where, and how of the communications that allegedly facilitated the parallel price increases.  Nothing scandalous or improper has been discovered within our borders, and no evidence permits a reasonable inference of a price-fixing agreement.  Plaintiffs offer no meaningful arguments or

---

[22] The court again commends counsel for their exemplary and diligent efforts throughout all phases of this litigation.

evidence to counter defendants' legitimate business explanations for the parallel price increases.  Accordingly, the court cannot but conclude that defendants' conduct is "as consistent with permissible competition as with illegal conspiracy." <u>Matsushita</u>, 475 U.S. at 594. In such circumstances, liability does not and cannot follow.

For all of the reasons articulated herein, the court concludes that summary judgment in favor of all defendants is warranted on the Section 1 antitrust claims of both the individual purchaser plaintiffs and the direct purchaser class and will thus grant defendants' motions.  An appropriate order follows.

<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      February 26, 2014